# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **JANE DOE, A.W., a pseudonym,** | ) | **CASE NO.:** _____ |
| c/o Levy Konigsberg, LLP | ) | |
| 800 Third Avenue, 33rd Floor | ) | |
| New York, New York 10158 | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| c/o Stinar Gould Grieco & Hensley | ) | Assigned Judge: |
| 101 North Wacker, Suite 100 | ) | The Honorable _____ |
| Chicago, Illinois 60606 | ) | |
| | ) | |
| **JANE DOE, T.H., a pseudonym,** | ) | |
| c/o Levy Konigsberg, LLP | ) | |
| 800 Third Avenue, 33rd Floor | ) | |
| New York, New York 10158 | ) | |
| | ) | |
| c/o Stinar Gould Grieco & Hensley | ) | |
| 101 North Wacker, Suite 100 | ) | |
| Chicago, Illinois 60606 | ) | |
| | ) | |
| **JOHN DOE, T.B., a pseudonym** | ) | |
| c/o Bailey Glasser, LLP | ) | |
| 210 West Division Street | ) | |
| Maryville, Illinois 62062 | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **KENNETH C. MONTAGUE, JR.** | ) | |
| In his official capacity as former | ) | |
| Maryland Secretary of Juvenile | ) | |
| Services | ) | |
| (2003 – 2007), | ) | |
| | ) | |
| **DONALD W. DEVORE,** | ) | |
| In his official capacity as former | ) | |
| Maryland Secretary of Juvenile | ) | |
| Services | ) | |

(2007 – 2011),                            )
                                          )
**SAM ABED**                              )
In his official capacity as former        )
Maryland Secretary of Juvenile            )
Services                                  )
(2011 – 2023),                            )
                                          )
**VINCENT N. SCHIRALDI**                  )
In his official capacity as               )
Maryland Secretary of Juvenile            )
Services                                  )
(2023 – current),                         )
                                          )
**TERRA HARRIS**                          )
In her official capacity as former        )
Superintendent of the Thomas J.           )
Waxter Children's Center                  )
(through 2018),                           )
                                          )
**LISA STEEPLE**                          )
In her official capacity as former        )
Superintendent of the Thomas J.           )
Waxter Children's Center                  )
(2018 – 2022),                            )
                                          )
**JOHN DOE 1 (A.W. ABUSER)**              )
In his official and individual            )
capacities as a former Guard of the       )
Thomas J. Waxter Children's Center,       )
                                          )
**JOHN DOE 2 (T.H. ABUSER)**              )
In his official and individual            )
capacities as a former Guard of the       )
Thomas J. Waxter Children's Center,       )
                                          )
**JOHN DOE 3 (T.B. Abuser 1)**            )
In his official and individual            )
capacities as a Guard at the Charles      )
H. Hickey, Jr. School                     )

**JOHN DOE 4 (T.B. Abuser 2)**                              )
In his official and individual                             )
capacities as a Guard at the Charles                       )
H. Hickey, Jr. School,                                     )
                                                           )
**JOHN DOE SUPERVISORS 1-5**                               )
In their official and individual                           )
capacities as Supervisors at the                           )
Thomas J. Waxter  Children's                               )
Center,                                                    )
                                                           )
**JOHN DOE SUPERVISORS 6-10**                              )
In their official and individual                           )
capacities as Supervisors at the                           )
Charles H. Hickey, Jr. School,                             )
                                                           )
                    Defendants.                            )

_____

## <u>COMPLAINT</u>

Plaintiffs Jane Doe, A.W, Jane Doe, T.H., and John Doe, T.B., by and through their undersigned counsel, file this Complaint against Defendants Kenneth C. Montague, Donald W. Devore, Sam Abed, Vincent N. Schiraldi, Terra Harris, John Doe 1 (A.W. Abuser), and John Doe 2 (J.R. Abuser), seeking all damages recoverable under the applicable law. In support of this action, Plaintiffs aver as follows:

1.     For generations, Maryland's juvenile detention system has subjected the State's most vulnerable children to unthinkable sexual abuse. Despite years of widespread reports, federal and state investigations, and public demands to close the

3

State's various prison-like facilities, the State of Maryland has long allowed a culture of sexual brutalization and abuse to flourish in its juvenile detention system.

2.      The Thomas J.S. Waxter Children's Center ("Waxter") in Prince George's County was a detention facility for vulnerable youth. Established in the early 2000s, Waxter was designed to provide a structured environment for at-risk youth with rehabilitation and other support services.

3.      Waxter's mission was to help at-risk youth grow and mature, with an emphasis on education and life skills—yet the very system that was in place to protect them wholly failed to do so and in-fact broke them.

4.      In 2006, an exposé in The Washington Post and The Baltimore Sun revealed that abuse and systemic neglect had become standard practice at Maryland's juvenile facilities. Something was clearly very wrong in the facilities run by the state, which served our most troubled and traumatized youth.[1]

5.      In 2007, many of the system's palpable failures were so bad that Maryland's Justice Monitoring Unit issued a Special Report demanding the closure of Waxter.[2] It noted that the facility was not safe, decent, or rehabilitative.

---

[1] *See* https://www.washingtonpost.com/archive/local/2006/05/24/state-centers-still-beset-by-problems-report-says/38357e44-2647-4399-b700-08b580276f93/ (last viewed June 4, 2025); *see also* https://www.baltimoresun.com/2006/05/11/dont-touch-me-get-off-my-stomach/ (last viewed June 4, 2025).

[2] *See* https://www.marylandattorneygeneral.gov/JJM%20Documents/WaxterSpecial3_22_07.pdf (last viewed June 4, 2025).

6.     In 2009, The Daily Record shared a shocking number of suicide attempts and mental health crises among youth in Waxter.[3] The children who were being held there were dealing with significant mental health issues, and due to the high number of incidents, it was clear they were not receiving the proper attention they needed quickly enough.

7.     In 2016, The Baltimore Sun reported that female kids in Maryland were more likely to be brought before a judge for small transgressions like disobeying their parents, breaking curfew, or running away, and that they were disproportionately imprisoned for low-level offenses.[4] Additionally, half of the 330 reported suicide attempts and suicide ideations that occurred in all of Maryland's juvenile facilities in 2015 occurred at Waxter.

8.     By 2022, the center was finally closed, as policy and other discussions changed about how we should or might house—if at all—youth in the future.[5]

9.     The Charles H. Hickey, Jr. School ("CHS") in Baltimore County, Maryland, has long been a notorious hotbed of sexual abuse. Contrary to the name,

---

[3] *See* https://thedailyrecord.com/2009/12/22/critics-call-for-closure-of-detention-facility-for-girls/ (last viewed June 4, 2025).
[4] *See* https://www.baltimoresun.com/2016/12/16/lost-girls-young-women-face-harsher-punishment-in-marylands-juvenile-justice-system/ (last viewed June 4, 2025).
[5] *See* https://cnsmaryland.org/2023/10/24/juvenile-services-department-to-move-detained-girls-again/ (last viewed June 4, 2025).

CHS is not a school, but a prison-like juvenile detention center operated by the State of Maryland.

10.    For decades, survivors and witnesses have reported abuses, pointing to a long-standing pattern of mistreatment and negligence within the facility.[6] Investigations into CHS suggest deeply ingrained problems in the administration's handling of staff conduct, as well as an utter failure to implement proper protocols that would safeguard children from harm.

11.    In the early 2000s, male inmates reported that officers at the school would break into their cells at night and beat and sexually assault them.[7] Survivors recounted incidents in which employees, who were supposed to keep them safe, instead turned into their abusers, frequently causing injuries serious enough to require medical care.

12.    Multiple instances of sexual abuse, involving both staff and other detainees, were documented by the Department of Justice ("DOJ").[8] The DOJ found that CHS staff frequently ignored signs of sexual abuse and failed to intervene

---

[6] *See* https://www.cbsnews.com/baltimore/news/dozens-of-people-file-lawsuits-alleging-abuse-in-marylands-juvenile-detention-centers/ (last viewed on June 4, 2025).

[7] *See* https://www.justice.gov/sites/default/files/crt/legacy/2010/12/15/cheltenham_md.pdf (last viewed June 4, 2024).

[8] *Id.*

effectively. In several reported cases, detainees were sexually assaulted by peers while staff either turned a blind eye or stood by and watched.

13.    The DOJ investigation highlighted a consistent failure by CHS staff to report instances of sexual abuse to authorities. This lack of response emboldened abusers and created a climate of fear, where victims were often too intimidated to come forward.

14.    Consistently over time, there were additional allegations of staff members engaging in inappropriate sexual conduct with detainees, often under the guise of disciplinary actions or private meetings. These incidents were rarely documented, and when reported, staff often faced minimal repercussions, perpetuating a cycle of abuse.

15.    The DOJ also documented cases where detainees were left unsupervised for extended periods, leading to instances of sexual assault among youth. Staff, in some cases, were found asleep or absent during shifts, which allowed these assaults to occur unchallenged and unchecked.

16.    Plaintiffs in this action are three individuals, two of whom were confined at Waxter, and one at CHS. As children, each was sexually brutalized and abused by guards and other staff members.

17.    Similar abuse of children at Maryland's juvenile detention facilities continues to this day.

18.    As children of various ages, Plaintiffs were in the custody of Defendants at Waxter and CHS.

19.    While at Waxter and CHS, Plaintiffs were subjected to sexual abuse, including sexual touching, coercion, and forcible rape, by various staff members employed by or acting under the color of state law and the authority of various Defendants.

20.    The sexual abuse endured by Plaintiffs at the hands of Defendants was part of a culture of abuse at Maryland's juvenile detention facilities that has been well-documented and known to Defendants for decades.

21.    Defendants fostered, permitted, and perpetuated this culture of sexual abuse and allowed it to flourish, and failed to protect the children in their custody, including Plaintiffs.

22.    Plaintiffs suffered physical, emotional, and psychological trauma, leading to significant anguish and distress that they will be forced to live with for the rest of their lives.

23.    Defendants' conduct, which occurred while in their official capacities, was at all material times the essence of conscious shocking, reckless, and callously indifferent.

24.    On a moment-to-moment basis, individually and collectively, Defendants treated Plaintiffs like commodities; like animals; like something far less than human.

25.    Defendants' conduct was motivated by evil motive and sinister intent and was so reckless or callous that it disregarded Plaintiffs' constitutional rights.

26.    As set forth in greater detail below, Plaintiffs assert claims under 42 U.S.C. §1983 for violation of their right to bodily integrity and for the state created danger born out of Defendants' conscious shocking conduct.

## PARTIES

27.    Plaintiff Jane Doe, A.W., is a 20-year-old female resident of Baltimore County, Maryland. At all times relevant to the wrongful conduct complained of herein, Plaintiff Jane Doe, A.W., was a minor in the legal and physical custody of Defendants in the State of Maryland. As a result, Plaintiff Jane Doe, A.W. suffered damages in the State of Maryland.

28.    Plaintiff Jane Doe., T.H., is a 20-year-old female resident of Baltimore County, Maryland. At all times relevant to the wrongful conduct complained of herein, Plaintiff Jane Doe, T.H., was a minor in the legal and physical custody of Defendants in the State of Maryland. As a result, Plaintiff Jane Doe, T.H., suffered damages in the State of Maryland.

29.     Plaintiff John Doe, T.B., is a 20-year-old male resident of Harford County, Maryland. At all times relevant to the wrongful conduct complained of herein, Plaintiff John Doe, T.B., was a minor in the legal and physical custody of Defendants in the State of Maryland. As a result, Plaintiff John Doe, T.B., suffered damages in the State of Maryland.

30.     Defendant Kenneth C. Montague, Jr. ("Montague") was the Acting Secretary of Juvenile Justice for the State of Maryland from January 15, 2003, through March 4, 2003. Defendant Montague officially became the Secretary of Juvenile Services for the State of Maryland and a member of the Governor's Executive Council on July 1, 2003, and served in that capacity until January 17, 2007.

31.     Additionally, Defendant Montague held a wide range of posts within state government where he was on the frontline of receiving and in a position to implement policies to combat rampant sexual abuse of minors in state custody, that undoubtedly would have saved Plaintiffs from the sexual brutalization they endured at the hands of the State, *to wit:*

(a)     Defendant Montague served as the Chairman of the Task Force to Study Alternative Living Arrangements for Children in Out-of-Home Placement and was a Member of the Drug and Alcohol Council from 2003 through 2004;

(b)    Defendant Montague served on the Task Force to Study the Mentoring and Monitoring of Children in the Custody of or under the Supervision of the Department of Juvenile Services between 2003 and 2004;

(c)    Defendant Montague served on the Governor's Workforce Investment Board between 2003 and 2004;

(d)    Defendant Montague was on the Sub-Cabinet for Children, Youth, and Families between 2003 and 2005;

(e)    Defendant Montague participated in the Cabinet Council on Criminal and Juvenile Justice between 2003 and 2005;

(f)    Defendant Montague was a Member of the State Commission on Public Safety Technology and Critical Infrastructure between 2003 and 2005;

(g)    Defendant Montague was a Member of the Cease Fire Council between 2003 and 2007;

(h)    Defendant Montague was a Member of the State Child Fatality Review Team between 2003 and 2007;

(i)    Defendant Montague was a Member of the Correctional Training Commission between 2003 and 2007;

(j)    Defendant Montague served on the Judges, Masters and Juvenile Justice Committee between 2003 and 2007;

(k)    Defendant Montague served on the State Advisory Board for Juvenile Services between 2003 and 2007;

(l)    Defendant Montague served on the Interdepartmental Advisory Committee for Minority Affairs between 2003 and 2007;

(m)    Defendant Montague served on the Maryland School-Based Health Center Policy Advisory Council between 2003 and 2007;

(n)    Defendant Montague served on the Governor's Commission on Service and Volunteerism between 2003 and 2007;

(o)    Defendant Montague served on the State's Attorneys Liaison Committee between 2003 and 2007;

(p)    Defendant Montague was a Member of the State Board of Victim Services between 2003 and 2007;

(q)    Defendant Montague was a Member of the Task Force to Study Criminal Offender Monitoring by Global Positioning Systems, between 2004 and 2005;

(r)    Defendant Montague was a Member of the Governor's Commission on Quality Education in Maryland between 2004 and 2005 and served on the subcommittee on school & community linkages;

(s)     Defendant Montague was a Member of the Coordinating Council for Juvenile Services Educational Programs between 2004 and 2007;

(t)     Defendant Montague served on the Maryland State Drug and Alcohol Abuse Council between 2004 and 2007;

(u)     Defendant Montague was a Member of the Advisory Council for Children between 2005 and 07;

(v)     Defendant Montague served on the Children's Cabinet between 2005 and 2007;

(w)     Defendant Montague was a Member of the Mental Health Transformation Working Group between 2005 and 2007;

(x)     Defendant Montague served on the Delinquency Prevention and Diversion Services Task Force between 2006 and 2007; and

(y)     Defendant Montague served on the Governor's Council on Family Violence Prevention between 2006 and 2007.

32.    From 2003 through 2007, there was no single individual within state government more aware of the rampant sexual abuse taking place in Maryland juvenile detention facilities than Defendant Montague.

33.    From 2003 through 2007, there was no single individual in state government more aware of the life-altering impact on and damages to children resulting from said abuse than Defendant Montague.

34.    From 2003 through 2007, there was no single individual in state government more responsible for creating policies that caused and perpetuated a culture of sexual abuse than Defendant Montague.

35.    From 2003 through 2007, Defendant Montague authorized, instituted, and through his conduct encouraged the malicious conduct within Maryland's juvenile detention system, and was responsible for enhancing a culture of sexual abuse therein, ultimately to the detriment of Plaintiffs.

36.    Between 2003 and 2007, Defendant Montague actively concealed what he knew to be the horrors associated with life in both Waxter and CHS, along with each and every state operated juvenile detention center, ultimately to the detriment of Plaintiffs.

37.    Between 2003 and 2007, Defendant Montague actively protected abusers from consequence for their notorious, rabid sexual violence put upon vulnerable youth in state operated detention facilities across Maryland, to the detriment of the children they were abusing, and ultimately to the detriment of Plaintiffs.

38.    Between 2003 and 2007, Defendant Montague, upon learning of the corrosive culture of rape, sodomy and sexual abuse in state operated juvenile detention facilities, and upon learning that those charged with the day-to-day operations of said facilities were the predominant abusers, sought to protect them and himself to the detriment of thousands of children who were confined in said facilities, and who would become confined to said facilities in the future, including Plaintiffs.

39.    Between 2003 and 2007, Defendant Montague instituted, permitted, endorsed, encouraged, facilitated and condoned the sexual abuse of children in State operated juvenile facilities.

40.    Between 2003 and 2007, Defendant Montague actively employed guards to repeatedly sexually brutalize children in State operated facilities.

41.    Between 2003 and 2007, Defendant Montague's actions caused the corrosive culture to continue and grow exponentially to those that were then confined, and ultimately to the detriment of Plaintiffs.

42.    Defendant Montague was, at all times between 2003 and 2007, acting under color of state law pursuant to 42 U.S.C. §1983, by overseeing, supervising, and having the responsibility of keeping children housed in state operated juvenile facilities safe and secure, in all respects, *in loco parentis*.

43.    Defendant Donald W. Devore ("Devore") was the Acting Secretary of Juvenile Services for the State of Maryland from February 22, 2007, through March 1, 2017. Defendant Devore officially became the Secretary of Juvenile Services for the State of Maryland and a member of the Governor's Executive Council on March 1, 2007, and served in that capacity until January 7, 2011.

44.    Additionally, Defendant Devore held a wide range of posts within state government where he was on the frontline of receiving and in a position to implement policies to combat rampant sexual abuse of minors in state custody, that undoubtedly would have saved Plaintiffs from the sexual brutalization they endured at the hands of the State, *to wit:*

(a)    Defendant was a Member of the Children's Cabinet from 2007 through 2011;

(b)    Defendant Devore was a Member of the Cease Fire Council from 2007 through 2011;

(c)    Defendant Devore was a Member of the State Child Fatality Review Team from 2007 through 2011;

(d)    Defendant Devore was a Member of the State Coordinating Council for Children from 2007 through 2011;

(e)    Defendant Devore served on the Advisory Council to the Children's Cabinet from 2007 through 2011;

(f)     Defendant Devore was a Member of the Correctional Training Commission from 2007 through 2011;

(g)     Defendant Devore was a Member of the Maryland State Drug and Alcohol Abuse Council from 2007 through 2011;

(h)     Defendant Devore served on the Governor's Family Violence Council (formerly Governor's Council on Family Violence Prevention) from 2007 through 2011;

(i)     Defendant Devore was a Member of the Judges, Masters and Juvenile Justice Committee from 2007 through 2011;

(j)     Defendant Devore served on the Coordinating Council for Juvenile Services Educational Programs from 2007 through 2011;

(k)     Defendant Devore was a Member of the Mental Health Transformation Working Group from 2007 through 2011;

(l)     Defendant Devore served on the Interdepartmental Advisory Committee for Minority Affairs from 2007 through 2011;

(m)     Defendant Devore was a Member of the Task Force to Study Prison Violence in Maryland from 2007 through 2011;

(n)     Defendant Devore was a Member of the Maryland School-Based Health Care Policy Advisory Council from 2007 through 2011;

(o)    Defendant Devore was a Member of the Vehicle Theft Prevention Council from 2007 through 2011;

(p)    Defendant Devore served on the State Board of Victim Services from 2007 through 2011;

(q)    Defendant Devore was a Member of the Task Force to Study the Procurement of Health and Social Services by State Agencies from 2008 through 2010;

(r)    Defendant Devore was a Member of the State Council for Interstate Juvenile Supervision from 2009 through 2011;

(s)    Defendant Devore was a Member of the State Advisory Board for Juvenile Services from 2009 through 2011;

(t)    Defendant Devore served on the Task Force on Prisoner Re-entry from 2009 through 2011;

(u)    Defendant Devore was a Member of the Maryland Commission on Suicide Prevention from 2009 through 2011;

(v)    Defendant Devore served on the Board of Directors, Maryland Workforce Corporation, from 2009 through 2011;

(w)    Defendant Devore was a Member of the Task Force to Study the Procurement of Health, Education, and Social Services by State Agencies from 2010 through 2011; and

(x)    Defendant Devore was a Member of the Sexual Offender Advisory Board from 2010 through 2011.

45.    From 2007 through 2011, there was no single individual within state government more aware of the rampant sexual abuse taking place in Maryland juvenile detention facilities than Defendant Devore.

46.    From 2007 through 2011, there was no single individual in state government more aware of the life-altering impact on and damages to children resulting from said abuse.

47.    From 2007 through 2011, there was no single individual in state government more responsible for creating policies that caused and perpetuated a culture of sexual abuse, ultimately to the detriment of Plaintiffs.

48.    From 2007 through 2011, Defendant Devore authorized, instituted, and through his conduct encouraged the malicious conduct within Maryland's juvenile detention system, and was responsible for enhancing a culture of sexual abuse therein, ultimately to the detriment of Plaintiffs.

49.    Between 2007 and 2011, Defendant Devore actively concealed what he knew to be the horrors associated with life in both Waxter and CHS, along with each and every state operated juvenile detention center, ultimately to the detriment of Plaintiffs.

50.     Between 2007 and 2011, Defendant Devore actively protected abusers from consequence for their notorious, rabid sexual violence put upon vulnerable youth in state operated detention facilities across Maryland, to the detriment of the children they were abusing and ultimately to the detriment of Plaintiffs.

51.     During the period between 2007 through 2011, Defendant Devore, upon learning of the corrosive culture of rape, sodomy and sexual abuse in state operated juvenile detention facilities, and upon learning that those charged with the day-to-day operations of said facilities were the predominant abusers, sought to protect them and himself to the detriment of thousands of children who were confined in said facilities, ultimately to the detriment of Plaintiffs.

52.     Between 2007 and 2011, Defendant Devore instituted, permitted, endorsed, encouraged, facilitated and condoned the sexual abuse of children in State operated juvenile facilities.

53.     Between 2007 and 2011, Defendant Devore actively employed guards to repeatedly sexually brutalize children in State operated facilities.

54.     Between 2007 and 2011, Defendant Devore's actions caused the corrosive culture to continue and grow exponentially to the detriment of Plaintiffs.

55.     Defendant Devore was, at all times between 2007 and 2011, acting under color of state law pursuant to 42 U.S.C. §1983, by overseeing, supervising,

having the responsibility of keeping children housed in state operated juvenile facilities safe and secure, in all respects, *in loco parentis.*

56.    Defendant Sam Abed ("Abed") was the Acting Secretary of Juvenile Services for the State of Maryland from February 4, 2011, through March 25, 2011. Defendant Abed officially became the Secretary of Juvenile Services for the State of Maryland and a member of the Governor's Executive Council on March 25, 2011, and served in that capacity until January 18, 2023.

57.    Additionally, Defendant Abed held a wide range of posts within state government where he was on the frontline of receiving and in a position to implement policies to combat rampant sexual abuse of minors in state custody, that undoubtedly would have saved Plaintiffs from the sexual brutalization they endured at the hands of the State, *to wit:*

    (a)    Defendant Abed served on the Children's Cabinet from 2011 through 2023;

    (b)    Defendant Abed was a Member of the Advisory Council to the Children's Cabinet from 2011through 2023;

    (c)    Defendant Abed was a Member of the Governor's Overdose Prevention Council from 2014 through 2015;

    (d)    Defendant Abed was a Member of the Maryland THINK Committee from 2021 through 2023;

(e)     Defendant Abed was the Chair of the Juvenile Justice Reform Council from 2019 through 2021.

(f)     Defendant Abed was a Member of the Mental Health Transformation Working Group in 2011;

(g)     Defendant Abed was a Member of the Maryland Integrated Map Executive Committee from 2011 through 2012;

(h)     Defendant Abed served on the Task Force on Prisoner Re-Entry from 2011 through 2012;

(i)     Defendant Abed was a Member of the Task Force to Study the Procurement of Health, Education, and Social Services by State Agencies from 2011 through 2012;

(j)     Defendant Abed served on the Maryland State Drug and Alcohol Abuse Council from 2011 through 2015;

(k)     Defendant Abed was a Member of the Maryland School-Based Health Center Policy Advisory Council from 2011 through 2015;

(l)     Defendant Abed was a Member of the Board of Directors for the Maryland Workforce Corporation from 2011 through 2016;

(m)     Defendant Abed was a Member of the Criminal Justice Coordinating Council for Baltimore City from 2011 through 2017;

(n)     Defendant Abed was a Member of the Interdepartmental Advisory Committee for Minority Affairs from 2011 through 2017;

(o)     Defendant Abed served on the Cease Fire Council from 2011 through 2023;

(p)     Defendant Abed was a Member of the State Child Fatality Review Team from 2011 through 2023;

(q)     Defendant Abed was a Member of the State Coordinating Council for Children from 2011 through 2023;

(r)     Defendant Abed served on the Correctional Training Commission, from 2011 through 2023;

(s)     Defendant Abed was a Member of the Governor's Family Violence Council from 2011 through 2023;

(t)     Defendant Abed was a Member of the Judges, Masters and Juvenile Justice Committee from 2011 through 2023;

(u)     Defendant Abed served on the Coordinating Council for Juvenile Services Educational Programs from 2011 through 2023;

(v)     Defendant Abed was a Member of the State Council for Interstate Juvenile Supervision from 2011 through 2023;

(w)     Defendant Abed served on the Sexual Offender Advisory Board from 2011 through 2023;

(x)    Defendant Abed was a Member of the Maryland Commission on Suicide Prevention from 2011 through 2023;

(y)    Defendant Abed was a Member of the Vehicle Theft Prevention Council from 2011 through 2023;

(z)    Defendant Abed served on the State Board of Victim Services from 2011 through 2023.

(aa)   Defendant Abed was a Member of the Advisory Board on After-School and Summer Opportunity Programs from 2012 through 2016;

(bb)   Defendant Abed served on the Council for the Procurement of Health, Educational and Social Services from 2012 through 2021;

(cc)   Defendant Abed was a Member of the Task Force to Study Housing and Supportive Services for Unaccompanied Homeless Youth from 2013 through 2014;

(dd)   Defendant Abed served on the Task Force on Juvenile Court Jurisdiction from 2013 through 2014;

(ee)   Defendant Abed was a Member of the Governor's Commission for Effective Community Inclusion of Individuals with Intellectual and Developmental Disabilities from 2013 through 2015;

(ff)    Defendant Abed was a Member of the Juvenile Grant Planning and Review Council from 2013 through 2019;

(gg)    Defendant Abed was a Member of the Interagency Council on Homelessness from 2014 through 2023;

(hh)    Defendant Abed was a Member of the Youth Apprenticeship Advisory Committee from 2014 through 2023;

(ii)    Defendant Abed was a Member of the Justice Reinvestment Coordinating Council from 2015 through 2016;

(jj)    Defendant Abed served on the Work Group to Study Safe Harbor Policy for Youth Victims of Human Trafficking from 2015 through 2019;

(kk)    Defendant Abed was a Member of the Behavioral Health Advisory Council from 2015 through 2023;

(ll)    Defendant Abed was a Member of the Governor's Workforce Development Board from 2015 through 2023;

(mm)    Defendant Abed was a Member of the Task Force to Study the Restraint, Searches, and Needs of Children in the Juvenile Justice System from 2016 through 2017;

(nn)    Defendant Abed was a Member of the Task Force to Combat Habitual Student Truancy from 2016 through 2018;

(oo)    Defendant Abed was a Member of the Commission on the School-to-Prison Pipeline and Restorative Practices from 2017 through 2019;

(pp)    Defendant Abed served on the Interagency Disabilities Board from 2017 through 2023;

(qq)    Defendant Abed was a Member of the Interdepartmental Advisory Committee on Small, Minority, and Women Business Affairs from 2017 through 2023;

(rr)    Defendant Abed served on the Task Force to Study Maryland's Criminal Gang Statutes from 2018 through 2020;

(ss)    Defendant Abed was a Member of the Juvenile Services Education Programs Work Group from 2018 through 2020;

(tt)    Defendant Abed was a Member of the School Safety Subcabinet Advisory Board from 2018 through 2023;

(uu)    Defendant Abed was a Member of the Work Group to Study Shelter and Supportive Services for Unaccompanied Homeless Minors from 2019 through 2020;

(vv)    Defendant Abed served on the Juvenile Justice Reform Council from 2019 through 2021;

(ww) Defendant Abed was a Member of the Maryland Longitudinal Data System Center Governing Board from 2019 through 2023;

(xx) Defendant Abed was a Member of the Two-Generation Family Economic Security Commission from 2020 through 2023;

(yy) Defendant Abed served on the Maryland Consortium on Coordinated Community Supports from 2021 through 23;

(zz) Defendant Abed was a Member of the Juvenile Services Education Board from 2021 through 2023;

(aaa) Defendant Abed was a Member of the Law Enforcement Coordinating Council from 2021 through 2023;

(bbb) Defendant Abed was a Member of the Procurement Improvement Council from 2021 through 2023; and

(ccc) Defendant Abed served on the Commission on Trauma-Informed Care from 2021 through 2023.

58.    From 2011 through 2023, there was no single individual within state government more aware of the rampant sexual abuse taking place in Maryland juvenile detention facilities than Defendant Abed, to the detriment of Plaintiffs.

59.    From 2011 through 2023, there was no single individual in state government more aware of the life-altering impact on and damages to children resulting from said abuse than Defendant Abed, to the detriment of Plaintiffs.

60.    From 2011 through 2023 there was no single individual in state government more responsible for creating policies that caused and perpetuated a culture of sexual abuse than Defendant Abed, to the detriment of Plaintiffs.

61.    Between 2011 and 2023, Defendant Abed authorized, instituted, and through his conduct encouraged the malicious conduct within Maryland's juvenile detention system, and was responsible for enhancing a culture of sexual abuse therein, to the detriment of Plaintiffs.

62.    Between 2011 and 2023, Defendant Abed actively concealed what he knew to be the horrors associated with life in both Waxter and CHS, along with each and every state operated juvenile detention center, to the detriment of Plaintiffs.

63.    Between 2011 and 2023, Defendant Abed actively protected abusers from consequence for their notorious, rabid sexual violence put upon vulnerable youth in state operated detention facilities across Maryland, to the detriment of the children they were abusing, including Plaintiffs.

64.    Between 2011 and 2023, Defendant Abed, upon learning about and knowing of the corrosive culture of rape, sodomy and sexual abuse in state operated juvenile detention facilities, and upon learning that those charged with the day-to-day operations of said facilities were the predominant abusers, sought to protect them and himself to the detriment of thousands of children who were confined in said facilities, including Plaintiffs.

65.    Between 2011 and 2023, Defendant Abed instituted, permitted, endorsed, encouraged, facilitated and condoned the sexual abuse of children in State operated juvenile facilities.

66.    Between 2011 and 2023, Defendant Abed actively employed guards to repeatedly sexually brutalize children in State operated facilities.

67.    Between 2011 and 2023, Defendant Abed's actions caused the corrosive culture to continue and grow exponentially, to the detriment of Plaintiffs.

68.    Defendant Abed was, at all times between 2011 and 2023, acting under color of state law pursuant to 42 U.S.C. §1983, by overseeing, supervising, and having the responsibility of keeping children housed in state operated juvenile facilities safe and secure, in all respects, *in loco parentis.*

69.    Defendant Vincent N. Schiraldi ("Schiraldi") was the Acting Secretary of Juvenile Services for the State of Maryland from January 18, 2023, through March 2, 2023. Defendant Schiraldi officially became the Secretary of Juvenile Services for the State of Maryland and a member of the Governor's Executive Council on March 2, 2023, and served in that capacity until June 10, 2025, when he was forced to resign because of his incompetency in the management of and contribution to the sexual abuse of thousands of children in Maryland juvenile detention facilities.

70.    Additionally, Defendant Schiraldi held a wide range of posts within state government where he was on the frontline of receiving and in a position to

implement policies to combat rampant sexual abuse of minors in state custody, that undoubtedly would have saved Plaintiffs from the sexual brutalization they endured at the hands of the State, *to wit:*

    (a)    Defendant Schiraldi currently serves on the Children's Cabinet, and has since 2023;

    (b)    Defendant Schiraldi currently serves on the Advisory Council to the Children's Cabinet, and has since 2023;

    (c)    Defendant Schiraldi currently serves on the Governor's Inter-Agency Heroin and Opioid Coordinating Council, and has since 2023;

    (d)    Defendant Schiraldi currently serves on the School Safety Subcabinet Advisory Board, and has since 2023;

    (e)    Defendant Schiraldi is a Member of the Maryland THINK Committee, and has been since 2023;

    (f)    Defendant Schiraldi is a Member of the Behavioral Health Advisory Council, and has been since 2023;

    (g)    Defendant Schiraldi serves on the Commission on Behavioral Health Care Treatment and Access, and has since 2023;

    (h)    Defendant Schiraldi is a Member of the Cease Fire Council, and has been since 2023;

(i)     Defendant Schiraldi is a Member of the State Child Fatality Review Team, and has been since 2023;

(j)     Defendant Schiraldi serves on the State Coordinating Council for Children, and has since 2023;

(k)     Defendant Schiraldi is a Member of the Maryland Consortium on Coordinated Community Supports, and has been since 2023;

(l)     Defendant Schiraldi serves on the Correctional Training Commission, and has since 2023;

(m)    Defendant Schiraldi is a Member of the Maryland Cybersecurity Coordinating Council, and has been since 2023;

(n)     Defendant Schiraldi is a Member of the Interagency Disabilities Board, and has been since 2023;

(o)     Defendant Schiraldi has served on the Governor's Family Violence Council, and has since 2023;

(p)     Defendant Schiraldi serves on the Interagency Council on Homelessness, and has since 2023;

(q)     Defendant Schiraldi is a Member of the Judges, Masters and Juvenile Justice Committee, and has been since 2023;

(r)     Defendant Schiraldi is a Member of the Commission on Juvenile Justice Reform and Emerging and Best Practices, and has been since 2023;

(s)     Defendant Schiraldi is a Member of the Juvenile Services Education Board, and has been since 2023;

(t)     Defendant Schiraldi is a Member of the State Council for Interstate Juvenile Supervision, and has been since 2023;

(u)     Defendant Schiraldi serves on the Law Enforcement Coordinating Council, and has since 2023;

(v)     Defendant Schiraldi is a Member of the Maryland Longitudinal Data System Center Governing Board, and has been since 2023;

(w)     Defendant Schiraldi serves on the Procurement Improvement Council, and has since 2023;

(x)     Defendant Schiraldi is a Member of the Sexual Offender Advisory Board, and has been since 2023;

(y)     Defendant Schiraldi is a Member of the Interdepartmental Advisory Committee on Small, Minority, and Women Business Affairs, and has been since 2023;

(z)     Defendant Schiraldi is a Member of the Maryland Commission on Suicide Prevention, and has been since 2023;

(aa)    Defendant Schiraldi is a Member of the Commission on Trauma-Informed Care, and has been since 2023;

(bb)    Defendant Schiraldi is a Member of the Two-Generation Family Economic Security Commission, and has been since 2023;

(cc)    Defendant Schiraldi serves on the Vehicle Theft Prevention Council, and has since 2023;

(dd)    Defendant Schiraldi serves on the State Board of Victim Services, and has since 2023;

(ee)    Defendant Schiraldi serves on the Governor's Workforce Development Board, and has since  2023;

(ff)    Defendant Schiraldi is a Member of the Youth Apprenticeship Advisory Committee, and has been since 2023;

(gg)    Defendant Schiraldi is a Member of the Maryland Council on Innovation and Impact and has been since 2024.

(hh)    Defendant Schiraldi is a Member of the Criminal Justice Coordinating Council, Baltimore City, and has been since 2023.

71.    Since 2023, there has been no single individual within state government more aware of the rampant sexual abuse taking place in Maryland juvenile detention facilities than Defendant Schiraldi.

72.    Since 2023, there has been no single individual in state government more aware of the life-altering impact on and damages to children resulting from said abuse than Defendant Schiraldi.

73.    Since 2023, there has been no single individual in state government more responsible for creating policies that caused and perpetuated a culture of sexual abuse than Defendant Schiraldi.

74.    Since 2023, Defendant Schiraldi has authorized, instituted, and through his conduct encouraged the malicious conduct within Maryland's juvenile detention system, and remains responsible for enhancing a culture of sexual abuse therein.

75.    Since 2023, Defendant Schiraldi has actively concealed what he knows to be the horrors associated with life in both Waxter and CHS, along with each and every state operated juvenile detention center, to the detriment of Plaintiffs.

76.    Since 2023, Defendant Schiraldi has actively protected abusers from consequence for their notorious, rabid sexual violence put upon vulnerable youth in state operated detention facilities across Maryland, to the detriment of the children they are abusing.

77.    Since 2023, Defendant Schiraldi, while being fully aware of the corrosive culture of rape, sodomy and sexual abuse in state operated juvenile detention facilities, and upon learning that those charged with the day-to-day operations of said facilities were the predominant abusers, has sought to protect them

and himself to the detriment of thousands of children who were and remain confined in said facilities.

78.    Since 2023, Defendant Schiraldi instituted, permitted, endorsed, encouraged, facilitated and condoned the sexual abuse of children in State operated juvenile facilities.

79.    Since 2023, Defendant Schiraldi actively employed guards to repeatedly sexually brutalize children in State operated facilities.

80.    Since 2023, Defendant Schiraldi's actions caused the corrosive culture to continue and grow exponentially, to the detriment of Plaintiffs.

81.    Defendant Schiraldi was, at all times between 2011 and 2023, acting under color of state law pursuant to 42 U.S.C. §1983, by overseeing, supervising, and having the responsibility of keeping children housed in state operated juvenile facilities safe and secure, in all respects, *in loco parentis.*

82.    Defendant Terra Harris ("Harris") was the Superintendent at Waxter prior to and during Plaintiff Jane Doe, A.W.'s confinement at Waxter.

83.    Defendant Harris was the Superintendent at Waxter prior to and during Plaintiff Jane Doe, T.H.'s confinement at Waxter.

84.    Prior to and during all relevant periods Defendant Harris served on the Female Population Task Force.

85.    During her time as Waxter Superintendent, there was no single individual within Maryland's juvenile detention system more aware of the rampant sexual abuse taking place at Waxter than Defendant Harris.

86.    During her time as Waxter Superintendent, there was no single individual within Maryland's juvenile detention system more aware of the life-altering impact on and damages to children, including Plaintiffs Jane Doe, A.W. and Jane Doe, T.H., resulting from abuses at Waxter, than Defendant Harris.

87.    During her time as Waxter Superintendent, there was no single individual more responsible for creating policies that caused and perpetuated a culture of sexual abuse at Waxter than Defendant Harris.

88.    During her time as Waxter Superintendent, Defendant Harris authorized, instituted, and through her conduct encouraged the malicious conduct within Maryland's juvenile detention system, in particular at Waxter, and she remains responsible for enhancing a culture of sexual abuse therein.

89.    During her time as Waxter Superintendent, Defendant Harris actively concealed what she knew to be the horrors associated with life at Waxter to the detriment of Plaintiffs.

90.    During her time as Waxter Superintendent, Defendant Harris actively protected abusers from consequence for their notorious, rabid sexual violence put

upon vulnerable youth at Waxter, to the detriment of the children they were abusing, including Plaintiffs Jane Doe, A.W. and Jane Doe, T.H.

91.    During her time as Waxter Superintendent, Defendant Harris, while being fully aware of the corrosive culture of rape, sodomy and sexual abuse at Waxter, and upon learning that those charged with the day-to-day operations of Waxter were predominant abusers, sought to protect them and herself to the detriment of thousands of children who were confined there, including Plaintiffs Jane Doe, A.W. and Jane Doe, T.H.

92.    During her time as Waxter Superintendent, Defendant Harris instituted, permitted, endorsed, encouraged, facilitated and condoned the sexual abuse of children in State operated juvenile facilities.

93.    During her time as Waxter Superintendent, Defendant Harris actively employed guards to repeatedly sexually brutalize children in State operated facilities.

94.    During her time as Waxter Superintendent, Defendant Harris' actions caused and significantly contributed to a corrosive culture of rampant sexual abuse at Waxter, and allowed it to continue and grow exponentially, to the detriment of Plaintiffs, including Plaintiffs Jane Doe, A.W. and Jane Doe, T.H.

95.    During her time as Waxter Superintendent, Defendant Harris was, at all times, acting under color of state law pursuant to 42 U.S.C. §1983, by overseeing,

supervising, and having the responsibility of keeping children housed at Waxter safe and secure, in all respects, *in loco parentis.*

96.    Defendant Lisa Steeple ("Steeple") was the Superintendent at CHS prior to and during Plaintiff John Doe, T.B.'s confinement at CHS.

97.    During her time as CHS Superintendent, there was no single individual within Maryland's juvenile detention system more aware of the rampant sexual abuse taking place at CHS than Defendant Steeple.

98.    During her time as CHS Superintendent, there was no single individual within Maryland's juvenile detention system more aware of the life-altering impact on and damages to children, including Plaintiff John Doe, T.B. resulting from abuses at CHS, than Defendant Steeple.

99.    During her time as CHS Superintendent, there was no single individual more responsible for creating policies that caused and perpetuated a culture of sexual abuse at CHS than Defendant Steeple.

100.    During her time as CHS Superintendent, Defendant Steeple authorized, instituted, and through her conduct encouraged the malicious conduct within Maryland's juvenile detention system, in particular at CHS, and she remains responsible for enhancing a culture of sexual abuse therein.

101.    During her time as CHS Superintendent, Defendant Steeple actively concealed what she knew to be the horrors associated with life at CHS to the detriment of Plaintiffs.

102.    During her time as CHS Superintendent, Defendant Steeple actively protected abusers from consequence for their notorious, rabid sexual violence put upon vulnerable youth at CHS, to the detriment of the children they were abusing, including Plaintiff John Doe, T.B.

103.    During her time as CHS Superintendent, Defendant Steeple, while being fully aware of the corrosive culture of rape, sodomy and sexual abuse at CHS, and upon learning that those charged with the day-to-day operations of CHS were predominant abusers, sought to protect them and herself to the detriment of thousands of children who were confined there, including Plaintiff John Doe, T.B.

104.    During her time as CHS Superintendent, Defendant Steeple's actions caused and significantly contributed to a corrosive culture of rampant sexual abuse at CHS, and allowed it to continue and grow exponentially, to the detriment of Plaintiff John Doe, T.B.

105.    During her time as CHS Superintendent, Defendant Steeple was, at all times, acting under color of state law pursuant to 42 U.S.C. §1983, by overseeing, supervising, and having the responsibility of keeping children housed at CHS safe and secure, in all respects, *in loco parentis.*

106.   Defendant John Doe 1 (A.W. Abuser) was employed by the State of Maryland as a Guard at Waxter during Plaintiff Jane Doe, A.W.'s confinement therein, from approximately 2019 to 2020 when Plaintiff Jane Doe, A.W. was approximately 14 to 15 years old.

107.   While confined at Waxter, Plaintiff Jane Doe, A.W., was in the care, custody, and control of Defendant John Doe 1 (A.W. Abuser).

108.   During her detention at Waxter, Plaintiff Jane Doe, A.W., was subjected to sexual abuse by Defendant John Doe 1 (A.W. Abuser).

109.   At all material times, Defendant John Doe 1 (A.W. Abuser) was in a position of authority and was directly responsible for supervising, and/or providing care to Plaintiff Jane Doe, A.W., during her confinement at Waxter.

110.   On multiple occasions, Defendant John Doe 1 (A.W. Abuser) sexually abused Plaintiff Jane Doe, A.W., by fondling Plaintiff Jane Doe, A.W.'s genitals and digitally penetrating Plaintiff Jane Doe, A.W.'s vagina and anus.

111.   At the relevant times herein, Defendant John Doe 1 (A.W. Abuser) was acting within the course and scope of his employment as a staff member, employee, and/or agent of Defendants at Waxter.

112.   At the relevant times herein, Defendant John Doe 1 (A.W. Abuser) was acting under color of state law pursuant to 42 U.S.C. §1983 by overseeing,

supervising, and being charged with keeping Plaintiff Jane Doe, A.W., safe in all respects, *in loco parentis*.

113.    Defendant John Doe 2 (T.H. Abuser) was employed by the State of Maryland as a Guard at Waxter during Plaintiff Jane Doe, T.H.'s confinement therein, in approximately 2019, when Plaintiff Jane Doe, T.H. was approximately 15 years old.

114.    While confined at Waxter, Plaintiff Jane Doe, A.W., was in the care, custody, and control of Defendant John Doe 2 (T.H. Abuser).

115.    During her detention at Waxter, Plaintiff Jane Doe, T.H., was subjected to sexual abuse by Defendant John Doe 2 (T.H. Abuser).

116.    At all material times, Defendant John Doe 2 (T.H. Abuser) was in a position of authority and was directly responsible for supervising, and/or providing care to Plaintiff Jane Doe, T.H., during her confinement at Waxter.

117.    On multiple occasions, Defendant John Doe 2 (T.H. Abuser) sexually abused Plaintiff Jane Doe, T.H., by forcibly touching and groping her genitals over and under her clothing; forced her to perform oral copulation; and vaginally penetrating her.

118.    At the relevant times herein, Defendant John Doe 2 (T.H. Abuser) was acting within the course and scope of his employment as a staff member, employee, and/or agent of Defendants at Waxter.

119.    At the relevant times herein, Defendant John Doe 2 (T.H. Abuser) was acting under color of state law pursuant to 42 U.S.C. §1983 by overseeing, supervising, and being charged with keeping Plaintiff Jane Doe, T.H., safe in all respects, *in loco parentis.*

120.    Defendant John Doe 3 (T.B. Abuser 1) was employed by the State of Maryland as a Guard at CHS during Plaintiff John, T.B.'s confinement therein, in approximately 2019, when Plaintiff John Doe, T.B. was approximately 14 years old.

121.    While confined at CHS, Plaintiff John Doe, T.B., was in the care, custody, and control of Defendant John Doe 3 (T.B. Abuser 1).

122.    During his detention at CHS, Plaintiff John Doe, T.B., was subjected to sexual abuse by Defendant John Doe 3 (T.B. Abuser 1).

123.    At all material times, Defendant John Doe 3 (T.B. Abuser 1) was in a position of authority and was directly responsible for supervising, and/or providing care to Plaintiff John Doe, T.B., during his confinement at CHS.

124.    On multiple occasions, Defendant John Doe 3 (T.B. Abuser 1) sexually abused Plaintiff John Doe, T.B., by forcing John Doe, T.B., to perform oral copulation on him and then digitally penetrated John Doe, T.B.'s anus.

125.   At the relevant times herein, Defendant John Doe 3 (T.B. Abuser 1) was acting within the course and scope of his employment as a staff member, employee, and/or agent of Defendants at CHS.

126.   At the relevant times herein, Defendant John Doe 3 (T.B. Abuser 1) was acting under color of state law pursuant to 42 U.S.C. §1983 by overseeing, supervising, and being charged with keeping Plaintiff John Doe, T.B., safe in all respects, *in loco parentis.*

127.   Defendant John Doe 4 (T.B. Abuser 2) was employed by the State of Maryland as a Guard at CHS during Plaintiff John, T.B.'s confinement therein, in approximately 2019, when Plaintiff John Doe, T.B. was approximately 14 years old.

128.   While confined at CHS, Plaintiff John Doe, T.B., was in the care, custody, and control of Defendant John Doe 4 (T.B. Abuser 2).

129.   During his detention at CHS, Plaintiff John Doe, T.B., was subjected to sexual abuse by Defendant John Doe 4 (T.B. Abuser 2).

130.   At all material times, Defendant John Doe 4 (T.B. Abuser 2) was in a position of authority and was directly responsible for supervising, and/or providing care to Plaintiff John Doe, T.B., during his confinement at CHS.

131.   On multiple occasions, Defendant John Doe 4 (T.B. Abuser 2) sexually abused Plaintiff John Doe, T.B., by forcing John Doe, T.B., to perform oral copulation on him while digitally penetrating John Doe, T.B.'s anus.

132.   At the relevant times herein, Defendant John Doe 4 (T.B. Abuser 2) was acting within the course and scope of his employment as a staff member, employee, and/or agent of Defendants at CHS.

133.   At the relevant times herein, Defendant John Doe 3 (T.B. Abuser 2) was acting under color of state law pursuant to 42 U.S.C. §1983 by overseeing, supervising, and being charged with keeping Plaintiff John Doe, T.B., safe in all respects, *in loco parentis*

134.   Defendants John Doe Supervisors 1-5 are individuals who were charged with supervising, training, monitoring, and making personnel decisions at Waxter during Plaintiffs Jane Doe, A.W.'s and Jane Doe, T.H.'s confinement therein.

135.   Defendants John Doe Supervisors 1-5 were employed by the State of Maryland as Supervisors at Waxter during Plaintiffs Jane Doe, A.W.'s and Jane Doe T.H.'s confinement therein, from approximately 2019 to 2020.

136.   While at Waxter, Plaintiffs Jane Doe, A.W., and Jane Doe, T.H., were in the care, custody, and control of Defendants John Doe Supervisors 1-5.

137.   During their detention at Waxter, Plaintiffs Jane Doe, A.W., and Jane Doe, T.H, were subjected to sexual abuse by Defendant John Doe 1 (A.W. Abuser)

and John Doe 2 (T.H. Abuser), while said Defendants were being supervised by Defendants John Doe Supervisors 1-5.

138.   At all material times, Defendants John Doe Supervisors 1-5 were in positions of authority and were directly responsible for supervising, and/or providing care to Plaintiffs Jane Doe, A.W. and Jane Doe, T.H., during their confinement at Waxter.

139.   At the relevant times herein, Defendants John Doe Supervisors 1-5 were acting within the course and scope of their employment as supervisors to Defendants John Doe 1 (A.W. Abuser) and John Doe 2 (T.H. Abuser), while they were employed at Waxter.

140.   At the relevant times herein, Defendants John Doe Supervisors 1-5 were acting under color of state law pursuant to 42 U.S.C. §1983 by overseeing and supervising Defendants John Doe 1 (A.W. Abuser) and John Doe 2 (T.H. Abuser), and by being charged with keeping Plaintiffs Jane Doe, A.W., and Jane Doe, T.H., safe in all respects, *in loco parentis*.

141.   Defendants John Doe Supervisors 6-10 are individuals who were charged with supervising, training, monitoring, and making personnel decisions at CHS during Plaintiff John Doe, T.B.'s confinement therein.

142.   Defendants John Doe Supervisors 6-10 were employed by the State of Maryland as Supervisors at CHS during Plaintiff John Doe, T.B.'s confinement therein, in approximately 2019.

143.   While at CHS, Plaintiff John Doe, T.B, was in the care, custody, and control of Defendants John Doe 3 (T.B. Abuser 1) and John Doe 4 (T.B. Abuser 2).

144.   During his detention at CHS, Plaintiff John Doe, T.B. was subjected to sexual abuse by Defendants John Doe 3 (T.B. Abuser 1) and John Doe 4 (T.B. Abuser 2), while said Defendants were being supervised by Defendants John Doe Supervisors 6-10.

145.   At all material times, Defendants John Doe Supervisors 6-10 were in positions of authority and were directly responsible for supervising, and/or providing care to Plaintiff John Doe, T.B., and for training and monitoring Defendant John Doe 3 (T.B. Abuser 1) and John Doe 4 (T.B. Abuser 2), during Plaintiff John Doe, T.B.'s confinement at CHS.

146.   At the relevant times herein, Defendants John Doe Supervisors 6-10 were acting within the course and scope of their employment as supervisors to Defendants John Doe 3 (T.B. Abuser 1) and John Doe 4 (T.B. Abuser 2), while they were employed at CHS.

147.   At the relevant times herein, Defendants John Doe Supervisors 6-10 were acting under color of state law pursuant to 42 U.S.C. §1983 by overseeing and

supervising Defendants John Doe 3 (T.B. Abuser 1) and John Doe 4 (T.B. Abuser 2), and by being charged with keeping Plaintiffs Jane Doe, A.W., Jane Doe, T.H., and John Doe, T.B. safe in all respects, *in loco parentis.*

## JURISDICTION AND VENUE

148.  This is a civil action brought pursuant to 42 U.S.C. § 1983 seeking compensatory damages and punitive damages against Defendants for, among other claims, violations of Plaintiffs' rights, privileges, and immunities secured by the United States Constitution, including the Fourteenth Amendment and federal law.

149.  This Court has subject matter jurisdiction over Plaintiffs' 42 U.S.C. § 1983 claims, pursuant to 28 U.S.C. § 1331, because Plaintiffs' claims arise under the United States Constitution and laws of the United States, 28 U.S.C. §§ 1343(a)(3) and (4), which authorizes federal courts to hear civil rights cases.

150.  Pursuant to 28 U.S.C. §1391(b), venue properly lies before this Court because the cause of action upon which the complaint is based arose in Maryland, which is situated within the vicinage of the United States District Court for the District of Maryland.

## HISTORY AND TOLERANCE OF SEXUAL ABUSE IN MARYLAND STATE JUVENILE DETENTION SYSTEM

151.  For decades, children detained in Maryland juvenile detention facilities have suffered sexual abuse at the hands of guards, counselors, and other agents of

DJS, all while Defendants have had knowledge of, and turned a blind eye to, this culture of abuse.[9]

152.  The sexual abuse at DJS facilities has ranged from inappropriate strip searches to rape using violent physical force. DJS agents have had, and continue to have, inappropriate and criminal sexual relationships with children at DJS facilities,[10] oftentimes involving bribery and grooming.

153.  Children detained in DJS facilities are regularly offered contraband—such as cigarettes, drugs, and alcohol—or privileges in exchange for sexual favors.[11]

154.  The pervasive and persistent abuse, including sexual abuse, at DJS facilities has been publicly reported on for decades,[12] leading to the formation of a

---

[9] *See, e.g.*, U.S. Dep't of Just., Bureau of Justice Statistics, *Sexual Victimization in Juvenile Facilities Reported by Youth, 2008-09* (Jan. 2010), https://files.eric.ed.gov/fulltext/ED508530.pdf.

[10] *See* U.S. Dep't of Just., Civil Rights Division, *Investigation of the Cheltenham Youth Facility in Cheltenham, Maryland, and the Charles H. Hickey, Jr. School in Baltimore, Maryland*, 13 (Apr. 2004), https://www.justice.gov/sites/default/files/crt/legacy/2010/12/15/cheltenham_md.pdf.

[11] *See* U.S. Dep't of Just., *supra* note 2, at 14.

[12] *See, e.g.*, Lan Nguyen, *Sex-Abuse Case Forces CYBA to Review Hiring,* Howard County Sun, May 24, 1992, at 4, https://baltimoresun.newspapers.com/image/173724510/; *Prince George's Nurse Indicted on Sex Charges*, The Sun, Aug. 22, 1991, at B3, https://baltimoresun.newspapers.com/image/375938591/.

task force in 1999[13] and an investigation by the U.S. Department of Justice between 2002 and 2004.[14]

155.    The culture of abuse nonetheless continues to be a reality for children detained in DJS facilities to this day.

156.    Children who are sexually abused in DJS facilities rarely file grievances against staff due to fear of retaliation[15] or knowing that they will not be believed.[16]

157.    Children at DJS facilities know that they cannot trust facility staff, who regularly engage in physical abuse of the children charged to their care.[17]

158.    When they do witness or learn of sexual assaults, staff members at DJS facilities look the other way and allow it to continue.[18]

---

[13] Kate Shatzkin, *Monitors Begin Their Watch at Youth Facilities*, The Sun, Dec. 15, 1999, at 1, https://baltimoresun.newspapers.com/image/173482911/.

[14] *See* U.S. Dep't of Just., *supra* note 3, at 1.

[15] *See* Philip J. Merson, Independent Juvenile Justice Monitor, *Special Report on Conditions/Incidents at the Charles Hickey School*, 1 (May 29, 2003), https://www.privateci.org/private_pics/Hickey.pdf.

[16] *See* Todd Richissin, *Abuse of Teens Persists Despite State's Promises*, The Sun, Nov. 25, 2001, at 9 https://baltimoresun.newspapers.com/image/378208304/ (noting that "prosecutions are rare" and quoting police officer stating that "[y]ou have a group of kids who are locked up for doing some pretty bad things, and . . . they don't make the world's best witnesses").

[17] *See id.* at 1.

[18] *See* Maureen O'Hagan, *Coalition Urges Closing of Md. Youth Facility*, Washington Post, Feb. 23, 2001, https://www.washingtonpost.com/archive/local/2001/02/23/coalition-urges-closing-of-md-youth-facility/3605e311-b90c-4411-b240-b1979ca8f08b/.

159.   DJS facilities operated for decades without adequate instructions or procedures for children to report abuse, necessitating the U.S. Department of Justice's call for implementation of such procedures as part of a settlement with Defendant State in 2005.[19] Sexual abuse at DJS facilities therefore goes severely underreported.

160.   Nonetheless, there is evidence that rates of sexual abuse at DJS facilities are extraordinarily high. In January 2010, the U.S. Department of Justice issued a report studying incidents of sexual abuse at nearly 200 juvenile detention facilities across the country.[20] The study found Maryland facilities to have some of the highest rates of sexual abuse of any facilities in the country, with over 36% of youth at the DJS's Backbone facility reporting sexual abuse, compared to a 12% average for facilities nationwide.[21]

161.   Maryland and its agents, including Defendants, have historically underpaid DJS facility staff,[22] provided inadequate training,[23] hired staff with known criminal histories of abuse against juveniles,[24] and implemented and preserved harmful policies like those allowing staff to perform strip searches on children with

---

[19] *See* U.S. Dep't of Just. & Maryland Settlement Agreement, https://clearinghouse-umich-production.s3.amazonaws.com/media/doc/19513.pdf.
[20] *See* U.S. Dep't of Just., *supra* note 1.
[21] *Id.* at 3-4.
[22] *See* Richissin, *supra* note 8, at 9.
[23] *See id.*
[24] *See* U.S. Dep't of Just., *supra* note 2, at 6.

no reasonable basis[25]—all of which have contributed to the exceptionally high rates of sexual abuse at DJS facilities over the decades.

162.    Defendants were aware that sexual abuse of children by facility staff was a persistent and prevalent problem in their juvenile detention facilities. For decades, Defendants have been made aware of the ongoing sexual abuse of children in their care through the investigations and reports by Defendant State's own task force and by the U.S. Department of Justice, studies by third parties, allegations by children at DJS facilities, and criminal proceedings against their employees and agents.

163.    Documented and publicized abuse, and reports of conditions known to be likely to lead to abuse, at DJS facilities include:

a.    In May 1986, a class action was filed against the State regarding abuse of children at the Montrose School (a juvenile detention facility that closed in 1988), alleging "systematic" mistreatment by staff, including allowing an eleven-year-old child to be raped repeatedly by older boys at the facility;[26]

---

[25] *See* Erica L. Green, *Task Force Calls for Limits on Strip Searches*, The Sun, Dec. 2, 2016, at A15, https://www.newspapers.com/image/263538737/.
[26] *See* Jeffrey A. Butts & Samuel M. Street, *Youth Correction Reform: The Maryland and Florida Experience*, 8 (1988), https://jeffreybutts.files.wordpress.com/1988/07/csyp-md.pdf.

b. In February 1991, a counselor at Cheltenham was found guilty of sexually assaulting a child at the facility;[27]

c. In October 1991, a nurse at Cheltenham was indicted on charges that he sexually abused 16 boys at the facility in the space of less than two weeks;[28]

d. In 1995, a report by the Annie E. Casey Foundation studied conditions at Cheltenham and called the facility one of the worst in the country, with poor training and squalid, overcrowded conditions leading to rampant physical abuse;[29]

e. In July 1999, Cheltenham Superintendent Carlton Richardson was demoted and transferred to another facility after it was discovered that a counselor under his supervision impregnated a teen at the facility;[30]

f. In 1999, the State acknowledged that it had fired seven Cheltenham staff members for assaulting children and, in response to public pressure, instituted a task force to monitor ongoing abuse at the facility;[31]

---

[27] *See* Nguyen, *supra* note 4.

[28] *See* The Sun, *supra* note 4.

[29] *See* Manuel Perez-Rivas, *The Trouble in Youth Detention*, Washington Post, Mar. 22, 2000, https://www.washingtonpost.com/archive/local/2000/03/22/the-trouble-in-youth-detention/56ba2f5c-0b1b-4c5c-81cc-8ceec86fcf3e/.

[30] *See* Todd Richissin, *Head of Juvenile Jail is Demoted*, The Sun, July 17, 1999, https://baltimoresun.newspapers.com/image/172822422/.

[31] *See* Shatzkin, *supra* note 5, at 28.

g.  In December 1999, a supervisor at Maple Run was charged with child abuse, shortly after a governor's task force investigation found a pattern of abuse at that facility and others;[32]

h.  In 2000, at least two guards at VCC were charged with sexually abusing children at the facility;[33]

i.  In May 2000, three guards at Backbone were fired due to rampant physical abuse of children at the facility;[34]

j.  In February 2001, a coalition of public advocacy organizations called for the closure of Cheltenham, citing physical and sexual abuse at the facility;[35]

---

[32] *See*, *Youth Camp Charge Filed; Counselor Accused of Abuse and Assault at Forestry Center; Juvenile Justice Operation; Teenager Tells Police He Was Handcuffed, Dragged in Dirt*, The Sun, Dec. 30, 1999, https://www.baltimoresun.com/1999/12/30/youth-camp-charge-filed-counselor-accused-of-abuse-and-assault-at-forestry-center-juvenile-justice-operation-teen-ager-tells-police-he-was-handcuffed-dragged-in-dirt/.

[33] *See* Richissin, *supra* note 8, at 9.

[34] *See 6 More Fired for Abuse at Boot Camps; 14 Guards Dismissed Since Brutality Allegations Surfaced*, The Sun, May 6, 2000, https://www.baltimoresun.com/2000/05/06/6-more-fired-for-abuse-at-boot-camps-14-guards-dismissed-since-brutality-allegations-surfaced-no-other-choice-officials-say-that-more-terminations-could-be-forthcoming/.

[35] *See* O'Hagan, *supra* note 10.

k.  In November 2001, a report by The Baltimore Sun found at least a dozen reports of sexual assaults by guards against children across the Cheltenham, VCC, and CHS facilities;[36]

l.  In April 2002, a Cheltenham guard was charged with multiple sex crimes after it was discovered that she had had a weeks-long sexual relationship with a child at the facility;[37]

m.  In May 2003, a Special Report by Maryland's Independent Juvenile Justice Monitor found multiple instances of sexual relationships between staff and children at CHS (Defendant Montague was serving as Acting Secretary of Juvenile Justice at this time, and was intimately aware of the findings);[38]

n.  In April 2004, following a two-year investigation, the U.S. Department of Justice issued a report on the conditions at Cheltenham and CHS, finding (among many other forms of abuse and insufficient care) multiple instances of sexual relationships between facility staff and children at the facilities and noting that "the facilities have failed to institute adequate measures to prevent incidents such as these from recurring (Defendant

---

[36] *See* Richissin, *supra* note 8, at 9.

[37] *See Cheltenham Guard is Charged With Sexual Assault*, The Sun, Apr. 12, 2002, https://web.archive.org/web/20210621162546/https://www.baltimoresun.com/news/bs-xpm-2002-04-12-0204120381-story.html.

[38] *See* Merson, *supra* note 7.

Montague was serving as Secretary of Juvenile Services at this time, and was intimately aware of the findings);"[39]

o.  In March 2005, reports emerged about a regular practice by a guard at Noyes forcing children to strip naked and allow the guard and other children to hit them in the groin repeatedly (Defendant Montague was serving as Secretary of Juvenile Services at this time, and was intimately aware of the reports);[40]

p.  In July 2005, the State of Maryland announced that it would be closing CHS due to concerns over conditions and what the State's own governor called "a violation of constitutional rights" and "a living model in what a system should not become;"[41] however, only the treatment center portion of the facility ended up closing, and CHS has continued operating as a detention center to this day (Defendant Montague was serving as Secretary of Juvenile Services at this time, and was intimately aware of the constitutional violations taking place at CHS);

---

[39] *See* U.S. Dep't of Just., *supra* note 3, at 13.
[40] *See* Lynn Anderson, *Abuse Alleged at 2 Juvenile Facilities*, The Sun, Mar. 30, 2005, https://www.baltimoresun.com/maryland/bal-te.md.juvenile30mar30-story.html.
[41] *See* Andrew Green, *Oft-Criticized Youth Facility to be Closed*, The Sun, July 1, 2005, https://www.baltimoresun.com/2005/07/01/oft-criticized-youth-facility-to-be-closed/.

q. In May 2006, investigators for Maryland's Independent Juvenile Justice Monitor witnessed and reported on a male Waxter staff member punching a girl in DJS custody while she screamed for him to get off her (Defendant Montague was serving as Secretary of Juvenile Services at this time, and was intimately aware of the investigation and its findings);[42]

r. In May 2006, reports on conditions at LESCC and Waxter found that the facilities continued to be sites of child abuse, assaults, underfunding, inadequate training, and overly aggressive staff; Maryland's former Independent Monitor was quoted as saying that these conditions appeared to have been unchanged from his years monitoring DJS facilities (Defendant Montague was serving as Secretary of Juvenile Services at this time, and was intimately aware of the findings);[43]

s. In August 2006, following a year-long investigation, the U.S. Department of Justice issued a report on the conditions at the BCJJC, finding numerous conditions likely to lead to sexual abuse, including overuse of solitary confinement, lack of staff supervision, and incomplete recordkeeping of

---

[42] *See* Greg Garland, *'Don't Touch Me. Get Off My Stomach.'*, The Sun, May 11, 2006, https://www.baltimoresun.com/news/bs-xpm-2006-05-11-0605110100-story.html.

[43] *See* Mary Otto, *State Centers Still Beset by Problems, Report Says*, Washington Post, May 24, 2006, https://www.washingtonpost.com/archive/local/2006/05/24/state-centers-still-beset-by-problems-report-says/38357e44-2647-4399-b700-08b580276f93/.

staff checks and interactions with children (Defendant Montague was serving as Secretary of Juvenile Services at this time, and was intimately aware of the report and its findings);[44]

t.  In March 2007, a Special Report by Maryland's Independent Juvenile Justice Monitor concluded that Waxter had "outlived its usefulness" and recommended that it be shut down; the Report further noted inadequate training, cruel overuse of solitary confinement, and a dangerous lack of sightlines in the facility's design (making it easier to hide what was going on in the facility) (Defendant Montague was serving as Secretary of Juvenile Services at this time, and was intimately aware of the Special Report and its findings);[45]

u.  In December 2009, a report by the Capital News Service detailed efforts by critics, including the American Civil Liberties Union and Advocates for Children and Youth, to shut down Waxter, due to, among many issues, the ongoing abuse of children by unqualified staff (Defendant Devore was

---

[44] *See* U.S. Dep't of Just., Civil Rights Division, *Investigation of the Baltimore City Juvenile Justice Center in Baltimore, Maryland*, 13 (Aug. 2004), https://www.justice.gov/sites/default/files/crt/legacy/2011/04/13/baltimore_juve_fi ndlet_8-7-06.pdf.

[45] *See* Juvenile Justice Monitor Unit, *Special Report on Thomas J.S. Waxter Children's Center – Final Findings and Recommendations* (Mar. 22, 2007), https://www.marylandattorneygeneral.gov/JJM%20Documents/WaxterSpecial3_22 _07.pdf.

serving as Secretary of Juvenile Services at this time, and was intimately aware of the report);[46]

v. In December 2016, a task force formed in response to ongoing abuse at DJS facilities recommended that policies finally be put in place to curb the overuse of strip searches of children across DJS facilities statewide, noting that existing policies allowed strip searches to be carried out without any reasonable belief that a child is actually concealing contraband (Defendant Abed was serving as Secretary of Juvenile Services at this time, and was intimately aware of the task force's findings);[47]

w. In December 2016, Defendant Abed voted against the aforementioned task force recommendations on curbing overuse of strip searches;[48]

x. In March 2021, a staff member at the Victor Cullen Center ("VCC") was indicted on three counts of child sexual abuse following the discovery of her ongoing sexual relationship with a child at the facility (Defendant Abed

---

[46] *See* Kelly Brooks, *Critics Call for Closure of Detention Facility for Girls*, Capital News Service, Dec. 22, 2009, https://thedailyrecord.com/2009/12/22/critics-call-for-closure-of-detention-facility-for-girls/.
[47] *See* Green, *supra* note 17.
[48] *See id*.

was serving as Secretary of Juvenile Services at this time, and was intimately aware of the discovery of ongoing sexual abuse);[49]

y. In October 2021, a juvenile corrections officer at Lower Eastern Shore Children's Center ("LESCC") was indicted for sexual assault of a 15-year-old girl who he had met while she was an LESCC resident (Defendant Schiraldi was serving as Secretary of Juvenile Services at this time, and was intimately aware of the conduct leading to the indictment);[50]

z. In 2022, Maryland's Juvenile Justice Monitoring Unit reported egregious conditions and abuse across DJS facilities, including that the Baltimore City Juvenile Justice Center ("BCJJC") "continues to operate as a prison-like environment" that is "dangerous and often chaotic" for the children housed there (Defendant Schiraldi was serving as Secretary of Juvenile Services at this time, and was intimately aware of the findings).[51]

---

[49] *See* Don Aines, *Former Victor Cullen Worker Indicted on Sexual Abuse Charges*, The Herald-Mail, Mar. 26, 2021, https://www.heraldmailmedia.com/story/news/local/2021/03/26/former-victor-cullen-worker-indicted-on-sexual-abuse-charges/115907068/.

[50] *See*, Natalie Jones, *Salisbury Juvenile Corrections Officer Indicted After Alleged Sex With 15-Year-Old Girl*, MyEasternShoreMD.com, Oct. 5, 2021, https://www.myeasternshoremd.com/stardem/news/salisbury-juvenile-corrections-officer-indicted-after-alleged-sex-with-15-year-old-girl/article_8c29a912-77c1-5ca1-932c-dba1377ec7d8.html.

[51] *See* Juvenile Justice Monitoring Unit, *2022 Second Quarter Report*, 27 (Sept. 2022), https://www.documentcloud.org/documents/22924402-jjmu-2022-q2-report-final-including-djs-jsep-response#document/.

164.   Defendants are now and were at all material times aware that the above reports represent only a fraction of incidents of sexual abuse in DJS facilities, given the prevalence of under-reporting in such environments.[52]

165.   Upon information and belief, Defendants are now and were at all material times aware (and have for decades been aware) that the conditions identified in the above reports as connected to sexual abuse (*e.g.*, the failure to adequately screen, supervise, train, investigate, and discipline staff members; the overcrowding of facilities leading to insufficient supervision and enforcement; the failure to provide adequate mental health and support services to residents; and the fostering of a culture of physical violence and intimidation) were and are endemic to all DJS facilities.

## SEXUAL ABUSE OF PLAINTIFFS AT DEPARTMENT OF JUVENILE SERVICES FACILITIES

166.   At all times relevant to the wrongful conduct complained of herein, Plaintiffs were children under the legal and physical custody, direct and exclusive control, and supervision of Defendants and their agents and officers, who were responsible for Plaintiffs' care and safety.[53]

---

[52] *See* U.S. Dep't of Just., *Prison Rape Elimination Act Regulatory Impact Assessment*, 17 (May 17, 2012), ("[O]nly a fraction of incidents of sexual abuse in a prison environment will typically come to the attention of correctional authorities or be reflected in institutional records.").

[53] For several years, DJS outsourced the operations of CHS to a private contractor, Youth Services International, until the State ended that relationship and took back

167.    The sexual conduct complained of herein lacked consent in that Plaintiffs did not have the capacity to consent by virtue of being, at all relevant times, minors and/or in the legal and physical custody of the State juvenile detention system.[54] Moreover, the sexual conduct complained of herein was accomplished using forcible compulsion, undue influence, duress, coercion, intimidation, and/or threat of physical harm and retaliation.

168.    Each event complained of by each Plaintiff herein caused a distinct injury and is pled as a separate incident or occurrence.

**A.    Sexual Abuse of Plaintiff Jane Doe, A.W.**

169.    Plaintiff Jane Doe, A.W., was a minor through the duration of the sexual abuse alleged herein.

170.    Plaintiff Jane Doe, A.W., was detained by Defendants as a juvenile from approximately 2019 to 2020 when she was approximately 14 to 15 years old.

171.    At all relevant times, Plaintiff Jane Doe, A.W., was in the care, custody, and control of Defendants and was detained at Waxter.

---

control of the facility in 2004. *See* Dan Fesperman, *Hickey Turns a Violent Page*, The Sun, Mar. 30, 2004, https://www.baltimoresun.com/2004/03/30/hickey-turns-a-violent-page/. At all times relevant herein, Youth Services International and its employees acted as agents of Defendants, pursuant to Defendants' non-delegable duty to the children in Maryland's juvenile detention system.

[54] In recognition that detained youths lack legal capacity to consent, Maryland state law criminalizes any sexual contact with any individual detained in a DJS facility, regardless of the age of consent. Md. Code Ann., Crim. Law § 3-314(c).

172. During her detention at Waxter, Plaintiff Jane Doe, A.W., was subjected to sexual abuse by a staff member, Defendant John Doe 1 (A.W. Abuser), who was employed at Waxter during the relevant time period.

173. Defendant John Doe 1 (A.W. Abuser) was in a position of authority and was directly responsible for supervising, and/or providing care to Plaintiff Jane Doe, A.W., during her confinement at Waxter.

174. On multiple occasions, Defendant John Doe 1 (A.W. Abuser) sexually abused Plaintiff Jane Doe, A.W., by fondling Plaintiff Jane Doe, A.W.'s genitals and digitally penetrating Plaintiff Jane Doe, A.W.'s vagina and anus.

175. Defendants never told Plaintiff Jane Doe, A.W., whether, how, or to whom to report physical or sexual abuse.

176. Given that her abuser was an employee at the facility and could impact whether her confinement was extended if she disclosed or reported the abuse, Plaintiff Jane Doe, A.W. did not know of any safe way to report the abuse.

177. At the relevant times herein, Defendant John Doe 1 (A.W. Abuser) was acting within the course and scope of his employment as a staff member, employee, and/or agent of Defendants at Waxter.

178. At the relevant times herein, Defendant John Doe 1 (A.W. Abuser) was acting under color of state law pursuant to 42 U.S.C. §1983 by overseeing, supervising, and being charged with keeping Plaintiff Jane Doe, A.W., safe.

179.    Defendants willfully knew, accepted and approved of Defendant John Doe 1 (A.W. Abuser) sexually brutalizing, raping and sodomizing Plaintiff Jane Doe, A.W., a child.

180.    At the time of the above-described sexual abuse, Defendant John Doe 1 (A.W. Abuser) was not being adequately supervised, monitored, or surveilled by Defendants.

181.    Not only did defendants fail to supervise, train, monitor, discipline, surveil, remove, and otherwise investigate Defendant John Doe 1 (A.W. Abuser), Defendants knew of the sexual brutalization perpetuated by Defendant John Doe 1 (A.W. Abuser) on Plaintiff Jane Doe, A.W.; purposefully allowed it to happen; and encouraged it through their silence.

182.    At the relevant times herein, Defendants were acting under color of state law pursuant to 42 U.S.C. §1983 by overseeing, supervising, and being charged with keeping Plaintiff Jane Doe, A.W., safe.

183.    Defendants' acts and omissions were a substantial factor in causing the harm suffered by Plaintiff Jane Doe 1, A.W.

184.    As a direct and proximate result of the foregoing, Plaintiff Jane Doe 1, A.W., has suffered significant physical and psychological injuries, and the combination thereof.

185.   Plaintiff Jane Doe 1, A.W., has undergone and sustained the expense of years of medical care and requires future and ongoing care.

**B.    Sexual Abuse of Plaintiff Jane Doe, T.H.**

186.   Plaintiff Jane Doe, T.H., was a minor through the duration of the sexual abuse alleged herein.

187.   Plaintiff Jane Doe, T.H., was detained by Defendants as a juvenile in approximately 2019 when she was approximately 15 years old.

188.   At all relevant times, Plaintiff Jane Doe, T.H., was in the care, custody, and control of Defendants and was detained at Waxter.

189.   During her detention at Waxter, Plaintiff Jane Doe, T.H., was subjected to sexual abuse by a staff member, Defendant John Doe 2 (T.H. Abuser), who was employed by Defendants at Waxter during the relevant time period.

190.   Defendant John Doe 2 (T.H. Abuser) was in a position of authority and was directly responsible for supervising, and/or providing care to Plaintiff Jane Doe 2, T.H., during her confinement at Waxter.

191.   On at least one occasion, Defendant John Doe 2 (T.H. Abuser) sexually abused Plaintiff Jane Doe 2, T.H. This abuse included, but was not limited to, Defendant John Doe (T.H. Abuser) forcibly touching and groping her genitals over and under her clothing; forcing her to perform oral copulation; and vaginally penetrating her.

192.   Defendants never told Plaintiff Jane Doe, T.H., whether, how, or to whom to report physical or sexual abuse.

193.   Given that her abuser was an employee at the facility and could impact whether her confinement was extended if she disclosed or reported the abuse, Plaintiff Jane Doe, T.H., did not know of any safe way to report the abuse.

194.   At the relevant times herein, Defendant John Doe 2 (T.H. Abuser) was acting within the course and scope of his employment as a staff member, employee, and/or agent of Defendants at Waxter.

195.   At the relevant times herein, Defendant John Doe 2 (T.H. Abuser) was acting under color of state law pursuant to 42 U.S.C. §1983 by overseeing, supervising, and being charged with keeping Plaintiff Jane Doe, T.H., safe.

196.   Defendants willfully knew, accepted and approved of Defendant John Doe 2 (T.H. Abuser) sexually brutalizing, raping and sodomizing Plaintiff Jane Doe, T.H., a child.

197.   At the time of the above-described sexual abuse, Defendant John Doe 2 (T.H. Abuser) was not being adequately supervised, monitored, or surveilled by Defendants.

198.   Not only did Defendants fail to supervise, train, monitor, discipline, surveil, remove, and otherwise investigate Defendant John Doe 2 (T.H. Abuser), Defendants knew of the sexual brutalization perpetuated by Defendant John Doe 2

(T.H. Abuser) on Plaintiff Jane Doe, T.H.; purposefully allowed it to happen; and encouraged it through their silence.

199.   At the relevant times herein, Defendants were acting under color of state law pursuant to 42 U.S.C. §1983 by overseeing, supervising, and being charged with keeping Plaintiff Jane Doe, T.H., safe.

200.   Defendants' acts and omissions were a substantial factor in causing the harm suffered by Plaintiff Jane Doe, T.H.

201.   As a direct and proximate result of the foregoing, Plaintiff Jane Doe, T.H. has suffered significant physical and psychological injuries, and the combination thereof.

202.   Plaintiff Jane Doe, T.H., has undergone and sustained the expense of years of medical care and requires future and ongoing care.

**C.    Sexual Abuse of Plaintiff John Doe, T.B.**

203.   Plaintiff John Doe, T.B., was a minor through the duration of the sexual abuse alleged herein.

204.   Plaintiff John Doe, T.B., was detained by Defendants as a juvenile in approximately 2019 when he was approximately 14 years old.

205.   At all relevant times, Plaintiff John Doe, T.B., was in the care, custody, and control of Defendants and was detained at CHS.

206.  During his detention at CHS, Plaintiff John Doe, T.B., was subjected to sexual abuse by multiple staff members, Defendant John Doe 3 (T.B. Abuser 1), and Defendant John Doe 4 (T.B. Abuser 2), both of whom were employed by Defendants at CHS during the relevant time period.

207.  Defendants John Doe 3 (T.B. Abuser 1) and John Doe 4 (T.B. Abuser 4) were in positions of authority and were directly responsible for supervising, and/or providing care to Plaintiff John Doe, T.B., during his confinement at CHS.

208.  On at least one occasion, Defendant John Doe 3 (T.B. Abuser 1) sexually abused Plaintiff John Doe, T.B., forcing John Doe, T.B., to perform oral copulation on him. John Doe 3 (T.B. Abuser 1) then digitally penetrated John Doe, T.B.'s anus.

209.  On at least two occasions, Defendant John Doe 4 (T.B. Abuser 2) sexually abused Plaintiff John Doe, T.B., forcing John Doe, T.B., to perform oral copulation on him while digitally penetrated John Doe, T.B.'s anus.

210.  Defendants never told Plaintiff John Doe, T.B., whether, how, or to whom to report physical or sexual abuse.

211.  Given that his abusers were employees at the facility and could impact whether his confinement was extended if he disclosed or reported the abuse, Plaintiff John Doe, T.B., did not know of any safe way to report the abuse.

212.   At the relevant times herein, Defendant John Doe 3 (T.B. Abuser 1) and John Doe 4 (T.B. Abuser 2) were acting within the course and scope of their employment as staff members, employees, and/or agents of Defendants at CHS.

213.   At the relevant times herein, Defendants John Doe 3 (T.B. Abuser 1) and John Doe 4 (T.B. Abuser 2) were acting under color of state law pursuant to 42 U.S.C. §1983 by overseeing, supervising, and being charged with keeping Plaintiff John Doe, T.B., safe.

214.   Defendants willfully knew, accepted and approved of Defendants John Doe 3 (T.B. Abuser 1) and John Doe 4 (T.B. Abuser 2) sexually brutalizing, raping and sodomizing Plaintiff John Doe, T.B., a child.

215.   At the time of the above-described sexual abuse, Defendants John Doe 3 (T.B. Abuser 1) and John Doe 4 (T.B. Abuser 2) were not being adequately supervised, monitored, or surveilled by Defendants.

216.   Not only did Defendants fail to supervise, train, monitor, discipline, surveil, remove, and otherwise investigate Defendants John Doe 3 (T.B. Abuser 1) and John Doe 4 (T.B. Abuser 2), Defendants knew of the sexual brutalization perpetuated by Defendants John Doe 3 (T.B. Abuser 1) and John Doe 4 (T.B. Abuser 2) on Plaintiff John Doe, T.B.; purposefully allowed it to happen; and encouraged it through their silence.

217.  At the relevant times herein, Defendants were acting under color of state law pursuant to 42 U.S.C. §1983 by overseeing, supervising, and being charged with keeping Plaintiff John Doe, T.B., safe.

218.  Defendants' acts and omissions were a substantial factor in causing the harm suffered by Plaintiff John Doe, T.B.

219.  As a direct and proximate result of the foregoing, Plaintiff John Doe, T.B. has suffered significant physical and psychological injuries, and the combination thereof.

220.  Plaintiff John Doe, T.B., has undergone and sustained the expense of years of medical care and requires future and ongoing care.

## CAUSES OF ACTION

### COUNT I: 42 U.S.C. § 1983 – FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS – BODILY INTEGRITY AGAINST ALL DEFENDANTS

221.  Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

222.  Plaintiffs have a clearly established and fundamental right to bodily integrity, pursuant to the substantive due process clause of the Fourteenth Amendment to the United States Constitution.

223.  The existence of this right to ultimate bodily integrity, the most fundamental aspect of personal privacy, was unmistakably established at the time of

the abuse alleged herein, as an attribute of the ordered liberty that is the concern of substantive due process.

224.    The right to bodily integrity is the last line of defense against those literally outrageous abuses of official power.

225.    State actions that result in sexual abuse of children are actionable under 42 U.S.C. § 1983.

226.    Each of the sexual abuses of Plaintiffs Jane Doe, A.W., Jane Doe, T.H., and John Doe, T.B, was conducted with malice and sadism, and cannot be considered mere carelessness or the product of excessive zeal.

227.    Each of the sexual abuses of Plaintiffs Jane Doe, A.W., Jane Doe, T.H., and John Doe, T.B., severely injured each of them and has caused each Plaintiff lifelong physical and emotional damages that cannot be undone.

228.    Each of the sexual abuses of Plaintiffs Jane Doe, A.W., Jane Doe, T.H., and John Doe, T.B, amounted to brutal, unprovoked, and inhumane abuses of official power, and was literally shocking to the conscience.

229.    Not only was each instance of sexual abuse put upon Plaintiffs Jane Doe, A.W., Jane Doe, T.H., and John Doe, T.B. disproportionate to any need for force or violence, there was not, is not, and could never be a "need" to brutally rape, sodomize, or otherwise sexually abuse or molest a child in State custody.

230.    Defendants deprived Plaintiffs of their respective rights to bodily integrity through their intentional, malicious, sadistic and conscience-shocking conduct as described herein.

231.    Each Defendant, in their own unique and specific way as described herein, and in each instance under color of state law, created, perpetuated, authorized, approved, ordered, sanctioned and actively participated in the sexual abuse of Plaintiffs as described herein, and/or in the purposeful creation of policies that fostered, encouraged and created a culture of sexual brutalization of minors in state custody, including Plaintiffs.

232.    Defendants were at all times material to this action fully aware of an individual's right, and ultimately Plaintiffs' fundamental right to bodily integrity, which was an established right in all respects, and at all material times.

233.    Defendants' individual and collective conduct, all while acting under color of law, endangered and/or threatened Plaintiffs' fundamental right to bodily integrity, as guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

234.    Defendants, individually and collectively, knowingly violated Plaintiffs' constitutionally protected rights to bodily integrity, through their conduct as described herein, with intention and a deliberate indifference to the known risks of harm that could, and ultimately did occur to Plaintiffs.

235.    At each instance described herein, Defendants had the time and opportunity to reflect and deliberate before acting and/or failing to act.

236.    Defendants acting in a supervisory capacity had actual or constructive knowledge of the unconstitutional acts of their subordinates and were deliberately indifferent and/or tacitly authorized such conduct of their subordinates.

237.    Defendants acting in a supervisory capacity failed to act to prevent or otherwise caused the unconstitutional conduct of their subordinates.

238.    As a direct and proximate result of Defendants' unconstitutional acts as described herein, Plaintiffs' fundamental rights to bodily integrity were violated, as were their liberty interests.

239.    These unconstitutional acts caused Plaintiffs' physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, various health problems, and lost earning capacity.

240.    Defendants' conduct was reckless, evinced callous indifference to Plaintiffs' rights, and included intentional violations of federal law, entitling Plaintiffs to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

## COUNT II: VIOLATION OF PLAINTIFFS' RIGHT TO BE FREE FROM STATE CREATED DANGER PURSUANT TO 42 U.S.C. § 1983 <u>AGAINST ALL DEFENDANTS</u>

241.   Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

242.   Plaintiffs have a clearly established right under the substantive due process clause of the Fourteenth Amendment to the United States Constitution to be protected from risks, dangers, dangerous situations, or being made more vulnerable to increased risk of harms, affirmatively created and/or caused by persons acting under color of state law.

243.   This right was clearly established at the time of Defendants' conduct, which caused Plaintiffs' sexual brutalization as described herein.

244.   Defendants owed Plaintiffs an affirmative duty to protect them, insofar as the State of Maryland, at all material times, affirmatively restrained Plaintiffs from acting on their own behalf.

245.   Defendants, through their affirmative exercise of power over Plaintiffs as described herein, restrained Plaintiffs' liberty, such that it rendered Plaintiffs unable to care for themselves.

246.   Defendants had an affirmative duty to protect Plaintiffs, due to, *inter alia,* the custodial nature of a special relationship.

247.   The affirmative duty to protect arises not from Defendants' knowledge of Plaintiffs' predicament or from expressions of intent to help them, but from the limitation which was imposed on Plaintiffs' freedom to act on their own behalf.

248.   Defendants, through their affirmative exercise of power over Plaintiffs as described herein, failed to provide for Plaintiffs' basic human needs.

249.   Defendants promulgated unconstitutional and unlawful policies that violated federal law and caused Plaintiffs' sexual brutalization as described herein.

250.   At all relevant times, Defendants maintained abhorrent policies as described herein, which individually and collectively caused Plaintiffs' sexual brutalization.

251.   Each Defendant, on a macro level, micro level, or some combination of both, was a policy making official in his/her own regard, and each acted directly on behalf of the State of Maryland, in promulgating policies as described herein, which individually and collectively violated Plaintiffs' rights, privileges, and immunities secured by the United States Constitution and federal law.

252.   To the extent any Defendant contends he or she is not or was not a policy maker at all relevant times, each Defendant in his or her own right allowed, tolerated, and acquiesced to the unconstitutional and unlawful customs and practices of non-policymakers that were so permanent and well-settled as to imply the consent and authorization of the policymakers.

253.   Each Defendant, while acting under color of state law, affirmatively created or exacerbated the dangers to which Plaintiffs were exposed, making them more vulnerable to said dangers, and these Defendants did so with an extreme degree of culpability.

254.   Each Defendant, while acting under color of state law, affirmatively perpetuated a dangerous situation and created a distinct culture of sexual brutalization, of which Plaintiffs were exposed and to which they fell victim.

255.   Each Defendant, while acting under color of state law, deliberately and affirmatively participated in, denied, lied about, covered up, deceived, discredited, and/or ignored the sexual brutalization of Plaintiffs, causing them harm and making them more vulnerable to same.

256.   Each Defendant, while acting under color of state law, was aware that their conduct would result in the deprivation of Plaintiffs' due process rights to be protected from and not made more vulnerable to the conduct described herein and the dangers and damages associated therewith.

257.   Defendants' conduct was reckless, deliberately indifferent and/or so outrageous as to shock the conscience, such that it was culpable in the extreme, insofar as these Defendants knew of and disregarded the substantial risk of serious harm to Plaintiffs as a result of their conduct in creating and participating in a culture of sexual brutalization.

258.   The dangers and risks of harm as a result of Defendants' conduct and their creation and participation in a culture of sexual brutalization, were discreet and special to Plaintiffs, young children who were confined by the State of Maryland; not risks affecting the public at large.

259.   The dangers and risks of harm to Plaintiffs, created, perpetuated and put on them by Defendants, individually and collectively, were extreme and included a level of sexual violence unseen in normal culture.

260.   Defendants' conduct constituted affirmative acts that caused and/or substantially increased the risks of physical, emotional, and economic harm to Plaintiffs.

261.   As a direct and proximate result of the unconstitutional acts of Defendants, Plaintiffs' fundamental rights to be free from state-created danger were violated, as were their liberty interests.

262.   Defendants acting in a supervisory capacity had actual or constructive knowledge of the unconstitutional acts of their subordinates and were deliberately indifferent and/or tacitly authorized such conduct of their subordinates.

263.   Defendants acting in a supervisory capacity failed to act to prevent or otherwise caused the unconstitutional conduct of their subordinates.

264.   Defendants' conduct transgressed the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

265.    These unconstitutional acts caused Plaintiffs' physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, various health problems, and lost earning capacity.

266.    Defendants' conduct was reckless, evinced callous indifference to Plaintiffs' rights, and included intentional violations of federal law, entitling Plaintiffs to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

## RELIEF REQUESTED

Plaintiffs demand judgement against Defendants, jointly and severally, for:

      (a) Compensatory Damages;

      (b) Punitive Damages;

      (c) Exemplary Damages;

      (d) Pre-Judgement and Post-Judgement Interest;

      (e) Attorneys' Fees and litigation costs and expenses; and

      (f) Any other relief the Court deems appropriate.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a jury trial on all issues so triable in this action.

*-signatures follow-*

Dated: June 25, 2025.                    Respectfully submitted,

                                         **BAILEY GLASSER**

                                         /s/ PANIDA ANDERSON
                                         Panida Anderson (Bar No. 30780)
                                         D. Todd Mathews (admission forthcoming)
                                         1055 Thomas Jefferson St., NW, Ste 540
                                         Washington, D.C. 20007
                                         (202) 463-2101
                                         panderson@baileyglasser.com
                                         tmathews@baileyglasser.com
                                         Counsel for Plaintiff John Doe, T.B.

                                         **LEVY KONIGSBERG LLP**

                                         /s/ COREY M. STERN
                                         Corey M. Stern (admission forthcoming)
                                         Clark Binkley (admission forthcoming)
                                         605 Third Ave., 33rd Fl.
                                         New York, New York 10158
                                         (212) 605-6200
                                         cstern@levylaw.com
                                         cbinley@levylaw.com
                                         Counsel for Plaintiffs Jane Doe A.W. and
                                         Jane Doe, T.H.

                                         **STINAR GOULD GRIECO & HENSLEY**

                                         /s/ MIKE GRIECO
                                         Mike Grieco (admission forthcoming)
                                         Nick Wainwright (admission forthcoming)
                                         101 North Wacker Drive, Ste. 100
                                         Chicago, Illinois 60606
                                         (312) 728-7444
                                         mike@sgghlaw.com
                                         nicholas@sgghlaw.com
                                         Counsel for Plaintiffs Jane Doe A.W. and
                                         Jane Doe, T.H.