# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **JANE DOE, A.W., a pseudonym,** ) <br> c/o Levy Konigsberg, LLP ) <br> 800 Third Avenue, 33rd Floor ) <br> New York, New York 10158 ) <br> ) <br> c/o Stinar Gould Grieco & Hensley ) <br> 101 North Wacker, Suite 100 ) <br> Chicago, Illinois 60606 ) <br> ) <br> **JANE DOE, T.H., a pseudonym,** ) <br> c/o Levy Konigsberg, LLP ) <br> 800 Third Avenue, 33rd Floor ) <br> New York, New York 10158 ) <br> ) <br> c/o Stinar Gould Grieco & Hensley ) <br> 101 North Wacker, Suite 100 ) <br> Chicago, Illinois 60606 ) <br> ) <br> **JOHN DOE, T.B., a pseudonym** ) <br> c/o Bailey Glasser, LLP ) <br> 210 West Division Street ) <br> Maryville, Illinois 62062 ) <br> ) <br>             Plaintiffs, ) <br> ) <br>     v. ) <br> ) <br> **KENNETH C. MONTAGUE, JR.** ) <br> In his individual capacity as former ) <br> Maryland Secretary of Juvenile ) <br> Services ) <br> (2003 – 2007), ) <br> ) <br> **DONALD W. DEVORE,** ) <br> In his individual capacity as former ) <br> Maryland Secretary of Juvenile ) <br> Services ) | **CASE NO.:** 1:25-cv-02039-ABA <br><br> **JURY TRIAL DEMANDED** <br><br> Assigned Judge: <br> The Honorable Adam B. Abelson |

(2007 – 2011),                          )
                                        )
**SAM ABED**                            )
In his individual capacity as former    )
Maryland Secretary of Juvenile          )
Services                                )
(2011 – 2023),                          )
                                        )
**LISA STEEPLE**                        )
In her individual capacity as former    )
Superintendent of the Thomas J.         )
Waxter Children's Center                )
(2016 – 2022),                          )
                                        )
**DANJUMA GASKINS**                     )
In his individual capacity as former    )
Superintendent of the Charles H.        )
Hickey, Jr. School                      )
(2013 – 2021),                          )
                                        )
**JOHN DOE 1 (A.W. ABUSER)**            )
In his official and individual          )
capacities as a former Guard of the     )
Thomas J. Waxter Children's Center,     )
                                        )
**JOHN DOE 2 (T.H. ABUSER)**            )
In his official and individual          )
capacities as a former Guard of the     )
Thomas J. Waxter Children's Center,     )
                                        )
**JOHN DOE 3 (T.B. Abuser 1)**          )
In his official and individual          )
capacities as a Guard at the Charles    )
H. Hickey, Jr. School,                  )
                                        )
**JOHN DOE 4 (T.B. Abuser 2)**          )
In his official and individual          )
capacities as a Guard at the Charles    )
H. Hickey, Jr. School,                  )
                                        )

| | |
|---|---|
| **JOHN DOE SUPERVISORS 1-5**<br>In their official and individual<br>capacities as Supervisors at the<br>Thomas J. Waxter Children's<br>Center, | ) <br>) <br>) <br>) <br>) <br>) |
| **JOHN DOE SUPERVISORS 6-10**<br>In their official and individual<br>capacities as Supervisors at the<br>Charles H. Hickey, Jr. School, | ) <br>) <br>) <br>) <br>) |
| Defendants. | ) <br>) <br>) |

## FIRST AMENDED COMPLAINT

Plaintiffs Jane Doe, A.W., Jane Doe, T.H., and John Doe, T.B., by and through their undersigned counsel, file this Complaint against Defendants Kenneth C. Montague, Donald W. Devore, Sam Abed, Lisa Steeple, Danjuma Gaskins, John Doe 1 (A.W. Abuser), John Doe 2 (T.H. Abuser), John Doe 3 (T.B. Abuser 1), John Doe 4 (T.B. Abuser 2), John Doe Supervisors 1-5, and John Doe Supervisors 6-10 (collectively "Defendants"), seeking all damages recoverable under the applicable law. In support of this action, Plaintiffs aver as follows:

## PRELIMINARY STATEMENT

1.    For generations, Maryland's juvenile detention system has subjected the State's most vulnerable children to unthinkable sexual abuse. Despite years of widespread reports, federal and state investigations, and public demands to close the State's various prison-like facilities, a culture of sexual brutalization and abuse has continued to flourish within Maryland's juvenile detention system. Defendants, in

their various roles and acting under the color of state law, perpetuated and further the abuse against these children, including Plaintiffs Jane Doe, A.W., Jane Doe, T.H., and John Doe, T.B.

2.     The Thomas J.S. Waxter Children's Center ("Waxter")—Maryland's most prominent juvenile detention facility for girls—and Charles H. Hickey, Jr. School ("CHS")—a state owned and operated secure treatment facility——are no exception to this pervasive culture of abuse. Both facilities served as a breeding ground for the sexual exploitation and brutalization of the children it was supposed to protect. For decades, these two facilities have been sources of controversy, known for their poor conditions and the suffering of children confined within their walls. Despite their well-documented deficiencies, no long-standing changes were implemented. Instead, an environment prone to widespread sexual abuse was allowed to flourish.

3.     Plaintiffs in this action are three individuals who, as children of various ages, were in custody at Waxter and CHS. While confined in these facilities, Plaintiffs were subjected to sexual abuse, including sexual touching, coercion, and forcible rape, by various staff members employed by, or acting under the color of, state law and the authority of their supervisors, the superintendents of the facilities, and Secretaries of the Maryland Department of Juvenile Servies.

4.    The sexual abuse endured by Plaintiffs at the hands of Defendants was part of a culture of abuse at Maryland's juvenile detention facilities that has been well-documented and known to Defendants for decades. Indeed, Defendants fostered, permitted, and perpetuated this culture of sexual abuse and allowed it to thrive, failing to protect the children in their custody.

5.    As a result of the abuse, Plaintiffs suffered physical, emotional, and psychological trauma, leading to significant anguish and distress that they will be forced to live with for the rest of their lives.

6.    Defendants' conduct, which occurred while Defendants were acting under color of state law, was at all material times the essence of conscious shocking, reckless, and callously indifferent. On a moment-to-moment basis, individually and collectively, Defendants treated Plaintiffs like commodities; like animals; like something far less than human. Defendants' conduct was motivated by evil and sinister intent and was so reckless and callous that it amounted to a complete disregard of Plaintiffs' constitutional rights.

7.    As set forth in greater detail below, Plaintiffs assert claims under 42 U.S.C. § 1983 for violation of their right to bodily integrity and for the state created danger born out of Defendants' conscious shocking conduct.

## PARTIES

8.      Plaintiff Jane Doe, A.W., is a 20-year-old female resident of Baltimore County, Maryland. At all times relevant to the wrongful conduct complained of herein, Plaintiff Jane Doe, A.W., was a minor in the legal and physical custody of Defendants in the State of Maryland. As a result, Plaintiff Jane Doe, A.W. suffered damages in the State of Maryland.

9.      Plaintiff Jane Doe., T.H., is a 20-year-old female resident of Baltimore County, Maryland. At all times relevant to the wrongful conduct complained of herein, Plaintiff Jane Doe, T.H., was a minor in the legal and physical custody of Defendants in the State of Maryland. As a result, Plaintiff Jane Doe, T.H., suffered damages in the State of Maryland.

10.     Plaintiff John Doe, T.B., is a 20-year-old male resident of Harford County, Maryland. At all times relevant to the wrongful conduct complained of herein, Plaintiff John Doe, T.B., was a minor in the legal and physical custody of Defendants in the State of Maryland. As a result, Plaintiff John Doe, T.B., suffered damages in the State of Maryland.

11.     Defendant Kenneth C. Montague, Jr. ("Montague") was the Acting Secretary of Juvenile Justice for the State of Maryland from January 15, 2003, through March 4, 2003. Defendant Montague officially became the Secretary of Juvenile Services for the State of Maryland and a member of the Governor's

Executive Council on July 1, 2003, and served in that capacity until January 17, 2007. Additionally, Defendant Montague held a wide range of posts within the Maryland state government.

12.    In these roles, Defendant Montague was responsible for the management, supervision and treatment of youth involved in the State's juvenile detention system, and was on the frontline of receiving information about, and in a position to implement policies to combat, rampant sexual abuse of minors in state custody, which would undoubtedly have saved Plaintiffs from the sexual brutalization they endured at the hands of their abusers.

13.    Defendant Donald W. Devore ("Devore") was the Acting Secretary of Juvenile Services for the State of Maryland from February 22, 2007, through March 1, 2017. Defendant Devore officially became the Secretary of Juvenile Services for the State of Maryland and a member of the Governor's Executive Council on March 1, 2007, and served in that capacity until January 7, 2011. Additionally, Defendant Montague held a wide range of posts within Maryland state government.

14.    In these roles, Defendant Devore was responsible for the management, supervision and treatment of youth involved in the State's juvenile detention system, and was on the frontline of receiving information about, and in a position to implement policies to combat, rampant sexual abuse of minors in state custody,

which would undoubtedly have saved Plaintiffs from the sexual brutalization they endured at the hands of their abusers.

15.    Defendant Sam Abed ("Abed") was the Acting Secretary of Juvenile Services for the State of Maryland from February 4, 2011, through March 25, 2011. Defendant Abed officially became the Secretary of Juvenile Services for the State of Maryland and a member of the Governor's Executive Council on March 25, 2011, and served in that capacity until January 18, 2023. Additionally, Defendant Abed held a wide range of posts within the Maryland state government.

16.    In these roles, Defendant Abed was responsible for the management, supervision and treatment of youth involved in the State's juvenile detention system, and was on the frontline of receiving information about, and in a position to implement policies to combat, rampant sexual abuse of minors in state custody, which would undoubtedly have saved Plaintiffs from the sexual brutalization they endured at the hands of their abusers.

17.    Defendant Lisa Steeple ("Steeple") was the Superintendent at Waxter prior to and during Plaintiff John Doe, A.W. and Plaintiff John Doe, T.H.'s confinement at Waxter.

18.    During her time as Waxter Superintendent, Defendant Steeple was aware of the rampant sexual abuse taking place at Waxter, as well as the life-altering

impact of and damages to children—including Plaintiffs John Doe, A.W. and John Doe, T.H.—resulting from abuse at Waxter.

19.    In her role as Waxter Superintendent, Defendant Steeple created and enforced policies that caused and perpetuated a culture of sexual abuse at Waxter. Defendant Steeple also authorized, instituted, and through her conduct encouraged the malicious conduct within Waxter, and she remains responsible for enhancing a culture of sexual abuse therein.

20.    During her time as Waxter Superintendent, Defendant Steeple actively concealed what she knew to be the horrors associated with life at Waxter to the detriment of Plaintiffs John Doe, A.W. and John Doe, T.H. Defendant Steeple also actively protected abusers from consequence for their notorious, rabid sexual violence put upon vulnerable youth at Waxter, to the detriment of the children they were abusing, including Plaintiffs John Doe, A.W. and John Doe, T.H.

21.    During her time as Waxter Superintendent, Defendant Steeple, while being fully aware of the corrosive culture of rape, sodomy and sexual abuse at Waxter, and upon learning that those charged with the day-to-day operations of Waxter were predominant abusers, sought to protect them and herself to the detriment of thousands of children who were confined therein, including Plaintiffs John Doe, A.W. and John Doe, T.H.

22.    During her time as Waxter Superintendent, Defendant Steeple's actions caused and significantly contributed to a corrosive culture of rampant sexual abuse at Waxter, and allowed it to continue and grow exponentially, to the detriment of Plaintiffs John Doe, A.W. and John Doe, T.H.

23.    During her time as Waxter Superintendent, Defendant Steeple was, at all times, acting under color of state law pursuant to 42 U.S.C. §1983, by overseeing, supervising, and having the responsibility of keeping children housed at Waxter safe and secure, in all respects, *in loco parentis.*

24.    Defendant Danjuma Gaskins ("Gaskins") was the Superintendent at CHS prior to and during Plaintiff John Doe, T.B.'s confinement at CHS.

25.    During his time as CHS Superintendent, Defendant Gaskins was aware of the rampant sexual abuse taking place at CHS, as well as the life-altering impact of and damages to children—including Plaintiff T.B.—resulting from abuses at CHS.

26.    In his role as CHS Superintendent, Defendant Gaskins created and enforced policies that caused and perpetuated a culture of sexual abuse at CHS. Defendant Gaskins also authorized, instituted, and through his conduct encouraged the malicious conduct within CHS, and he remains responsible for enhancing a culture of sexual abuse therein.

27.    During his time as CHS Superintendent, Defendant Gaskins actively concealed what he knew to be the horrors associated with life at CHS to the detriment of Plaintiff T.B. Defendant Gaskins also actively protected abusers from consequence for their notorious, rabid sexual violence put upon vulnerable youth at CHS, to the detriment of the children they were abusing, including Plaintiff T.B.

28.    During his time as CHS Superintendent, Defendant Gaskins, while being fully aware of the corrosive culture of rape, sodomy and sexual abuse at CHS, and upon learning that those charged with the day-to-day operations of CHS were predominant abusers, sought to protect them and himself to the detriment of thousands of children who were confined therein, including Plaintiff T.B.

29.    During his time as CHS Superintendent, Defendant Gaskins's actions caused and significantly contributed to a corrosive culture of rampant sexual abuse at CHS, and allowed it to continue and grow exponentially, to the detriment of Plaintiff T.B.

30.    During his time as CHS Superintendent, Defendant Gaskins, at all times, acted under color of state law pursuant to 42 U.S.C. §1983, by overseeing, supervising, and having the responsibility of keeping children housed at CHS safe and secure, in all respects, *in loco parentis.*

31.    Defendant John Doe 1 (A.W. Abuser) was employed by the State of Maryland as a Guard at Waxter during Plaintiff Jane Doe, A.W.'s confinement

therein, from approximately 2019 to 2020 when Plaintiff Jane Doe, A.W. was approximately 14 to 15 years old.

32.    While confined at Waxter, Plaintiff Jane Doe, A.W., was in the care, custody, and control of Defendant John Doe 1 (A.W. Abuser).

33.    At all material times, Defendant John Doe 1 (A.W. Abuser) was in a position of authority and was directly responsible for supervising, and/or providing care to Plaintiff Jane Doe, A.W. during her confinement at Waxter.

34.    On multiple occasions, Defendant John Doe 1 (A.W. Abuser) sexually abused Plaintiff Jane Doe, A.W., by fondling Plaintiff Jane Doe, A.W.'s genitals and digitally penetrating Plaintiff Jane Doe, A.W.'s vagina and anus.

35.    At the relevant times herein, Defendant John Doe 1 (A.W. Abuser) was acting within the course and scope of his employment as a staff member, employee, and/or agent of Defendants at Waxter.

36.    At the relevant times herein, Defendant John Doe 1 (A.W. Abuser) was acting under color of state law pursuant to 42 U.S.C. § 1983 by overseeing, supervising, and being charged with keeping Plaintiff Jane Doe, A.W., safe in all respects, *in loco parentis*.

37.    Defendant John Doe 2 (T.H. Abuser) was employed by the State of Maryland as a Guard at Waxter during Plaintiff Jane Doe, T.H.'s confinement

therein, in approximately 2019, when Plaintiff Jane Doe, T.H. was approximately 15 years old.

38.     While confined at Waxter, Plaintiff Jane Doe, A.W., was in the care, custody, and control of Defendant John Doe 2 (T.H. Abuser).

39.     At all material times, Defendant John Doe 2 (T.H. Abuser) was in a position of authority and was directly responsible for supervising, and/or providing care to Plaintiff Jane Doe, T.H., during her confinement at Waxter.

40.     On multiple occasions, Defendant John Doe 2 (T.H. Abuser) sexually abused Plaintiff Jane Doe, T.H., by forcibly touching and groping her genitals over and under her clothing; forced her to perform oral copulation; and vaginally penetrating her.

41.     At the relevant times herein, Defendant John Doe 2 (T.H. Abuser) was acting within the course and scope of his employment as a staff member, employee, and/or agent of Defendants at Waxter.

42.     At the relevant times herein, Defendant John Doe 2 (T.H. Abuser) was acting under color of state law pursuant to 42 U.S.C. § 1983 by overseeing, supervising, and being charged with keeping Plaintiff Jane Doe, T.H., safe in all respects, *in loco parentis.*

43.     Defendant John Doe 3 (T.B. Abuser 1) was employed by the State of Maryland as a Guard at CHS during Plaintiff John Doe, T.B.'s confinement therein,

in approximately 2019, when Plaintiff John Doe, T.B. was approximately 14 years old.

44.    While confined at CHS, Plaintiff John Doe, T.B., was in the care, custody, and control of Defendant John Doe 3 (T.B. Abuser 1).

45.    At all material times, Defendant John Doe 3 (T.B. Abuser 1) was in a position of authority and was directly responsible for supervising, and/or providing care to Plaintiff John Doe, T.B., during his confinement at CHS.

46.    On multiple occasions, Defendant John Doe 3 (T.B. Abuser 1) sexually abused Plaintiff John Doe, T.B., by forcing John Doe, T.B., to perform oral copulation on him and then digitally penetrated John Doe, T.B.'s anus.

47.    At the relevant times herein, Defendant John Doe 3 (T.B. Abuser 1) was acting within the course and scope of his employment as a staff member, employee, and/or agent of Defendants at CHS.

48.    At the relevant times herein, Defendant John Doe 3 (T.B. Abuser 1) was acting under color of state law pursuant to 42 U.S.C. § 1983 by overseeing, supervising, and being charged with keeping Plaintiff John Doe, T.B., safe in all respects, *in loco parentis*.

49.    Defendant John Doe 4 (T.B. Abuser 2) was employed by the State of Maryland as a Guard at CHS during Plaintiff John, T.B.'s confinement therein, in

approximately 2019, when Plaintiff John Doe, T.B. was approximately 14 years old.

50.    While confined at CHS, Plaintiff John Doe, T.B., was in the care, custody, and control of Defendant John Doe 4 (T.B. Abuser 2).

51.    At all material times, Defendant John Doe 4 (T.B. Abuser 2) was in a position of authority and was directly responsible for supervising, and/or providing care to Plaintiff John Doe, T.B., during his confinement at CHS.

52.    On multiple occasions, Defendant John Doe 4 (T.B. Abuser 2) sexually abused Plaintiff John Doe, T.B., by forcing John Doe, T.B., to perform oral copulation on him while digitally penetrating John Doe, T.B.'s anus.

53.    At the relevant times herein, Defendant John Doe 4 (T.B. Abuser 2) was acting within the course and scope of his employment as a staff member, employee, and/or agent of Defendants at CHS.

54.    At the relevant times herein, Defendant John Doe 3 (T.B. Abuser 2) was acting under color of state law pursuant to 42 U.S.C. § 1983 by overseeing, supervising, and being charged with keeping Plaintiff John Doe, T.B. safe in all respects, *in loco parentis*.

55.    Defendants John Doe Supervisors 1-5 are individuals who were charged with supervising, training, monitoring, and making personnel decisions at Waxter during Plaintiffs Jane Doe, A.W.'s and Jane Doe, T.H.'s confinement therein.

56.     Defendants John Doe Supervisors 1-5 were employed by the State of Maryland as Supervisors at Waxter during Plaintiffs Jane Doe, A.W.'s and Jane Doe T.H.'s confinement therein, from approximately 2019 to 2020.

57.     While at Waxter, Plaintiffs Jane Doe, A.W., and Jane Doe, T.H. were in the care, custody, and control of Defendants John Doe Supervisors 1-5.

58.     During their detention at Waxter, Plaintiffs Jane Doe, A.W., and Jane Doe, T.H were subjected to sexual abuse by Defendant John Doe 1 (A.W. Abuser) and John Doe 2 (T.H. Abuser), while said Defendants were being supervised by Defendants John Doe Supervisors 1-5.

59.     At all material times, Defendants John Doe Supervisors 1-5 were in positions of authority and were directly responsible for supervising, and/or providing care to Plaintiffs Jane Doe, A.W. and Jane Doe, T.H. during their confinement at Waxter.

60.     At the relevant times herein, Defendants John Doe Supervisors 1-5 were acting within the course and scope of their employment as supervisors to Defendants John Doe 1 (A.W. Abuser) and John Doe 2 (T.H. Abuser), while they were employed at Waxter.

61.     At the relevant times herein, Defendants John Doe Supervisors 1-5 were acting under color of state law pursuant to 42 U.S.C. § 1983 by overseeing and supervising Defendants John Doe 1 (A.W. Abuser) and John Doe 2 (T.H. Abuser),

and by being charged with keeping Plaintiffs Jane Doe, A.W., and Jane Doe, T.H. safe in all respects, *in loco parentis.*

62.     Defendants John Doe Supervisors 6-10 are individuals who were charged with supervising, training, monitoring, and making personnel decisions at CHS during Plaintiff John Doe, T.B.'s confinement therein.

63.     Defendants John Doe Supervisors 6-10 were employed by the State of Maryland as Supervisors at CHS during Plaintiff John Doe, T.B.'s confinement therein, in approximately 2019.

64.     While at CHS, Plaintiff John Doe, T.B, was in the care, custody, and control of Defendants John Doe 3 (T.B. Abuser 1) and John Doe 4 (T.B. Abuser 2).

65.     During his detention at CHS, Plaintiff John Doe, T.B. was subjected to sexual abuse by Defendants John Doe 3 (T.B. Abuser 1) and John Doe 4 (T.B. Abuser 2), while said Defendants were being supervised by Defendants John Doe Supervisors 6-10.

66.     At all material times, Defendants John Doe Supervisors 6-10 were in positions of authority and were directly responsible for supervising, and/or providing care to Plaintiff John Doe, T.B., and for training and monitoring Defendant John Doe 3 (T.B. Abuser 1) and John Doe 4 (T.B. Abuser 2) during Plaintiff John Doe, T.B.'s confinement at CHS.

67.    At the relevant times herein, Defendants John Doe Supervisors 6-10 were acting within the course and scope of their employment as supervisors to Defendants John Doe 3 (T.B. Abuser 1) and John Doe 4 (T.B. Abuser 2), while they were employed at CHS.

68.    At the relevant times herein, Defendants John Doe Supervisors 6-10 were acting under color of state law pursuant to 42 U.S.C. § 1983 by overseeing and supervising Defendants John Doe 3 (T.B. Abuser 1) and John Doe 4 (T.B. Abuser 2), and by being charged with keeping Plaintiff John Doe, T.B. safe in all respects, *in loco parentis.*

## JURISDICTION AND VENUE

69.    This is a civil action brought pursuant to 42 U.S.C. § 1983 seeking compensatory damages and punitive damages against Defendants for, among other claims, violations of Plaintiffs' rights, privileges, and immunities secured by the United States Constitution, including the Fourteenth Amendment and federal law.

70.    This Court has subject matter jurisdiction over Plaintiffs' 42 U.S.C. § 1983 claims, pursuant to 28 U.S.C. § 1331, because Plaintiffs' claims arise under the United States Constitution and laws of the United States, 28 U.S.C. §§ 1343(a)(3) and (4), which authorizes federal courts to hear civil rights cases.

71.    Pursuant to 28 U.S.C. § 1391(b), venue properly lies before this Court because the cause of action upon which the complaint is based arose in Maryland,

which is situated within the vicinage of the United States District Court for the District of Maryland.

## HISTORY AND TOLERANCE OF SEXUAL ABUSE IN MARYLAND STATE JUVENILE DETENTION SYSTEM

### A.    Sexual Abuse of Children at DJS Juvenile Detention Facilities

72.    The Maryland Department of Juvenile Services (hereinafter referred to as "DJS") is a department within the Executive Branch of the Maryland State government and has appointing authority for all persons employed by it. It is charged with the responsibility and is delegated the power, under Maryland State law, to ensure the care, custody, and control of the people, primarily children, who are housed within its facilities.

73.    Within its broader mandate to manage, supervise, and treat youth who are involved in the juvenile justice system in Maryland, DJS is responsible for operation of Maryland's secure juvenile detention facilities and is charged with ensuring the care, custody, and control of the individuals housed within its facilities.[1] DJS currently oversees six juvenile detention centers within the State of Maryland, including CHS. DJS also operated Waxter before its closure in 2022.

74.    For decades, children detained in Maryland juvenile detention facilities suffered sexual abuse at the hands of guards, counselors, and other agents of DJS,

---

[1]    Dep't of Juvenile Servs., Detention and Community Supervision, https://djs.maryland.gov/Pages/detention/Detention-Community-Supervision.aspx.

all while Defendants and their agents had knowledge of, and turned a blind eye to, this culture of abuse.[2] The sexual abuse at DJS facilities has ranged from inappropriate strip searches to rape using violent physical force. DJS agents have had, and continue to have, inappropriate and criminal sexual relationships with children at DJS facilities,[3] oftentimes involving bribery and grooming. Children detained in DJS facilities are regularly offered contraband—such as cigarettes, drugs, and alcohol—or privileges in exchange for sexual favors.[4] The pervasive and persistent abuse, including sexual abuse, at DJS facilities has been publicly reported on for decades,[5] leading to the formation of a task force in 1999[6] and an investigation by the United States Department of Justice between 2002 and 2004.[7] The culture of abuse nonetheless continues to be a reality for children detained in DJS facilities to this day.

---

[2] *See, e.g.*, U.S. Dep't of Just., Bureau of Justice Statistics, *Sexual Victimization in Juvenile Facilities Reported by Youth, 2008-09* (Jan. 2010), https://files.eric.ed.gov/fulltext/ED508530.pdf.
[3] *See* U.S. Dep't of Just., Civil Rights Division, *Investigation of the Cheltenham Youth Facility in Cheltenham, Maryland, and the Charles H. Hickey, Jr. School in Baltimore, Maryland*, 13 (Apr. 2004), https://www.justice.gov/sites/default/files/crt/legacy/2010/12/15/cheltenham_md.pdf.
[4] *See* U.S. Dep't of Just., *supra* note 2, at 14.
[5] *See, e.g.*, Lan Nguyen, *Sex-Abuse Case Forces CYBA to Review Hiring,* The Howard County Sun, May 24, 1992, at 84; *Prince George's Nurse Indicted on Sex Charges*, The Sun, Aug. 22, 1991, at B3, https://baltimoresun.newspapers.com/image/375938591/.
[6] Kate Shatzkin, *Monitors Begin Their Watch at Youth Facilities*, The Sun, Dec. 15, 1999, at 1, https://baltimoresun.newspapers.com/image/173482911/.
[7] *See* U.S. Dep't of Just., *supra* note 3, at 1.

75.     Children who are sexually abused in DJS facilities rarely file grievances against staff due to fear of retaliation[8] or knowing that they will not be believed.[9] Children at DJS facilities know that they cannot trust facility staff, who regularly engage in physical abuse of the children charged to their care.[10] When they do witness or learn of sexual assaults, staff members at DJS facilities look the other way and allow it to continue.[11] Upon information and belief, DJS facilities operated for decades without adequate instructions or procedures for children to report abuse, necessitating the U.S. Department of Justice's call for implementation of such procedures as part of a settlement with the State of Maryland in 2005.[12] Sexual abuse at DJS facilities therefore goes severely underreported.

76.     Nonetheless, there is evidence that rates of sexual abuse at DJS facilities are extraordinarily high. In January 2010, the U.S. Department of Justice issued a report studying incidents of sexual abuse at nearly 200 juvenile detention

---

[8] *See* Philip J. Merson, Independent Juvenile Justice Monitor, *Special Report on Conditions/Incidents at the Charles Hickey School*, May 29, 2003, at 1, https://www.privateci.org/private_pics/Hickey.pdf.

[9] *See* Todd Richissin, *Abuse of Teens Persists Despite State's Promises*, The Sun, Nov. 25, 2001, at 9, https://baltimoresun.newspapers.com/image/378208304/ (noting that "prosecutions are rare" and quoting police officer stating that "[y]ou have a group of kids who are locked up for doing some pretty bad things, and . . . they don't make the world's best witnesses").

[10] *See id.* at 1.

[11] *See* Maureen O'Hagan, *Coalition Urges Closing of Md. Youth Facility*, Washington Post, Feb. 23, 2001, https://www.washingtonpost.com/archive/local/2001/02/23/coalition-urges-closing-of-md-youth-facility/3605e311-b90c-4411-b240-b1979ca8f08b/.

[12] *See* U.S. Dep't of Just. & Maryland Settlement Agreement, https://clearinghouse-umich-production.s3.amazonaws.com/media/doc/19513.pdf.

facilities across the country.[13] The study found Maryland facilities to have some of the highest rates of sexual abuse of any facilities in the country, with over 36% of youth at the DJS's Backbone facility reporting sexual abuse, compared to a 12% average for facilities nationwide.[14] Defendants and their agents have historically underpaid DJS facility staff,[15] provided inadequate training,[16] hired staff with known criminal histories of abuse against juveniles,[17] and implemented and preserved harmful policies like those allowing staff to perform strip searches on children with no reasonable basis[18]—all of which have contributed to the exceptionally high rates of sexual abuse at DJS facilities over the decades.

### B.    Knowledge of Sexual Abuse at DJS Juvenile Detention Facilities

77.    It was well known at every level of DJS—ranging from individuals who served as the Secretary of DJS and superintendents of juvenile detention facilities to supervisors and guards at juvenile detention facilities—that the sexual abuse of children by facility staff was a persistent and prevalent problem in their juvenile detention facilities. For decades, Defendants have been made aware of the ongoing sexual abuse of children in their care through the investigations and reports by the

---

[13] *See* U.S. Dep't of Just., *supra* note 1.
[14] *Id.* at 3-4.
[15] *See* Richissin, *supra* note 9, at 9.
[16] *See id.*
[17] *See* U.S. Dep't of Just., *supra* note 2, at 6.
[18] *See* Erica L. Green, *Task Force Calls for Limits on Strip Searches*, The Sun, Dec. 2, 2016, at A15, https://www.newspapers.com/image/263538737/.

State's own task force and by the U.S. Department of Justice, studies by third parties, allegations by children at DJS facilities, and criminal proceedings against their employees and agents.

78.    Documented and publicized abuse at DJS facilities, and reports of conditions known to be likely to lead to abuse, include:

a.    In May 1986, a class action was filed against the State regarding abuse of children at the Montrose School (a juvenile detention facility that closed in 1988), alleging "systematic" mistreatment by staff, including allowing an eleven-year-old child to be raped repeatedly by older boys at the facility;[19]

b.    In February 1991, a counselor at Cheltenham was found guilty of sexually assaulting a child at the facility;[20]

c.    In October 1991, a nurse at Cheltenham was indicted on charges that he sexually abused 16 boys at the facility in the space of less than two weeks;[21]

d.    In 1995, a report by the Annie E. Casey Foundation studied conditions at Cheltenham and called the facility one of the worst in the country, with

---

[19] *See* Jeffrey A. Butts & Samuel M. Street, *Youth Correction Reform: The Maryland and Florida Experience*, 8 (1988), https://jeffreybutts.files.wordpress.com/1988/07/csyp-md.pdf.
[20] *See* Nguyen, *supra* note 5.
[21] *See* The Sun, *supra* note 5.

poor training and squalid, overcrowded conditions leading to rampant physical abuse;[22]

e. In July 1999, Cheltenham Superintendent Carlton Richardson was demoted and transferred to another facility after it was discovered that a counselor under his supervision impregnated a teen at the facility;[23]

f. In 1999, the State acknowledged that it had fired seven Cheltenham staff members for assaulting children and, in response to public pressure, instituted a task force to monitor ongoing abuse at the facility;[24]

g. In December 1999, a supervisor at Maple Run was charged with child abuse, shortly after a governor's task force investigation found a pattern of abuse at that facility and others;[25]

h. In 2000, at least two guards at VCC were charged with sexually abusing children at the facility;[26]

---

[22] *See* Manuel Perez-Rivas, *The Trouble in Youth Detention*, Washington Post, Mar. 22, 2000, https://www.washingtonpost.com/archive/local/2000/03/22/the-trouble-in-youth-detention/56ba2f5c-0b1b-4c5c-81cc-8ceec86fcf3e/.

[23] *See* Todd Richissin, *Head of Juvenile Jail is Demoted*, The Sun, July 17, 1999, https://baltimoresun.newspapers.com/image/172822422/.

[24] *See* Shatzkin, *supra* note 6, at 28.

[25] *See*, *Youth Camp Charge Filed; Counselor Accused of Abuse and Assault at Forestry Center; Juvenile Justice Operation; Teenager Tells Police He Was Handcuffed, Dragged in Dirt*, The Sun, Dec. 30, 1999, https://www.baltimoresun.com/1999/12/30/youth-camp-charge-filed-counselor-accused-of-abuse-and-assault-at-forestry-center-juvenile-justice-operation-teen-ager-tells-police-he-was-handcuffed-dragged-in-dirt/.

[26] *See* Richissin, *supra* note 9, at 9.

i.  In May 2000, three guards at Backbone were fired due to rampant physical abuse of children at the facility;[27]

j.  In February 2001, a coalition of public advocacy organizations called for the closure of Cheltenham, citing physical and sexual abuse at the facility;[28]

k.  In November 2001, a report by The Baltimore Sun found at least a dozen reports of sexual assaults by guards against children across the Cheltenham, VCC, and CHS facilities;[29]

l.  In April 2002, a Cheltenham guard was charged with multiple sex crimes after it was discovered that she had had a weeks-long sexual relationship with a child at the facility;[30]

m.  In May 2003, a Special Report by Maryland's Independent Juvenile Justice Monitor found multiple instances of sexual relationships between staff and children at CHS (Defendant Montague was serving as Acting Secretary of Juvenile Justice at this time, and was intimately aware of the findings);[31]

---

[27] *See 6 More Fired for Abuse at Boot Camps; 14 Guards Dismissed Since Brutality Allegations Surfaced*, The Sun, May 6, 2000, https://www.baltimoresun.com/2000/05/06/6-more-fired-for-abuse-at-boot-camps-14-guards-dismissed-since-brutality-allegations-surfaced-no-other-choice-officials-say-that-more-terminations-could-be-forthcoming/.

[28] *See* O'Hagan, *supra* note 11.

[29] *See* Richissin, *supra* note 9, at 9.

[30] *See Cheltenham Guard is Charged With Sexual Assault*, The Sun, Apr. 12, 2002, https://web.archive.org/web/20210621162546/https://www.baltimoresun.com/news/bs-xpm-2002-04-12-0204120381-story.html.

[31] *See* Merson, *supra* note 8.

n.  In April 2004, following a two-year investigation, the U.S. Department of Justice issued a report on the conditions at Cheltenham and CHS, finding (among many other forms of abuse and insufficient care) multiple instances of sexual relationships between facility staff and children at the facilities and noting that "the facilities have failed to institute adequate measures to prevent incidents such as these from recurring (Defendant Montague was serving as Secretary of Juvenile Services at this time, and was intimately aware of the findings);"[32]

o.  In March 2005, reports emerged about a regular practice by a guard at Noyes forcing children to strip naked and allow the guard and other children to hit them in the groin repeatedly (Defendant Montague was serving as Secretary of Juvenile Services at this time, and was intimately aware of the reports);[33]

p.  In July 2005, the State of Maryland announced that it would be closing CHS due to concerns over conditions and what the State's own governor called "a violation of constitutional rights" and "a living model in what a system should not become;"[34] however, only the treatment center portion

---

[32] *See* U.S. Dep't of Just., *supra* note 3, at 13.
[33] *See* Lynn Anderson, *Abuse Alleged at 2 Juvenile Facilities*, The Sun, Mar. 30, 2005, https://www.baltimoresun.com/maryland/bal-te.md.juvenile30mar30-story.html.
[34] *See* Andrew Green, *Oft-Criticized Youth Facility to be Closed*, The Sun, July 1, 2005, https://www.baltimoresun.com/2005/07/01/oft-criticized-youth-facility-to-be-closed/.

of the facility ended up closing, and CHS has continued operating as a detention center to this day (Defendant Montague was serving as Secretary of Juvenile Services at this time, and was intimately aware of the constitutional violations taking place at CHS);

q. In May 2006, investigators for Maryland's Independent Juvenile Justice Monitor witnessed and reported on a male Waxter staff member punching a girl in DJS custody while she screamed for him to get off her (Defendant Montague was serving as Secretary of Juvenile Services at this time, and was intimately aware of the investigation and its findings);[35]

r. In May 2006, reports on conditions at LESCC and Waxter found that the facilities continued to be sites of child abuse, assaults, underfunding, inadequate training, and overly aggressive staff; Maryland's former Independent Monitor was quoted as saying that these conditions appeared to have been unchanged from his years monitoring DJS facilities (Defendant Montague was serving as Secretary of Juvenile Services at this time, and was intimately aware of the findings);[36]

---

[35] *See* Greg Garland, *'Don't Touch Me. Get Off My Stomach.'*, The Sun, May 11, 2006, https://www.baltimoresun.com/news/bs-xpm-2006-05-11-0605110100-story.html.

[36] *See* Mary Otto, *State Centers Still Beset by Problems, Report Says*, Washington Post, May 24, 2006, https://www.washingtonpost.com/archive/local/2006/05/24/state-centers-still-beset-by-problems-report-says/38357e44-2647-4399-b700-08b580276f93/.

s.  In August 2006, following a year-long investigation, the U.S. Department of Justice issued a report on the conditions at the BCJJC, finding numerous conditions likely to lead to sexual abuse, including overuse of solitary confinement, lack of staff supervision, and incomplete recordkeeping of staff checks and interactions with children (Defendant Montague was serving as Secretary of Juvenile Services at this time, and was intimately aware of the report and its findings);[37]

t.  In March 2007, a Special Report by Maryland's Independent Juvenile Justice Monitor concluded that Waxter had "outlived its usefulness" and recommended that it be shut down; the Report further noted inadequate training, cruel overuse of solitary confinement, and a dangerous lack of sightlines in the facility's design (making it easier to hide what was going on in the facility) (Defendant Montague was serving as Secretary of Juvenile Services at this time, and was intimately aware of the Special Report and its findings);[38]

---

[37] *See* U.S. Dep't of Just., Civil Rights Division, *Investigation of the Baltimore City Juvenile Justice Center in Baltimore, Maryland*, 13 (Aug. 2004), https://www.justice.gov/sites/default/files/crt/legacy/2011/04/13/baltimore_juve_findlet_8-7-06.pdf.
[38] *See* Juvenile Justice Monitor Unit, *Special Report on Thomas J.S. Waxter Children's Center – Final Findings and Recommendations* (Mar. 22, 2007), https://www.marylandattorneygeneral.gov/JJM%20Documents/WaxterSpecial3_22_07.pdf.

u. In December 2009, a report by the Capital News Service detailed efforts by critics, including the American Civil Liberties Union and Advocates for Children and Youth, to shut down Waxter, due to, among many issues, the ongoing abuse of children by unqualified staff (Defendant Devore was serving as Secretary of Juvenile Services at this time, and was intimately aware of the report);[39]

v. In December 2016, a task force formed in response to ongoing abuse at DJS facilities recommended that policies finally be put in place to curb the overuse of strip searches of children across DJS facilities statewide, noting that existing policies allowed strip searches to be carried out without any reasonable belief that a child is actually concealing contraband (Defendant Abed was serving as Secretary of Juvenile Services at this time, and was intimately aware of the task force's findings);[40]

w. In December 2016, Defendant Abed voted against the aforementioned task force recommendations on curbing overuse of strip searches;[41]

x. In March 2021, a staff member at the Victor Cullen Center ("VCC") was indicted on three counts of child sexual abuse following the discovery of

---

[39] *See* Kelly Brooks, *Critics Call for Closure of Detention Facility for Girls*, Capital News Service, Dec. 22, 2009, https://thedailyrecord.com/2009/12/22/critics-call-for-closure-of-detention-facility-for-girls/.

[40] *See* Green, *supra* note 18.

[41] *See id.*

her ongoing sexual relationship with a child at the facility (Defendant Abed was serving as Secretary of Juvenile Services at this time, and was intimately aware of the discovery of ongoing sexual abuse);[42]

y.  In October 2021, a juvenile corrections officer at Lower Eastern Shore Children's Center ("LESCC") was indicted for sexual assault of a 15-year-old girl who he had met while she was an LESCC resident (Defendant Schiraldi was serving as Secretary of Juvenile Services at this time, and was intimately aware of the conduct leading to the indictment);[43]

z.  In 2022, Maryland's Juvenile Justice Monitoring Unit reported egregious conditions and abuse across DJS facilities, including that the Baltimore City Juvenile Justice Center ("BCJJC") "continues to operate as a prison-like environment" that is "dangerous and often chaotic" for the children housed there (Defendant Schiraldi was serving as Secretary of Juvenile Services at this time, and was intimately aware of the findings).[44]

---

[42] *See* Don Aines, *Former Victor Cullen Worker Indicted on Sexual Abuse Charges*, The Herald-Mail, Mar. 26, 2021, https://www.heraldmailmedia.com/story/news/local/2021/03/26/former-victor-cullen-worker-indicted-on-sexual-abuse-charges/115907068/.

[43] *See*, Natalie Jones, *Salisbury Juvenile Corrections Officer Indicted After Alleged Sex With 15-Year-Old Girl*, MyEasternShoreMD.com, Oct. 5, 2021, https://www.myeasternshoremd.com/stardem/news/salisbury-juvenile-corrections-officer-indicted-after-alleged-sex-with-15-year-old-girl/article_8c29a912-77c1-5ca1-932c-dba1377ec7d8.html.

[44] *See* Juvenile Justice Monitoring Unit, *2022 Second Quarter Report*, 27 (Sept. 2022), https://www.documentcloud.org/documents/22924402-jjmu-2022-q2-report-final-including-djs-jsep-response#document/.

79.    Defendants are now and were at all material times aware that the above reports represent only a fraction of incidents of sexual abuse in DJS facilities, given the prevalence of under-reporting in such environments.[45]

80.    Upon information and belief, Defendants are now and were at all material times aware (and have for decades been aware) that the conditions identified in the above reports as connected to sexual abuse (*e.g.*, the failure to adequately screen, supervise, train, investigate, and discipline staff members; the overcrowding of facilities leading to insufficient supervision and enforcement; the failure to provide adequate mental health and support services to residents; and the fostering of a culture of physical violence and intimidation) were and are endemic to all DJS facilities.

## C.    History and Knowledge of Sexual Abuse at Waxter and CHS, the Facilities Plaintiffs Were Incarcerated.

81.    Additionally, Defendants have long been aware of the abuse suffered by children at Waxter and CHS—including Plaintiffs Jane Doe, A.W., Jane Doe, T.H., and Jane Doe, T.B.—and the conditions at these facilities likely to lead to further sexual abuse of the individuals therein.

---

[45] *See* U.S. Dep't of Just., *Prison Rape Elimination Act Regulatory Impact Assessment*, 17 (May 17, 2012), ("[O]nly a fraction of incidents of sexual abuse in a prison environment will typically come to the attention of correctional authorities or be reflected in institutional records.").

1. **Systemic Issues at Waxter Foster an Environment of Sexual Abuse.**

82.    The Thomas J.S. Waxter Children's Center ("Waxter") in Prince George's County was first opened in the 1960s. Originally designed for both boys and girls, it became a center for only girls in 2000 and, until 2011, operated as Maryland's only secure commitment facility for girls.

83.    Waxter's mission was to help at-risk youth grow and mature, with an emphasis on education and life skills—yet the very system that was in place to protect these children wholly failed to do so and, in-fact, broke them.

84.    In 2006, exposés in the Washington Post and the Baltimore Sun revealed that abuse and systemic neglect had become standard practice at Maryland's juvenile facilities, including Waxter.[46]

85.    In 2007, many of Waxter's palpable failures were so bad that Maryland's Justice Monitoring Unit issued a Special Report demanding its closure.[47] It noted that the facility was not safe, decent, or rehabilitative.

---

[46] *See State Centers Still Best by Problems Report Says*, The Washington Post (May 24, 2000), https://www.washingtonpost.com/archive/local/2006/05/24/state-centers-still-beset-by-problems-report-says/38357e44-2647-4399-b700-08b580276f93/ (last viewed November 14, 2025); *see also* Greg Garland, *'Don't Touch Me Get Off My Stomach'*, The Baltimore Sun (May 11, 2006), https://www.baltimoresun.com/2006/05/11/dont-touch-me-get-off-my-stomach/ (last viewed November 14, 2025).

[47] *See https://www.marylandattorneygeneral.gov/JJM%20Documents/WaxterSpecial3_22_07.pdf* (last viewed June 5, 2025).

86.    In 2009, the Daily Record revealed a shocking number of suicide attempts and mental health crises among youth in Waxter.[48] The children who were being held there were dealing with significant mental health issues and were very clearly not receiving the proper attention they needed.

87.    In 2016, the Baltimore Sun reported that female children in Maryland were more likely to be brought before a judge for small transgressions like disobeying their parents, breaking curfew, or running away, and that they were disproportionately imprisoned for low-level offenses.[49] Additionally, it reported that half of the 330 reported suicide attempts and suicide ideations that occurred in all of Maryland's juvenile facilities in 2015 occurred at Waxter.

88.    The Maryland Juvenile Justice Monitoring Unit ("JJMU")'s monitoring reports revealed a pattern of self-harm, suicidal ideation, and suicide attempts between 2010 to 2020 at Waxter that was both startlingly high and consistent. JJMU described conditions at Waxter as "dilapidated," "decrepit," and "in a state of disrepair." JJMU also reported that the terrible facility conditions stopped the facility from recruiting qualified personnel to supervise the girls and administer the

---

[48] See Critics call for closure of detention facility for girls, Capital News Servs. (Dec. 22, 2009), https://thedailyrecord.com/2009/12/22/critics-call-for-closure-of-detention-facility-for-girls/ (last viewed November 14, 2025).

[49] See Lost girls: Young women face harsher punishment in Maryland's juvenile justice system, The Baltimore Sun (Dec. 16, 2016), https://www.baltimoresun.com/2016/12/16/lost-girls-young-women-face-harsher-punishment-in-marylands-juvenile-justice-system/ (last viewed November 14, 2025).

programs. Indeed, throughout the years, JJMU noted that Waxter continually struggled to find qualified employees willing to work there, and that job vacancies were frequent and hard to fill. Waxter's staffing issues contributed to the persistent mistreatment of children housed there.

89.    By 2022, the Waxter was finally closed, as policy and other discussions changed about how the State should or might house—if at all—youth in the future.[50]

### 2.    Systemic Issues at CHS Foster an Environment of Sexual Abuse.

90.    The Charles H. Hickey, Jr. School ("CHS") in Baltimore County, Maryland, has long been a notorious hotbed of sexual abuse. Contrary to the name, CHS is not a school, but a prison-like juvenile detention center operated by the State of Maryland.

91.    CHS first opened in 1911 under the name the "Maryland School for Boys."[51] It was re-named the Charles H. Hickey, Jr. School in 1985.[52]

92.    For decades, survivors and witnesses at CHS reported abuses, pointing to a long-standing pattern of mistreatment and negligence within the facility.[53]

---

[50] *See* Steph Quinn, *Juvenile services department to move detained girls, again*, Capital News Servs. (Oct. 24, 2023), https://cnsmaryland.org/2023/10/24/juvenile-services-department-to-move-detained-girls-again/ (last viewed June 4, 2025).
[51] Dep't of Juvenile Services, *Charles H. Hickey, Jr. School*, https://djs.maryland.gov/Pages/facilities/Charles-H Hickey-Jr-School.aspx.
[52] *Id.*
[53] *See* Kelsey Kushner, *Dozens of people file lawsuits alleging abuse in Maryland's juvenile detention centers* (Oct. 5, 2023), https://www.cbsnews.com/baltimore/news/dozens-of-people-file-lawsuits-alleging-abuse-in-marylands-juvenile-detention-centers/ (last viewed on November 14, 2025).

Investigations into CHS suggest deeply ingrained problems in the administration's handling of staff conduct, as well as an utter failure to implement proper protocols that would safeguard children from harm.

93.    In 1967, the U.S. Department of Health, Education and Welfare, the predecessor agency to the U.S. Department of Health and Human Services, conducted a review of Maryland's juvenile services system. Its report described Maryland's juvenile detention facilities as, "too large," and recommended that the state "evaluate effective means of reducing the size of [its] institutions."[54]

94.    In 1973, the NAACP recommended that Maryland's Training Schools, including CHS, "be phased out and replaced by a variety of community-based facilities."[55]

95.    In April 1988, the Evening Sun in Baltimore reported on the unusually high number of altercations involving staff and residents at CHS, citing a previously unreleased study by the Maryland Health Department that found more than 800 CHS students had received injuries serious enough to require visits to the infirmary during

---

[54] Jeffrey A. Butts & Samuel M. Street, *Youth Correction Reform: The Maryland and Florida Experience* 8 (1988), available at https://jeffreybutts.files.wordpress.com/1988/07/csyp-md.pdf (quoting U.S. Dep't of Health, Education and Welfare, A Study and Assessment of Maryland's Program and Facilities for the Treatment and Control of Juvenile Delinquency (1967)).
[55] *Id.* at 8–9 (quoting NAACP Legal Defense and Educational Fund, Inc., *A Call for Reform of Maryland's Training Schools, A Report by the Task Force on Juvenile Justice* (Feb. 1973)).

1987.[56] The Maryland State Police investigated 10 accusations of child abuse at CHS during the same period.[57]

96.    In September 1990, University of Maryland law students observed girls detained in a female ward at the CHS with "scars, bruises and fairly deep cuts on their arms."[58] The girls also reported being placed in seclusion for periods as long as five days and being subjected to strip searches by male security guards. These reports prompted a DJS investigation conducted in October 1990.[59]

97.    In the early 2000s, male inmates reported that officers at the school would break into their cells at night and beat and sexually assault them.[60] Survivors recounted incidents in which employees, who were supposed to keep them safe, instead turned into their abusers, frequently causing injuries serious enough to require medical care.

98.    On May 29, 2003, JJMU issued a report to the Governor's Office for Children, Youth and Families documenting 20 cases of abuse and neglect at CHS

---

[56] Michael Wentzel, *Jail for Kids Punishment methods eyed as Hickey School Changes*, The Evening Sun (April 25, 1988)).

[57] *Id.*

[58] Laura Lippman, *State probes charge of girls' abuse at Hickey*, The Baltimore Sun (Oct. 17, 1990), https://www.baltimoresun.com/news/bs-xpm-1990-10-17-1990290143-story.html (last visited November 14, 2025)

[59] *Id.*

[60] *See* U.S. Dep't of Just., *Investigation of the Cheltenham Youth Facility in Cheltenham, Maryland, and the Charles H. Hickey, Jr. School in Baltimore, Maryland* (Apr., 2004), https://www.justice.gov/sites/default/files/crt/legacy/2010/12/15/cheltenham_md.pdf (last viewed November 14, 2025).

between January and May 2003. The 20 cases included instances of both physical and sexual abuse and questioned the accuracy of the DJS's incident report database that purported to track child abuse, assaults, and use-of-force incidents within Maryland's juvenile detention facilities.[61] While the report revealed "approximately 2.5 documented assault/use-of-force type incidents at Hickey each day," it emphasized that, "there may be many other cases that go unreported by staff and youth for fear of retaliation."[62]

99.    Additional incident reports appear to have been redacted from publicly available versions of the 2003 JJMU Report. Upon information and belief, earlier reports from JJMU describe similar patterns of abuse and excessive use of force.[63]

100.    On April 9, 2004, the U.S. Department of Justice's Civil Rights Division published the findings of its investigation into conditions at the Cheltenham Youth Facility and CHS in a 51-page report.[64] The Civil Rights Division found "major constitutional deficiencies" in both facilities' failure to protect youth from staff violence, unsafe restraint practices, youth violence, excessive isolation, and

---

[61] Philip J. Merson, *Independent Juvenile Justice Monitor Special Report on Conditions/Incidents at the Charles Hickey School* (May 29, 2003).
[62] *Id.*
[63] *Id.*
[64] *See* U.S. Dep't of Just., *Investigation of the Cheltenham Youth Facility in Cheltenham, Maryland, and the Charles H. Hickey, Jr. School in Baltimore, Maryland* (Apr., 2004), https://www.justice.gov/sites/default/files/crt/legacy/2010/12/15/cheltenham_md.pdf (last viewed November 14, 2025).

other abusive practices. The Civil Rights Division also found that CHS staff frequently ignored signs of sexual abuse and failed to intervene effectively. In several reported cases, detainees were sexually assaulted by peers while staff either turned a blind eye or stood by and watched.

101.   The U.S. Department of Justice investigation highlighted a consistent failure by CHS staff to report instances of sexual abuse to authorities. This lack of response emboldened abusers and created a climate of fear, where victims were often too intimidated to come forward.

102.   The findings of the U.S. Department of Justice Report also prompted the U.S. Department of Justice to initiate a civil action against the State of Maryland related to the conditions it observed at Cheltenham and CHS. The parties settled the matter on June 29, 2005. Underscoring the severity of U.S. Department of Justice's observations, the first substantive remedial measure appearing in the settlement agreement states: "The State shall take all reasonable measures to assure that youth are protected from violence and other physical or sexual abuse by staff and other youth."[65]

103.   Consistently over time, there were additional allegations of staff members engaging in inappropriate sexual conduct with detainees, often under the guise of disciplinary actions or private meetings. These incidents were rarely

---

[65] Settlement Agreement at 5, *United States v. Maryland*, 1:05-cv-01772 (June 29, 2005).

documented, and when reported, staff often faced minimal repercussions, perpetuating a cycle of abuse.

104.    The U.S. Department of Justice also documented cases where detainees were left unsupervised for extended periods, leading to instances of sexual assault among youth. Staff, in some cases, were found asleep or absent during shifts, which allowed these assaults to occur unchallenged and unchecked.

105.    On July 1, 2005, then Governor of Maryland Robert Ehrlich announced his intention to close CHS, describing conditions at the facility as "intolerable," "a violation of constitutional rights," and "a living model in what a system should not become."[66] However, less than two weeks later, Defendant Montague clarified that only a portion of the school, a 130-bed long-term residential program for post-disposition youths would be closed by November 30, 2005.[67] Despite the reduction in size, issues regarding DJS and its management of CHS remained.

106.    A June 22, 2007, JJMU Special Report regarding a May 2007 escape from CHS recommended closure of the facility stating: "We believe no amount of renovations, no matter how extensive, will ever make the Hickey facility appropriate for the housing of youth."[68]

---

[66] Andrew A. Green, *Oft-criticized youth facility to be closed*, The Baltimore Sun (July 1, 2005) https://www.baltimoresun.com/maryland/bal-te.md.hickey01jul01-story.html.
[67] Greg Garland, *Plans to close Hickey school questioned*, The Baltimore Sun (July 13, 2005) https://www.baltimoresun.com/maryland/bal-md.hickey13jul13-story.html.
[68] State of Maryland Office of the Attorney General Juvenile Justice Monitoring Unit, *Charles H. Hickey, Jr. School Special Report* (Oct. 11, 2007) (quoting State of Maryland Office of the Attorney

107.   On October 11, 2007, another JJMU Special Report regarding an escape from CHS in September 2007 reiterated its recommendation to close the facility, choosing to simply quote its June recommendations in full.[69]

108.   On January 12, 2008, reporting by the Baltimore Sun revealed that the Superintendent of CHS, Wallis Norman, had previously resigned under threat of dismissal from a superintendent role at a juvenile detention facility for trying to hide allegations of assault made by an incarcerated youth in his care.[70] DJS did not remove Norman from his position as Superintendent.[71]

109.   In 2009, Tyra M. Greenfield, a counselor at the New Directions Program, a privately-run secure program for youth sex offenders operating at CHS, was charged with sexual child abuse following an incident in which she had sex with a child in her care at her home following his escape from CHS.[72]

---

General Juvenile Justice Monitoring Unit, *Charles H. Hickey, Jr. School Special Report* (June 22, 2007) https://www.marylandattorneygeneral.gov/JJM%20Documents/Hickey%20Special%20Report%20Final102507.pdf.

[69] *Id.*

[70] Gadi Dechter, *Head of Hickey forced out in Ga.*, The Baltimore Sun (Jan. 12, 2008) https://www.baltimoresun.com/news/bs-xpm-2008-01-12-0801120147-story.html    (last    visited November 14, 2025).

[71] Gadi Dechter, *Chief of Hickey School to keep post*, The Baltimore Sun (Feb. 23, 2008) https://www.baltimoresun.com/news/bs-xpm-2008-02-23-0802230227-story.html    (last    visited November 14, 2025).

[72] Ben Nuckols, *Escaped Juvenile Had Sex with Counselor*, News 4 Washington (Oct. 1, 2009) https://www.nbcwashington.com/news/local/escaped-juvenile-had-sex-with-counselor-police/1858044/ (last visited November 14, 2025)

110.   From 2010 to the present day, JJMU has issued quarterly reports on incidents within Maryland's juvenile detention facilities.[73] These quarterly reports do not categorize incidents of staff physical or sexual abuse. However, the Reports document a troubling volume of incidents involving the restraint of youths as well as incidents of suicide ideation, gestures, attempts or behavior within CHS and throughout Maryland's juvenile detention facilities. Defendants knew of the incidents described above, and many more, at CHS, yet failed to address or remediate the myriad harms, which continue to persist.

### D.    Secretary's Knowledge and Furtherance of Sexual Abuse at DJS Facilities.

111.   Defendants Montague, Devore, Abed, and Schiraldi each served as the Secretary of the Maryland Department of Juvenile Services, which heads the Department of Juvenile Services.[74]

112.   Defendants Montague, Devore, Abed, and Schiraldi exercised control over, and responsibility for, the State of Maryland Maryland's juvenile justice system, which included managing, supervising, and treating youth who were involved in the juvenile justice system in Maryland. As Secretary, these Defendants were responsible for the operation of, and conditions at, the juvenile detention

---

[73] *See, e.g.,* Maryland Office of the Attorney General Juvenile Justice Monitoring Unit, 2011 Annual Report (2011).
[74] Md. Human Servs. Art., Sec. 9-202.

facilities; for ensuring the safety and security of the youth therein; for ensuring that the youth were adequately protected from harm; for ensuring that youth received appropriate treatment, rehabilitation, and education commensurate with their needs and abilities; for ensuring that youth were provided due process of law; for ensuring that youth received adequate medical for ensuring that youth receive adequate medical and mental health care; for ensuring that youth are adequately protected from fire; and for ensuring that programs for youth are consistent with the Maryland Department of Juvenile Services' mission to provide opportunities for the treatment and rehabilitation of youth. Indeed, Defendants Montague, Devore, Abed, and Schiraldi Defendants Montague, Devore, Abed, and Schiraldi "involved in nearly every stage of the juvenile justice process from the moment [each] youth [was] brought into a juvenile intake center by the police or as a result of a citizen complaint to the time when a youth return[ed] to the community after completing treatment."[75]

113.    Despite this, the actions and omissions of Defendants Montague, Devore, Abed, and Schiraldi represent conduct which was willful, reckless and deliberately indifferent to the health, safety, and welfare of the individuals

---

[75] *Role of DJS in Maryland Juvenile Justice System,* Maryland: Department of Juvenile Services, https://djs.maryland.gov/Pages/about-us/Role.aspx#:~:text=If%20a%20youth%20is%20placed,%2Dof%2Dhome%20treatment%20program (last visited November 14, 2025).

incarcerated at the juvenile detention facilities, including Plaintiffs. Such actions and omissions include, *inter alia*:

    a. Failing to adopt and/or effectuate policy or policies to facilitate the discovery of sexual abuse and the prompt reporting thereof to appropriate authorities;

    b. Failing to properly and vigorously investigate various reports of sexual abuse by individuals incarcerated at DJS;

    c. Concealing the various complaints and accusations of sexual abuse made against employees at DJS facilities;

    d. Encouraging and perpetuating the development of a custom or course of conduct at DJS facilities whereby allegations of sexual abuse or mistreatment were not investigated or reported;

    e. Failing to have a policy, custom or procedure by which individuals incarcerated at DJS facilities could report such abuse.

114. Defendants Montague, Devore, Abed, and Schiraldi actions resulted in the youth at the juvenile detention facilities suffering sexual abuse, including Plaintiffs.

### 1. **Defendant Kenneth C. Montague Jr.**

115. Defendant Montague was the Acting Secretary of Juvenile Justice for the State of Maryland from January 15, 2003, through March 4, 2003. Defendant Montague officially became the Secretary of Juvenile Services for the State of Maryland and a member of the Governor's Executive Council on July 1, 2003, and served in that capacity until January 17, 2007.

116. Additionally, Defendant Montague held a wide range of posts within state government where he was on the frontline of receiving and in a position to implement policies to combat rampant sexual abuse of minors in state custody, that

undoubtedly would have saved Plaintiffs from the sexual brutalization they endured at the hands of their abusers, *to wit:*

    (a)    Defendant Montague served as the Chairman of the Task Force to Study Alternative Living Arrangements for Children in Out-of-Home Placement and was a Member of the Drug and Alcohol Council from 2003 through 2004;

    (b)    Defendant Montague served on the Task Force to Study the Mentoring and Monitoring of Children in the Custody of or under the Supervision of the Department of Juvenile Services between 2003 and 2004;

    (c)    Defendant Montague served on the Governor's Workforce Investment Board between 2003 and 2004;

    (d)    Defendant Montague was on the Sub-Cabinet for Children, Youth, and Families between 2003 and 2005;

    (e)    Defendant Montague participated in the Cabinet Council on Criminal and Juvenile Justice between 2003 and 2005;

    (f)    Defendant Montague was a Member of the State Commission on Public Safety Technology and Critical Infrastructure between 2003 and 2005;

(g)     Defendant Montague was a Member of the Cease Fire Council between 2003 and 2007;

(h)     Defendant Montague was a Member of the State Child Fatality Review Team between 2003 and 2007;

(i)     Defendant Montague was a Member of the Correctional Training Commission between 2003 and 2007;

(j)     Defendant Montague served on the Judges, Masters and Juvenile Justice Committee between 2003 and 2007;

(k)     Defendant Montague served on the State Advisory Board for Juvenile Services between 2003 and 2007;

(l)     Defendant Montague served on the Interdepartmental Advisory Committee for Minority Affairs between 2003 and 2007;

(m)     Defendant Montague served on the Maryland School-Based Health Center Policy Advisory Council between 2003 and 2007;

(n)     Defendant Montague served on the Governor's Commission on Service and Volunteerism between 2003 and 2007;

(o)     Defendant Montague served on the State's Attorneys Liaison Committee between 2003 and 2007;

(p)     Defendant Montague was a Member of the State Board of Victim Services between 2003 and 2007;

(q)     Defendant Montague was a Member of the Task Force to Study Criminal Offender Monitoring by Global Positioning Systems, between 2004 and 2005;

(r)     Defendant Montague was a Member of the Governor's Commission on Quality Education in Maryland between 2004 and 2005 and served on the subcommittee on school & community linkages;

(s)     Defendant Montague was a Member of the Coordinating Council for Juvenile Services Educational Programs between 2004 and 2007;

(t)     Defendant Montague served on the Maryland State Drug and Alcohol Abuse Council between 2004 and 2007;

(u)     Defendant Montague was a Member of the Advisory Council for Children between 2005 and 2007;

(v)     Defendant Montague served on the Children's Cabinet between 2005 and 2007;

(w)     Defendant Montague was a Member of the Mental Health Transformation Working Group between 2005 and 2007;

(x)     Defendant Montague served on the Delinquency Prevention and Diversion Services Task Force between 2006 and 2007; and

(y)    Defendant Montague served on the Governor's Council on Family Violence Prevention between 2006 and 2007.

117.    From 2003 through 2007, there was no single individual within state government more aware of the rampant sexual abuse taking place in Maryland juvenile detention facilities than Defendant Montague. Nor was there an individual in state government more aware of the life-altering impact on and damages to children resulting from said abuse than Defendant Montague.[76] Indeed, Defendant Montague acknowledged the systemic problems at DJS facilities, including predatory staff members.[77]

118.    From 2003 through 2007, there was no single individual in state government more responsible for creating policies that caused and perpetuated a culture of sexual abuse than Defendant Montague.[78]

---

[76] For example, in June of 2003, Defendant Montague received a state monitor's report which "detailed more than 20 cases of child abuse and neglect over the past year, including instance of staff allegedly having sex with youth and brining alcohol and pornographic materials into Cheltenham," a facility with "a history of kids not receiving adequate services or being mistreated." Jeff Barker, *State may take over operation of Hickey School youth facility*, Baltimore Sun (July 16, 2003). Defendant Montague also acknowledged that his agency was responsible for taking actions to correct such abuse, *id.*, yet failed to take necessary corrective action. This report also came three years after Defendant Montague's predecessor, Bishop L. Robinson, "told legislators that the facility 'needed to be demolished.'" *Id.*

[77] Jeff Barker, *At state-run juvenile facility, a life of violence, predators*, The Baltimore Sun (June 6, 2003).

[78] *Ex-critic now faces criticism*, The Baltimore Sun (June 21, 2008) (criticizing Montague for not doing enough to improve conditions at juvenile detention facilities despite undoubtedly knowing the problems). Further, Defendant Montague signed a settlement

119.   From 2003 through 2007, Defendant Montague authorized, instituted, and, through his conduct, encouraged the malicious conduct within Maryland's juvenile detention system, and was responsible for enhancing a culture of sexual abuse therein, ultimately to the detriment of Plaintiffs, despite explicit assurances to "take all reasonable measures to assure that youth are protected from violence and other physical or sexual abuse by staff and other youth" when constitutional violations were uncovered by the DOJ.[79]

120.   For example, just one year after DJS resumed responsibility for operations at CHS, then Maryland Governor Robert Ehrlick announced his intention to close the facility, describing conditions at the facility as, "intolerable," "a violation of constitutional rights," and "a living model in what a system should not become."[80] Despite this, less than two weeks after Governor Ehrlich's announcement, Secretary Montague clarified that only a portion of the school would be closed, while another portion would continue to operate indefinitely.[81] The detention center remained in operation and, less than two years later, a Juvenile

---

[79] U.S. Dep't of Justice, *Settlement Agreement* (June 29, 2005), available at https://www.justice.gov/sites/default/files/crt/legacy/2010/12/15/split_maryland_agree_6-29-05.pdf; *see also* U.S. Dep't of Just., Civil Rights Division, *Investigation of the Cheltenham Youth Facility in Cheltenham, Maryland, and the Charles H. Hickey, Jr. School in Baltimore, Maryland*, 13 (Apr. 2004), available at https://www.justice.gov/sites/default/files/crt/legacy/2010/12/15/cheltenham_md.pdf.

[80] Andrew A. Green, *Oft-criticized youth facility to be closed*, The Baltimore Sun (July 1, 2005).

[81] Greg Garland, *Plans to close Hickey school questioned*, The Baltimore Sun (July 13, 2005).

Justice Monitoring Unit Special Report outlined the numerous violations of federal State standards of care within the facility, calling the facility a "jail for children."[82]

121.   Between 2003 and 2007, Defendant Montague actively concealed what he knew to be the horrors associated with life in both Waxter and CHS, along with each and every state operated juvenile detention center, ultimately to the detriment of Plaintiffs. On one instance, Montague touted that juvenile detention facility populations were down because of his agency's reform efforts, despite the then Director of Baltimore juvenile center writing desperate memos to Montague to the contrary and JJM issuing a scathing report describing "youth attacking each other and workers, setting fires, climbing walls to escape and attempting suicide."[83]

122.   Between 2003 and 2007, Defendant Montague actively protected abusers from consequence for their notorious, rabid sexual violence put upon vulnerable youth in state operated detention facilities across Maryland, to the detriment of the children they were abusing, and ultimately to the detriment of Plaintiffs.

---

[82] State of Maryland Office of the Attorney General Juvenile Justice Monitoring Unit, *Charles H. Hickey, Jr. School Special Report* (Oct. 11, 2007) (quoting State of Maryland Office of the Attorney General Juvenile Justice Monitoring Unit, *Charles H. Hickey, Jr. School Special Report* (June 22, 2007)), available at https://www.marylandattorneygeneral.gov/JJM%20Documents/Hickey%20Special%20Report%20Final102507.pdf.

[83] Greg Garland, *Montague made many trips as DJS chief,* The Baltimore Sun (Jan. 14, 2007).

123.    Between 2003 and 2007, Defendant Montague, upon learning of the corrosive culture of rape, sodomy and sexual abuse in state operated juvenile detention facilities, and upon learning that those charged with the day-to-day operations of said facilities were the predominant abusers, sought to protect them and himself to the detriment of thousands of children who were confined in said facilities, and who would become confined to said facilities in the future, including Plaintiffs.[84] Instead of taking corrective action, Montague repeatedly defended DJS after reports of abuse emerged.[85]

124.    Between 2003 and 2007, Defendant Montague instituted, permitted, endorsed, encouraged, facilitated and condoned the sexual abuse of children in State operated juvenile facilities.

125.    Between 2003 and 2007, Defendant Montague's actions caused the corrosive culture to continue and grow exponentially to those that were then confined, and ultimately to the detriment of Plaintiffs.[86]

---

[84] Greg Garland, *Juvenile Services head defends agency*, The Baltimore Sun (Sept. 18, 2004).

[85] *Id.*; Lynn Anderson, *Secretary says Juvenile Services making progress*, The Baltimore Sun (Apr. 1, 2005) (stating that Montague "defend[ed]" DJS after when "responding to mounting criticism that came after reports of abuse revealed by the state Office of the Independent Juvenile Justice Monitor"); Greg Garland, *Officials deny agencies failed to guarantee youths' safety*, The Baltimore Sun (June 13, 2005) (explaining that the DJS was aware of incidents reported but, nevertheless, disputed findings of the juvenile justice officials who investigate instances of abuse and disputing that they failed to ensure safety at Hickey).

[86] Bobby Zirkin, *Montague missed chance for reform*, The Sun (Jan. 19, 2007) (stating that "Montague missed chance for reform" because "the underlying reforms, including expanding community placements and day reporting centers, were not implemented—not because further study was required").

126. Defendant Montague, at all times between 2003 and 2007, acted under color of state law pursuant to 42 U.S.C. § 1983, by overseeing, supervising, and having the responsibility of keeping children housed in state operated juvenile facilities safe and secure, in all respects, *in loco parentis*.

## 2. **Defendant Donald W. Devore**

127. Defendant Donald W. Devore ("Devore") was the Acting Secretary of Juvenile Services for the State of Maryland from February 22, 2007, through March 1, 2017. Defendant Devore officially became the Secretary of Juvenile Services for the State of Maryland and a member of the Governor's Executive Council on March 1, 2007, and served in that capacity until January 7, 2011.

128. Additionally, Defendant Devore held a wide range of posts within the Maryland state government where he was on the frontline of receiving, and in a position to implement policies to combat, rampant sexual abuse of minors in state custody, that undoubtedly would have saved Plaintiffs from the sexual brutalization they endured at the hands of their abusers, *to wit:*

(a)    Defendant was a Member of the Children's Cabinet from 2007 through 2011;

(b)    Defendant Devore was a Member of the Cease Fire Council from 2007 through 2011;

(c)     Defendant Devore was a Member of the State Child Fatality Review Team from 2007 through 2011;

(d)     Defendant Devore was a Member of the State Coordinating Council for Children from 2007 through 2011;

(e)     Defendant Devore served on the Advisory Council to the Children's Cabinet from 2007 through 2011;

(f)     Defendant Devore was a Member of the Correctional Training Commission from 2007 through 2011;

(g)     Defendant Devore was a Member of the Maryland State Drug and Alcohol Abuse Council from 2007 through 2011;

(h)     Defendant Devore served on the Governor's Family Violence Council (formerly Governor's Council on Family Violence Prevention) from 2007 through 2011;

(i)     Defendant Devore was a Member of the Judges, Masters and Juvenile Justice Committee from 2007 through 2011;

(j)     Defendant Devore served on the Coordinating Council for Juvenile Services Educational Programs from 2007 through 2011;

(k)     Defendant Devore was a Member of the Mental Health Transformation Working Group from 2007 through 2011;

(l)     Defendant Devore served on the Interdepartmental Advisory Committee for Minority Affairs from 2007 through 2011;

(m)     Defendant Devore was a Member of the Task Force to Study Prison Violence in Maryland from 2007 through 2011;

(n)     Defendant Devore was a Member of the Maryland School-Based Health Care Policy Advisory Council from 2007 through 2011;

(o)     Defendant Devore was a Member of the Vehicle Theft Prevention Council from 2007 through 2011;

(p)     Defendant Devore served on the State Board of Victim Services from 2007 through 2011;

(q)     Defendant Devore was a Member of the Task Force to Study the Procurement of Health and Social Services by State Agencies from 2008 through 2010;

(r)     Defendant Devore was a Member of the State Council for Interstate Juvenile Supervision from 2009 through 2011;

(s)     Defendant Devore was a Member of the State Advisory Board for Juvenile Services from 2009 through 2011;

(t)     Defendant Devore served on the Task Force on Prisoner Re-entry from 2009 through 2011;

(u)     Defendant Devore was a Member of the Maryland Commission on Suicide Prevention from 2009 through 2011;

(v)     Defendant Devore served on the Board of Directors, Maryland Workforce Corporation, from 2009 through 2011;

(w)     Defendant Devore was a Member of the Task Force to Study the Procurement of Health, Education, and Social Services by State Agencies from 2010 through 2011; and

(x)     Defendant Devore was a Member of the Sexual Offender Advisory Board from 2010 through 2011.

129.   From 2007 through 2011, there was no single individual within state government more aware of the rampant sexual abuse taking place in Maryland juvenile detention facilities, or of the life-altering impact on and damages to children resulting from said abuse, than Defendant Devore.

130.   From 2007 through 2011, there was no single individual in state government more responsible for creating policies that caused and perpetuated a culture of sexual abuse, ultimately to the detriment of Plaintiffs. At Waxter, for instance, Defendant Devore permitted "co-mingling of high security girls with other

residents, which is illegal under law" and ignored "complaints about bugs in the cafeteria and tables that had been urinated upon."[87]

131.    From 2007 through 2011, Defendant Devore authorized, instituted, and through his conduct encouraged the malicious conduct within Maryland's juvenile detention system, and was responsible for enhancing a culture of sexual abuse therein, ultimately to the detriment of Plaintiffs. For example, Defendant Devore regularly placed individuals with "shady past[s]" into "high-ranking positions."[88] In one instance, Defendant Devore hired Wallis Norman as the superintended of CHS, despite knowing that Norman had previously resigned under threat of dismissal from a superintendent role for ordering a guard to falsify a report that a guard physically abused an incarcerated youth in his care.[89]

132.    Between 2007 and 2011, Defendant Devore actively concealed what he knew to be the horrors associated with life in both Waxter and CHS, along with each

---

[87] Alex Gutter, *Juvenile Services Secretary Donald DeVore Resigns*, Capital News Service (Nov. 18, 2010), https://cnsmaryland.org/2010/11/18/juvenile-services-secretary-donald-devore-resigns/ (last visited November 14, 2025). Despite recommendations to improve Waxter, Defendant Devore failed to create an action plan to implement them. *Id.*

[88] *See* David Reutter, Maryland Juvenile Justice Official Resigns Over Past Abuse Allegations,          Prison          Legal          News          (Aug.          2008), https://www.prisonlegalnews.org/news/2008/aug/15/maryland-juvenile-justice-official-resigns-over-past-abuse-allegations/ (last visited November 14, 2025).

[89] *Id.* The hiring and retention of Norman was not unique. In another instance, Defendant Devore hired Chris Perkins as the director of Maryland's juvenile detention facilities, who later resigned following a report (which included allegations known at the time of Perkins' hiring) that Perkins had abused children at a Montana boot camp. The report detailed "incidents of staff forcing youths to exercise naked for hours at a time, making them drink hot water, repeatedly slamming them against a wall, and placing them in isolation for extended periods of time." *Id.*

and every state operated juvenile detention center, ultimately to the detriment of Plaintiffs.

133.    Between 2007 and 2011, Defendant Devore actively protected abusers from consequence for their notorious, rabid sexual violence put upon vulnerable youth in state operated detention facilities across Maryland, to the detriment of the children they were abusing and ultimately to the detriment of Plaintiffs. When reports of the issues were released by JJMU, Defendant Devore "roundly rejected the findings of the monitoring reports."[90]

134.    During the period between 2007 through 2011, Defendant Devore, upon learning of the corrosive culture of rape, sodomy and sexual abuse in state operated juvenile detention facilities, and upon learning that those charged with the day-to-day operations of said facilities were the predominant abusers, sought to protect them and himself to the detriment of thousands of children who were confined in said facilities, ultimately to the detriment of Plaintiffs.[91]

---

[90] Christopher M. Matthews, *Critics Say State's Juvenile Detention Facility for Girls Needs to be Shut Down* (Dec. 22, 2009), https://somd.com/news/headlines/2009/11011.php (last visited November 14, 2025).

[91] During his tenure as Secretary, Defendant Devore was repeatedly criticized for "incidents of violence at juvenile facilities and questionable bookkeeping." Erin Cunningham, *Big task ahead for Abed in turning around juvenile services department*, South Maryland News (June 24, 2011), https://www.somdnews.com/archive/news/big-task-ahead-for-abed-in-turning-around-juvenile-services-department/article_528053da-849e-5e80-87d3-8ee89f96cde6.html    (last    visited November 14, 2025).

135.   Between 2007 and 2011, Defendant Devore instituted, permitted, endorsed, encouraged, facilitated and condoned the sexual abuse of children in State operated juvenile facilities.[92] Between 2007 and 2011, Defendant Devore also actively employed guards who repeatedly sexually brutalize children in State operated facilities.

136.   Between 2007 and 2011, Defendant Devore's actions caused the corrosive culture to continue to grow exponentially, ultimately to the detriment of Plaintiffs.[93]

137.   Defendant Devore, at all times between 2007 and 2011, acted under color of state law pursuant to 42 U.S.C. § 1983, by overseeing, supervising, having

---

[92] The preventable homicide of a teacher at one of the State's juvenile detention facilities raised shed light on issues with Defendant Devore's leadership. *Calling Mr. DeVore,* The Baltimore Sun (Feb. 28, 2010), https://www.newspapers.com/image/252400904/?match=1&terms=donald%20devore (last visited November 14, 2025). But even before the incident occurred, it was well known by Devore that security procedures were "lax" and that there weren't "enough staff to properly supervise" the youth housed at the juvenile detention facilities, yet no actions were taken. Further, "[m]any of the buildings" at the facilities were "deteriorating: poor lighting and lack of security cameras in some areas add to the hazards. The combination of inadequate infrastructure and facilities, along with systemic problems in its security protocols" left windspeed issues in the facilities. Despite instances of abuse occurring, Defendant Devore seemed "bent on blocking inquiries into the incident[s]." *Id.*

[93] Defendant Devore signed a settlement agreement with the U.S. Department of Justice acknowliging that it "has a right to impose policies and procedures for the protection of the public, the staff of DHS, and the juveniles within the State's custody." U.S. Dep't of Justice, Second Amended Settlement Agreement, available at https://www.justice.gov/sites/default/files/crt/legacy/2011/04/13/maryland_2nd_agree_juv_6-23-08.pdf. The Agreement also highlighted Defendant Devore's failure to take substantive action in response to the United States' direction.

the responsibility of keeping children housed in state operated juvenile facilities safe and secure, in all respects, *in loco parentis*.

### 3. <u>Defendant Sam Abed</u>

138.   Defendant Sam Abed ("Abed") was the Acting Secretary of Juvenile Services for the State of Maryland from February 4, 2011, through March 25, 2011. Defendant Abed officially became the Secretary of Juvenile Services for the State of Maryland and a member of the Governor's Executive Council on March 25, 2011, and served in that capacity until January 18, 2023.

139.   Additionally, Defendant Abed held a wide range of posts within Maryland state government where he was on the frontline of receiving information about, and was in a position to implement policies to combat, rampant sexual abuse of minors in state custody, that undoubtedly would have saved Plaintiffs from the sexual brutalization they endured at the hands of their abusers, *to wit:*

      (a)    Defendant Abed served on the Children's Cabinet from 2011 through 2023;

      (b)    Defendant Abed was a Member of the Advisory Council to the Children's Cabinet from 2011through 2023;

      (c)    Defendant Abed was a Member of the Governor's Overdose Prevention Council from 2014 through 2015;

(d)     Defendant Abed was a Member of the Maryland THINK Committee from 2021 through 2023;

(e)     Defendant Abed was the Chair of the Juvenile Justice Reform Council from 2019 through 2021.

(f)     Defendant Abed was a Member of the Mental Health Transformation Working Group in 2011;

(g)     Defendant Abed was a Member of the Maryland Integrated Map Executive Committee from 2011 through 2012;

(h)     Defendant Abed served on the Task Force on Prisoner Re-Entry from 2011 through 2012;

(i)     Defendant Abed was a Member of the Task Force to Study the Procurement of Health, Education, and Social Services by State Agencies from 2011 through 2012;

(j)     Defendant Abed served on the Maryland State Drug and Alcohol Abuse Council from 2011 through 2015;

(k)     Defendant Abed was a Member of the Maryland School-Based Health Center Policy Advisory Council from 2011 through 2015;

(l)     Defendant Abed was a Member of the Board of Directors for the Maryland Workforce Corporation from 2011 through 2016;

(m)   Defendant Abed was a Member of the Criminal Justice Coordinating Council for Baltimore City from 2011 through 2017;

(n)   Defendant Abed was a Member of the Interdepartmental Advisory Committee for Minority Affairs from 2011 through 2017;

(o)   Defendant Abed served on the Cease Fire Council from 2011 through 2023;

(p)   Defendant Abed was a Member of the State Child Fatality Review Team from 2011 through 2023;

(q)   Defendant Abed was a Member of the State Coordinating Council for Children from 2011 through 2023;

(r)   Defendant Abed served on the Correctional Training Commission, from 2011 through 2023;

(s)   Defendant Abed was a Member of the Governor's Family Violence Council from 2011 through 2023;

(t)   Defendant Abed was a Member of the Judges, Masters and Juvenile Justice Committee from 2011 through 2023;

(u)   Defendant Abed served on the Coordinating Council for Juvenile Services Educational Programs from 2011 through 2023;

(v)   Defendant Abed was a Member of the State Council for Interstate Juvenile Supervision from 2011 through 2023;

(w)    Defendant Abed served on the Sexual Offender Advisory Board from 2011 through 2023;

(x)    Defendant Abed was a Member of the Maryland Commission on Suicide Prevention from 2011 through 2023;

(y)    Defendant Abed was a Member of the Vehicle Theft Prevention Council from 2011 through 2023;

(z)    Defendant Abed served on the State Board of Victim Services from 2011 through 2023.

(aa)    Defendant Abed was a Member of the Advisory Board on After-School and Summer Opportunity Programs from 2012 through 2016;

(bb)    Defendant Abed served on the Council for the Procurement of Health, Educational and Social Services from 2012 through 2021;

(cc)    Defendant Abed was a Member of the Task Force to Study Housing and Supportive Services for Unaccompanied Homeless Youth from 2013 through 2014;

(dd)    Defendant Abed served on the Task Force on Juvenile Court Jurisdiction from 2013 through 2014;

(ee)    Defendant Abed was a Member of the Governor's Commission for Effective Community Inclusion of Individuals with Intellectual and Developmental Disabilities from 2013 through 2015;

(ff)    Defendant Abed was a Member of the Juvenile Grant Planning and Review Council from 2013 through 2019;

(gg)    Defendant Abed was a Member of the Interagency Council on Homelessness from 2014 through 2023;

(hh)    Defendant Abed was a Member of the Youth Apprenticeship Advisory Committee from 2014 through 2023;

(ii)    Defendant Abed was a Member of the Justice Reinvestment Coordinating Council from 2015 through 2016;

(jj)    Defendant Abed served on the Work Group to Study Safe Harbor Policy for Youth Victims of Human Trafficking from 2015 through 2019;

(kk)    Defendant Abed was a Member of the Behavioral Health Advisory Council from 2015 through 2023;

(ll)    Defendant Abed was a Member of the Governor's Workforce Development Board from 2015 through 2023;

(mm) Defendant Abed was a Member of the Task Force to Study the Restraint, Searches, and Needs of Children in the Juvenile Justice System from 2016 through 2017;

(nn) Defendant Abed was a Member of the Task Force to Combat Habitual Student Truancy from 2016 through 2018;

(oo) Defendant Abed was a Member of the Commission on the School-to-Prison Pipeline and Restorative Practices from 2017 through 2019;

(pp) Defendant Abed served on the Interagency Disabilities Board from 2017 through 2023;

(qq) Defendant Abed was a Member of the Interdepartmental Advisory Committee on Small, Minority, and Women Business Affairs from 2017 through 2023;

(rr) Defendant Abed served on the Task Force to Study Maryland's Criminal Gang Statutes from 2018 through 2020;

(ss) Defendant Abed was a Member of the Juvenile Services Education Programs Work Group from 2018 through 2020;

(tt) Defendant Abed was a Member of the School Safety Subcabinet Advisory Board from 2018 through 2023;

(uu)  Defendant Abed was a Member of the Work Group to Study Shelter and Supportive Services for Unaccompanied Homeless Minors from 2019 through 2020;

(vv)  Defendant Abed served on the Juvenile Justice Reform Council from 2019 through 2021;

(ww) Defendant Abed was a Member of the Maryland Longitudinal Data System Center Governing Board from 2019 through 2023;

(xx)  Defendant Abed was a Member of the Two-Generation Family Economic Security Commission from 2020 through 2023;

(yy)  Defendant Abed served on the Maryland Consortium on Coordinated Community Supports from 2021 through 23;

(zz)  Defendant Abed was a Member of the Juvenile Services Education Board from 2021 through 2023;

(aaa) Defendant Abed was a Member of the Law Enforcement Coordinating Council from 2021 through 2023;

(bbb) Defendant Abed was a Member of the Procurement Improvement Council from 2021 through 2023; and

(ccc) Defendant Abed served on the Commission on Trauma-Informed Care from 2021 through 2023.

140.   From 2011 through 2023, there was no single individual within state government more aware of the rampant sexual abuse taking place in Maryland juvenile detention facilities, or of the life-altering impact on and damages to children resulting from said abuse, than Defendant Abed.[94] Nor was there a single individual in state government more responsible for creating policies that caused and perpetuated a culture of sexual abuse than Defendant Abed, to the detriment of Plaintiffs.

141.   Between 2011 and 2023, Defendant Abed authorized, instituted, and through his conduct encouraged the malicious conduct within Maryland's juvenile detention system, and was responsible for enhancing a culture of sexual abuse therein, to the detriment of Plaintiffs. Defendant Abed also actively concealed what he knew to be the horrors associated with life in both Waxter and CHS, along with each and every state operated juvenile detention center, to the detriment of Plaintiffs.

---

[94] Defendant Abed acknowledged the systemic issues within juvenile detention facilities when he first began as Secretary. Erin Cunningham, *Big task ahead for Abed in turning around juvenile services department*, South Maryland News (June 24, 2011), https://www.somdnews.com/archive/news/big-task-ahead-for-abed-in-turning-around-juvenile-services-department/article_528053da-849e-5e80-87d3-8ee89f96cde6.html.    Despite    this, Defendant                    Abed                    stated                    that, "There isn't a huge difference between Secretary DeVore and myself on where we want to take the department."

Indeed, by the end of his term as Secretary, concerns over the failures of DJS were widespread.[95]

142.   Between 2011 and 2023, Defendant Abed actively protected abusers from consequence for their notorious, rabid sexual violence put upon vulnerable youth in state operated detention facilities across Maryland, to the detriment of the children they were abusing, including Plaintiffs. Indeed, Defendant Abed, upon learning about and knowing of the corrosive culture of rape, sodomy and sexual abuse in state operated juvenile detention facilities, and upon learning that those charged with the day-to-day operations of said facilities were the predominant abusers, sought to protect them and himself to the detriment of thousands of children who were confined in said facilities, including Plaintiffs.[96]

---

[95] Adam Thompson, *New audit report details allegations of failures within Maryland's Department of Juvenile Services* (May 9, 2025), https://www.cbsnews.com/baltimore/news/new-audit-report-details-allegations-on-failures-within-marylands-department-of-juvenile-services/ (last visited November 14, 2025).

[96] *Id.* An audit conducted by Maryland's Department of Legislative Services covering the period from April 1, 2020, to December 1, 2023, found longstanding operational issues, including that "DJS did not conduct thorough background checks for its contractors who were providing youth care services. The report notes that an employee working for a DJS contractor was a convict who may have been ineligible to work. As of January, that employee was still there." *Id.* The audit also revealed that "DJS did not have a process to ensure that residential service facilities timely corrected deficiencies identified by its OIG resulting in numerous deficiencies going uncorrected." Office of Legislative Audits, *Dep't of Juvenile Servs. Audit* (May 2025), available at https://dls.maryland.gov/pubs/prod/NoPblTabPDF/DJS25.pdf. Nor did juvenile detention facilities have a process for reviewing or analyzing overtime activity or have adequate procedures and controls over its materials and supplies. *Id.*

143.   Between 2011 and 2023, Defendant Abed instituted, permitted, endorsed, encouraged, facilitated and condoned the sexual abuse of children in State operated juvenile facilities.

144.   Between 2011 and 2023, Defendant Abed actively employed guards to repeatedly sexually brutalize children in State operated facilities.

145.   Between 2011 and 2023, Defendant Abed's actions caused the corrosive culture to continue and grow exponentially, to the detriment of Plaintiffs.

146.   Defendant Abed, at all times between 2011 and 2023, acted under color of state law pursuant to 42 U.S.C. § 1983, by overseeing, supervising, and having the responsibility of keeping children housed in state operated juvenile facilities safe and secure, in all respects, *in loco parentis.*

## SEXUAL ABUSE OF PLAINTIFFS AT DJS FACILITIES

147.   At all times relevant to the wrongful conduct complained of herein, Plaintiffs were children under the legal and physical custody, direct and exclusive control, and supervision of Defendants and their agents and officers, who were responsible for Plaintiffs' care and safety.[97]

---

[97] For several years, DJS outsourced the operations of CHS to a private contractor, Youth Services International, until the State ended that relationship and took back control of the facility in 2004. *See* Dan Fesperman, *Hickey Turns a Violent Page*, The Sun, Mar. 30, 2004, https://www.baltimoresun.com/2004/03/30/hickey-turns-a-violent-page/ (last visited November 14, 2025). At all times relevant herein, Youth Services International and its employees acted as agents of Defendants, pursuant to Defendants' non-delegable duty to the children in Maryland's juvenile detention system.

148.   The sexual conduct complained of herein lacked consent in that Plaintiffs did not have the capacity to consent by virtue of being, at all relevant times, minors and/or in the legal and physical custody of the State juvenile detention system.[98] Moreover, the sexual conduct complained of herein was accomplished using forcible compulsion, undue influence, duress, coercion, intimidation, and/or threat of physical harm and retaliation.

149.   Each event complained of by each Plaintiff herein caused a distinct injury and is pled as a separate incident or occurrence.

**A. Sexual Abuse of Plaintiff Jane Doe, A.W.**

150.   Plaintiff Jane Doe, A.W., was a minor through the duration of the sexual abuse alleged herein.

151.   Plaintiff Jane Doe, A.W., was detained by Defendants as a juvenile from approximately 2019 to 2020 when she was approximately 14 to 15 years old.

152.   At all relevant times, Plaintiff Jane Doe, A.W., was in the care, custody, and control of Defendants and was detained at Waxter.

153.   During her detention at Waxter, Plaintiff Jane Doe, A.W., was subjected to sexual abuse by a staff member, Defendant John Doe 1 (A.W. Abuser), who was employed at Waxter during the relevant time period.

---

[98] In recognition that detained youths lack legal capacity to consent, Maryland state law criminalizes any sexual contact with any individual detained in a DJS facility, regardless of the age of consent. Md. Code Ann., Crim. Law § 3-314(c).

154.   Defendant John Doe 1 (A.W. Abuser) was in a position of authority and was directly responsible for supervising, and/or providing care to Plaintiff Jane Doe, A.W., during her confinement at Waxter.

155.   On multiple occasions, Defendant John Doe 1 (A.W. Abuser) sexually abused Plaintiff Jane Doe, A.W., by fondling Plaintiff Jane Doe, A.W.'s genitals and digitally penetrating Plaintiff Jane Doe, A.W.'s vagina and anus.

156.   Defendants never told Plaintiff Jane Doe, A.W., whether, how, or to whom to report physical or sexual abuse.

157.   Given that her abuser was an employee at the facility and could impact whether her confinement was extended if she disclosed or reported the abuse, Plaintiff Jane Doe, A.W. did not know of any safe way to report the abuse.

158.   At the relevant times herein, Defendant John Doe 1 (A.W. Abuser) was acting within the course and scope of his employment as a staff member, employee, and/or agent of Defendants at Waxter.

159.   At the relevant times herein, Defendant John Doe 1 (A.W. Abuser) was acting under color of state law pursuant to 42 U.S.C. § 1983 by overseeing, supervising, and being charged with keeping Plaintiff Jane Doe, A.W., safe.

160.   Defendants willfully knew, accepted and approved of Defendant John Doe 1 (A.W. Abuser) sexually brutalizing, raping and sodomizing Plaintiff Jane Doe, A.W., a child.

161.   At the time of the above-described sexual abuse, Defendant John Doe 1 (A.W. Abuser) was not being adequately supervised, monitored, or surveilled by Defendants.

162.   Not only did defendants fail to supervise, train, monitor, discipline, surveil, remove, and otherwise investigate Defendant John Doe 1 (A.W. Abuser), Defendants knew of the sexual brutalization perpetuated by Defendant John Doe 1 (A.W. Abuser) on Plaintiff Jane Doe, A.W.; purposefully allowed it to happen; and encouraged it through their silence.

163.   At the relevant times herein, Defendants were acting under color of state law pursuant to 42 U.S.C. §1983 by overseeing, supervising, and being charged with keeping Plaintiff Jane Doe, A.W., safe.

164.   Defendants' acts and omissions were a substantial factor in causing the harm suffered by Plaintiff Jane Doe 1, A.W.

165.   As a direct and proximate result of the foregoing, Plaintiff Jane Doe 1, A.W., has suffered significant physical and psychological injuries, and the combination thereof.

166.   Plaintiff Jane Doe 1, A.W., has undergone and sustained the expense of years of medical care and requires future and ongoing care.

**B.    Sexual Abuse of Plaintiff Jane Doe, T.H.**

167.    Plaintiff Jane Doe, T.H., was a minor through the duration of the sexual abuse alleged herein.

168.    Plaintiff Jane Doe, T.H., was detained by Defendants as a juvenile in approximately 2019 when she was approximately 15 years old.

169.    At all relevant times, Plaintiff Jane Doe, T.H., was in the care, custody, and control of Defendants and was detained at Waxter.

170.    During her detention at Waxter, Plaintiff Jane Doe, T.H., was subjected to sexual abuse by a staff member, Defendant John Doe 2 (T.H. Abuser), who was employed by Defendants at Waxter during the relevant time period.

171.    Defendant John Doe 2 (T.H. Abuser) was in a position of authority and was directly responsible for supervising, and/or providing care to Plaintiff Jane Doe 2, T.H., during her confinement at Waxter.

172.    On at least one occasion, Defendant John Doe 2 (T.H. Abuser) sexually abused Plaintiff Jane Doe 2, T.H. This abuse included, but was not limited to, Defendant John Doe (T.H. Abuser) forcibly touching and groping her genitals over and under her clothing; forcing her to perform oral copulation; and vaginally penetrating her.

173.    Defendants never told Plaintiff Jane Doe, T.H., whether, how, or to whom to report physical or sexual abuse.

174.   Given that her abuser was an employee at the facility and could impact whether her confinement was extended if she disclosed or reported the abuse, Plaintiff Jane Doe, T.H., did not know of any safe way to report the abuse.

175.   At the relevant times herein, Defendant John Doe 2 (T.H. Abuser) was acting within the course and scope of his employment as a staff member, employee, and/or agent of Defendants at Waxter.

176.   At the relevant times herein, Defendant John Doe 2 (T.H. Abuser) was acting under color of state law pursuant to 42 U.S.C. § 1983 by overseeing, supervising, and being charged with keeping Plaintiff Jane Doe, T.H., safe.

177.   Defendants willfully knew, accepted and approved of Defendant John Doe 2 (T.H. Abuser) sexually brutalizing, raping and sodomizing Plaintiff Jane Doe, T.H., a child.

178.   At the time of the above-described sexual abuse, Defendant John Doe 2 (T.H. Abuser) was not being adequately supervised, monitored, or surveilled by Defendants.

179.   Not only did Defendants fail to supervise, train, monitor, discipline, surveil, remove, and otherwise investigate Defendant John Doe 2 (T.H. Abuser), Defendants knew of the sexual brutalization perpetuated by Defendant John Doe 2 (T.H. Abuser) on Plaintiff Jane Doe, T.H.; purposefully allowed it to happen; and encouraged it through their silence.

180.   At the relevant times herein, Defendants were acting under color of state law pursuant to 42 U.S.C. §1983 by overseeing, supervising, and being charged with keeping Plaintiff Jane Doe, T.H., safe.

181.   Defendants' acts and omissions were a substantial factor in causing the harm suffered by Plaintiff Jane Doe, T.H.

182.   As a direct and proximate result of the foregoing, Plaintiff Jane Doe, T.H. has suffered significant physical and psychological injuries, and the combination thereof.

183.   Plaintiff Jane Doe, T.H., has undergone and sustained the expense of years of medical care and requires future and ongoing care.

**C.    Sexual Abuse of Plaintiff John Doe, T.B.**

184.   Plaintiff John Doe, T.B., was a minor through the duration of the sexual abuse alleged herein.

185.   Plaintiff John Doe, T.B., was detained by Defendants as a juvenile in approximately 2019 when he was approximately 14 years old.

186.   At all relevant times, Plaintiff John Doe, T.B., was in the care, custody, and control of Defendants and was detained at CHS.

187.   During his detention at CHS, Plaintiff John Doe, T.B., was subjected to sexual abuse by multiple staff members, Defendant John Doe 3 (T.B. Abuser 1), and

Defendant John Doe 4 (T.B. Abuser 2), both of whom were employed by Defendants at CHS during the relevant time period.

188.   Defendants John Doe 3 (T.B. Abuser 1) and John Doe 4 (T.B. Abuser 4) were in positions of authority and were directly responsible for supervising, and/or providing care to Plaintiff John Doe, T.B., during his confinement at CHS.

189.   On at least one occasion, Defendant John Doe 3 (T.B. Abuser 1) sexually abused Plaintiff John Doe, T.B., forcing John Doe, T.B., to perform oral copulation on him. John Doe 3 (T.B. Abuser 1) then digitally penetrated John Doe, T.B.'s anus.

190.   On at least two occasions, Defendant John Doe 4 (T.B. Abuser 2) sexually abused Plaintiff John Doe, T.B., forcing John Doe, T.B., to perform oral copulation on him while digitally penetrated John Doe, T.B.'s anus.

191.   Defendants never told Plaintiff John Doe, T.B., whether, how, or to whom to report physical or sexual abuse.

192.   Given that his abusers were employees at the facility and could impact whether his confinement was extended if he disclosed or reported the abuse, Plaintiff John Doe, T.B., did not know of any safe way to report the abuse.

193.   At the relevant times herein, Defendant John Doe 3 (T.B. Abuser 1) and John Doe 4 (T.B. Abuser 2) were acting within the course and scope of their employment as staff members, employees, and/or agents of Defendants at CHS.

194.   At the relevant times herein, Defendants John Doe 3 (T.B. Abuser 1) and John Doe 4 (T.B. Abuser 2) were acting under color of state law pursuant to 42 U.S.C. §1983 by overseeing, supervising, and being charged with keeping Plaintiff John Doe, T.B., safe.

195.   Defendants willfully knew, accepted and approved of Defendants John Doe 3 (T.B. Abuser 1) and John Doe 4 (T.B. Abuser 2) sexually brutalizing, raping and sodomizing Plaintiff John Doe, T.B., a child.

196.   At the time of the above-described sexual abuse, Defendants John Doe 3 (T.B. Abuser 1) and John Doe 4 (T.B. Abuser 2) were not being adequately supervised, monitored, or surveilled by Defendants.

197.   Not only did Defendants fail to supervise, train, monitor, discipline, surveil, remove, and otherwise investigate Defendants John Doe 3 (T.B. Abuser 1) and John Doe 4 (T.B. Abuser 2), Defendants knew of the sexual brutalization perpetuated by Defendants John Doe 3 (T.B. Abuser 1) and John Doe 4 (T.B. Abuser 2) on Plaintiff John Doe, T.B.; purposefully allowed it to happen; and encouraged it through their silence.

198.   At the relevant times herein, Defendants were acting under color of state law pursuant to 42 U.S.C. § 1983 by overseeing, supervising, and being charged with keeping Plaintiff John Doe, T.B., safe.

199.   Defendants' acts and omissions were a substantial factor in causing the harm suffered by Plaintiff John Doe, T.B.

200.   As a direct and proximate result of the foregoing, Plaintiff John Doe, T.B. has suffered significant physical and psychological injuries, and the combination thereof.

201.   Plaintiff John Doe, T.B., has undergone and sustained the expense of years of medical care and requires future and ongoing care.

## REPORTS OF SEXUAL ABUSE BY PLAINTIFFS AT DJS FACILITIES

202.   Defendants and their agents obstructed Plaintiffs from lodging a complaint or otherwise reporting the sexual abuse they endured.

203.   As an initial matter, Defendants and their agents failed to have a policy, custom or procedure by which individuals incarcerated at DJS facilities could report instances of sexual abuse, such that reporting sexual abuse was infeasible.

204.   Further, Defendants and their agents encouraged and perpetuated a custom at DJS facilities whereby allegations of sexual abuse or mistreatment were not investigated or reported by individuals at DJS facilities.

205.   Even assuming an adequate grievance process for reporting sexual abuse did exist, a reasonable individual in Plaintiffs' situation would have been deferred from pursuing such process.

206.   The sexual conduct complained of herein was accomplished using forcible compulsion, undue influence, duress, coercion, intimidation, and/or threat of physical harm and retaliation. Plaintiffs were threatened by their abusers, preventing them from reporting the instances of sexual abuse or lodging any sort of grievance against them.

207.   Plaintiffs also knew that their abusers were employees at the facility and could impact whether their confinement was extended if they disclosed or reported the abuse. Plaintiffs did not know of any safe way to report the abuse.

208.   Even when individuals within DJS facilities reported instance of sexual abuse, DJS officers were unwilling to take corrective action. Instead, Defendants and their agents concealed the various complaints and accusations of sexual abuse made against employees at DJS facilities and, instead, sought to protect themselves.

## CAUSES OF ACTION

### COUNT I: 42 U.S.C. § 1983 – FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS – BODILY INTEGRITY AGAINST ALL DEFENDANTS

209.   Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

210.   Plaintiffs have a clearly established and fundamental right to bodily integrity, pursuant to the substantive due process clause of the Fourteenth Amendment to the United States Constitution.

211.    The existence of this right to ultimate bodily integrity, the most fundamental aspect of personal privacy, was unmistakably established at the time of the abuse alleged herein, as an attribute of the ordered liberty that is the concern of substantive due process.

212.    The right to bodily integrity is the last line of defense against those literally outrageous abuses of official power.

213.    State actions that result in sexual abuse of children are actionable under 42 U.S.C. § 1983.

214.    Each of the sexual abuses of Plaintiffs Jane Doe, A.W., Jane Doe, T.H., and John Doe, T.B, was conducted with malice and sadism, and cannot be considered mere carelessness or the product of excessive zeal.

215.    Each of the sexual abuses of Plaintiffs Jane Doe, A.W., Jane Doe, T.H., and John Doe, T.B., severely injured each of them and has caused each Plaintiff lifelong physical and emotional damages that cannot be undone.

216.    Each of the sexual abuses of Plaintiffs Jane Doe, A.W., Jane Doe, T.H., and John Doe, T.B, amounted to brutal, unprovoked, and inhumane abuses of official power, and was literally shocking to the conscience.

217.    Not only was each instance of sexual abuse put upon Plaintiffs Jane Doe, A.W., Jane Doe, T.H., and John Doe, T.B. disproportionate to any need for force

or violence, there was not, is not, and could never be a "need" to brutally rape, sodomize, or otherwise sexually abuse or molest a child in State custody.

218.   Defendants deprived Plaintiffs of their respective rights to bodily integrity through their intentional, malicious, sadistic and conscience-shocking conduct as described herein.

219.   Each Defendant, in their own unique and specific way as described herein, and in each instance under color of state law, created, perpetuated, authorized, approved, ordered, sanctioned and actively participated in the sexual abuse of Plaintiffs as described herein, and/or in the purposeful creation of policies that fostered, encouraged and created a culture of sexual brutalization of minors in state custody, including Plaintiffs.

220.   Defendants were at all times material to this action fully aware of an individual's right, and ultimately Plaintiffs' fundamental right to bodily integrity, which was an established right in all respects, and at all material times.

221.   Defendants' individual and collective conduct, all while acting under color of law, endangered and/or threatened Plaintiffs' fundamental right to bodily integrity, as guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

222. Defendants, individually and collectively, knowingly violated Plaintiffs' constitutionally protected rights to bodily integrity, through their conduct

as described herein, with intention and a deliberate indifference to the known risks of harm that could, and ultimately did occur to Plaintiffs.

223.   At each instance described herein, Defendants had the time and opportunity to reflect and deliberate before acting and/or failing to act.

224.   Defendants acting in a supervisory capacity had actual or constructive knowledge of the unconstitutional acts of their subordinates and were deliberately indifferent and/or tacitly authorized such conduct of their subordinates.

225.   Defendants acting in a supervisory capacity failed to act to prevent or otherwise caused the unconstitutional conduct of their subordinates.

226.   As a direct and proximate result of Defendants' unconstitutional acts as described herein, Plaintiffs' fundamental rights to bodily integrity were violated, as were their liberty interests.

227.   These unconstitutional acts caused Plaintiffs' physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, various health problems, and lost earning capacity.

228.   Defendants' conduct was reckless, evinced callous indifference to Plaintiffs' rights, and included intentional violations of federal law, entitling Plaintiffs to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

## COUNT II: VIOLATION OF PLAINTIFFS' RIGHT TO BE FREE FROM STATE CREATED DANGER PURSUANT TO 42 U.S.C. § 1983 <u>AGAINST ALL DEFENDANTS</u>

229.   Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

230.   Plaintiffs have a clearly established right under the substantive due process clause of the Fourteenth Amendment to the United States Constitution to be protected from risks, dangers, dangerous situations, or being made more vulnerable to increased risk of harms, affirmatively created and/or caused by persons acting under color of state law.

231.   This right was clearly established at the time of Defendants' conduct, which caused Plaintiffs' sexual brutalization as described herein.

232.   Defendants owed Plaintiffs an affirmative duty to protect them, insofar as the State of Maryland, at all material times, affirmatively restrained Plaintiffs from acting on their own behalf.

233.   Defendants, through their affirmative exercise of power over Plaintiffs as described herein, restrained Plaintiffs' liberty, such that it rendered Plaintiffs unable to care for themselves.

234.   Defendants had an affirmative duty to protect Plaintiffs, due to, *inter alia,* the custodial nature of a special relationship.

235.   The affirmative duty to protect arises not from Defendants' knowledge of Plaintiffs' predicament or from expressions of intent to help them, but from the limitation which was imposed on Plaintiffs' freedom to act on their own behalf.

236.   Defendants, through their affirmative exercise of power over Plaintiffs as described herein, failed to provide for Plaintiffs' basic human needs.

237.   Defendants promulgated unconstitutional and unlawful policies that violated federal law and caused Plaintiffs' sexual brutalization as described herein.

238.   At all relevant times, Defendants maintained abhorrent policies as described herein, which individually and collectively caused Plaintiffs' sexual brutalization.

239.   Each Defendant, on a macro level, micro level, or some combination of both, was a policy making official in his/her own regard, and each acted directly on behalf of the State of Maryland, in promulgating policies as described herein, which individually and collectively violated Plaintiffs' rights, privileges, and immunities secured by the United States Constitution and federal law.

240.   To the extent any Defendant contends he or she is not or was not a policy maker at all relevant times, each Defendant in his or her own right allowed, tolerated, and acquiesced to the unconstitutional and unlawful customs and practices of non-policymakers that were so permanent and well-settled as to imply the consent and authorization of the policymakers.

241.   Each Defendant, while acting under color of state law, affirmatively created or exacerbated the dangers to which Plaintiffs were exposed, making them more vulnerable to said dangers, and these Defendants did so with an extreme degree of culpability.

242.   Each Defendant, while acting under color of state law, affirmatively perpetuated a dangerous situation and created a distinct culture of sexual brutalization, of which Plaintiffs were exposed and to which they fell victim.

243.   Each Defendant, while acting under color of state law, deliberately and affirmatively participated in, denied, lied about, covered up, deceived, discredited, and/or ignored the sexual brutalization of Plaintiffs, causing them harm and making them more vulnerable to same.

244.   Each Defendant, while acting under color of state law, was aware that their conduct would result in the deprivation of Plaintiffs' due process rights to be protected from and not made more vulnerable to the conduct described herein and the dangers and damages associated therewith.

245.   Defendants' conduct was reckless, deliberately indifferent and/or so outrageous as to shock the conscience, such that it was culpable in the extreme, insofar as these Defendants knew of and disregarded the substantial risk of serious harm to Plaintiffs as a result of their conduct in creating and participating in a culture of sexual brutalization.

246.   The dangers and risks of harm as a result of Defendants' conduct and their creation and participation in a culture of sexual brutalization, were discreet and special to Plaintiffs, young children who were confined by the State of Maryland; not risks affecting the public at large.

247.   The dangers and risks of harm to Plaintiffs, created, perpetuated and put on them by Defendants, individually and collectively, were extreme and included a level of sexual violence unseen in normal culture.

248.   Defendants' conduct constituted affirmative acts that caused and/or substantially increased the risks of physical, emotional, and economic harm to Plaintiffs.

249.   As a direct and proximate result of the unconstitutional acts of Defendants, Plaintiffs' fundamental rights to be free from state-created danger were violated, as were their liberty interests.

250.   Defendants acting in a supervisory capacity had actual or constructive knowledge of the unconstitutional acts of their subordinates and were deliberately indifferent and/or tacitly authorized such conduct of their subordinates.

251.   Defendants acting in a supervisory capacity failed to act to prevent or otherwise caused the unconstitutional conduct of their subordinates.

252.   Defendants' conduct transgressed the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

253.    These unconstitutional acts caused Plaintiffs' physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, various health problems, and lost earning capacity.

254.    Defendants' conduct was reckless, evinced callous indifference to Plaintiffs' rights, and included intentional violations of federal law, entitling Plaintiffs to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

### RELIEF REQUESTED

Plaintiffs demand judgement against Defendants, jointly and severally, for:

(a) Compensatory Damages;

(b) Punitive Damages;

(c) Exemplary Damages;

(d) Pre-Judgement and Post-Judgement Interest;

(e) Attorneys' Fees and litigation costs and expenses; and

(f) Any other relief the Court deems appropriate.

### <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a jury trial on all issues so triable in this action.

Dated: November 14, 2025                 Respectfully submitted,

**BAILEY GLASSER**

/s/ D. TODD MATHEWS
D. Todd Mathews (Bar No. 31823)
Panida Anderson (Bar No. 30780)
1055 Thomas Jefferson St., NW
Washington, D.C. 20007
(202) 463-2101
tmathews@baileyglasser.com
panderson@baileyglasser.com
Counsel for Plaintiff John Doe, T.B.

**LEVY KONIGSBERG LLP**

/s/ COREY M. STERN
Corey M. Stern (swearing in forthcoming)
Clark Binkley (admission forthcoming)
605 Third Ave., 33rd Fl.
New York, New York 10158
(212) 605-6200
cstern@levylaw.com
cbinley@levylaw.com
Counsel for Plaintiffs Jane Doe A.W. and
Jane Doe, T.H.

**STINAR GOULD GRIECO & HENSLEY**

/s/ MIKE GRIECO
Mike Grieco (admission forthcoming)
Nick Wainwright (admission forthcoming)
101 North Wacker Drive, Ste. 100
Chicago, Illinois 60606
(312) 728-7444
mike@sgghlaw.com
nicholas@sgghlaw.com
Counsel for Plaintiffs Jane Doe A.W. and
Jane Doe, T.H.