**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| JANE DOE, A.W., *et al.*,<br>*Plaintiffs*,<br>v.<br>KENNETH C. MONTAGUE, JR., *et al.*,<br>*Defendants* | No. 25-cv-02039-ABA |

## MEMORANDUM OPINION

Plaintiffs, A.W., T.H., and T.B. allege that they were sexually abused by guards between 2019 and 2020 while confined at the Thomas J.S. Waxter Children's Center ("Waxter"), a juvenile detention center in Prince George's County, Maryland, and Charles H. Hickey, Jr. School ("Hickey"), a state-owned secure treatment center in Baltimore County, Maryland. Plaintiffs assert claims under 42 U.S.C. § 1983, alleging violations of the Fourteenth Amendment of the U.S. Constitution by the unnamed guards who allegedly abused them ("Officer John Doe Defendants'), the superintendents of Waxter and Hickey while Plaintiffs were detained there (Lisa Steeple and Danjuma Gaskins), the Secretary of Juvenile Services during those detentions (Sam Abed), two of Secretary Abed's predecessors as Secretary of Juvenile Services (Kenneth C. Montague, Jr. and Donald W. DeVore), and other unnamed supervisors ("Supervisor John Doe Defendants"). Defendants Steeple, Gaskins, Abed, Montague and DeVore (collectively, the "Named Defendants") have filed motions to dismiss the amended complaint. For the reasons that follow, the Court will grant the motions and will dismiss the complaint without prejudice.

## I. FACTUAL AND PROCEDURAL HISTORY[1]

Plaintiffs A.W. and T.H. were confined at Waxter between 2019 and 2020, and Plaintiff T.B. was housed at Hickey in 2019. ECF No. 21 ¶¶ 151–52, 168–69, 185–86. All three Plaintiffs allege that they were minors at the relevant times, and that they were sexually abused by Officer John Doe Defendants. *Id.* ¶¶ 151, 153–555, 168, 170–72, 185, 187–90. Plaintiffs did not report the alleged abuse at that time. *Id.* ¶¶ 157, 174, 192.

As noted above, Defendants Montague, DeVore and Abed held the position of Secretary of Juvenile Services for the State of Maryland. Their dates in that office were as follows:

Montague – January 15, 2003 to January 17, 2007 (*id.* ¶ 11);

DeVore – February 22, 2007 to January 7, 2011 (*id.* ¶ 13);

Abed – February 4, 2011 to January 18, 2023 (*id.* ¶ 15).

Defendant Steeple was the Superintendent at Waxter during A.W.'s and T.H.'s confinement. *Id.* ¶ 17. Defendant Gaskins was the Superintendent at Hickey during T.B.'s confinement. *Id.* ¶ 24. Therefore, only Abed, Steeple, and Gaskins were employed in their relevant positions at the time of the alleged sexual abuse of Plaintiffs.

Plaintiffs allege that various incidents of sexual and other abuse occurred between 1986 and 2009 (*i.e.*, up until ten years before Plaintiffs' confinement at Waxter/Hickey), and then between 2021 and 2022 (*i.e.*, after their confinements ended) at various Maryland Department of Juvenile Services facilities, that are not directly related to Plaintiffs' own allegations of abuse. *Id.* ¶ 78. For example, and regarding

[1] At the pleadings stage, the Court must "accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016).

allegations specific to Waxter and Hickey, Plaintiffs allege that between 2006 and 2009 the media reported abuse, neglect, and high suicide attempt rates at various facilities including Waxter. *Id.* ¶¶ 84–86. Plaintiffs allege that in 2016, Defendant Abed voted against policies to curb the overuse of strip searches of minors. *Id.* ¶ 78(w). Regarding Hickey specifically, Plaintiffs allege that in 1990 girls reported being strip searched by male guards, that in the "early 2000s" male inmates reported that officers at the school would beat them and sexually assault them at night, that reports in 2003 and 2004 documented cases of physical and sexual abuse and neglect and "major constitutional deficiencies" at Hickey, and in 2005 the State of Maryland settled a case with the Department of Justice regarding conditions at Hickey and another facility. *Id.* ¶¶ 96–98, 100–02.

Plaintiffs further allege that in 2005 then-Governor Robert Erlich announced his intention to close Hickey, but that "Defendant Montague clarified that only a portion of the school, a 130-bed long-term residential program for post disposition youths[,] would be closed by November 30, 2005," and that additional reports in 2007 recommended closing the facility. *Id.* ¶¶ 105–06, 120. Plaintiffs allege that in 2008 media reported that the Superintendent of Hickey, Wallis Norman, who had been hired by Defendant DeVore, had previously resigned from a superintendent role at another juvenile detention facility after allegedly "trying to hide allegations of assault made by an incarcerated youth in his care." *Id.* ¶¶ 108, 131. DeVore did not remove Norman from his position in light of those allegations. *Id.* Plaintiffs allege that in 2009, a counselor at a privately run program for youth sex offenders that operated at Hickey was charged with

sexual abuse of a minor who had escaped from Hickey, conduct that allegedly occurred in the counselor's home. *Id.* ¶ 109.

Other than their own allegations—which they do not allege the Named Defendants knew about—Plaintiffs do not allege any specific reports of sexual abuse between 2009 and 2021. Instead, Plaintiffs allege generally that "[t]he sexual abuse endured by Plaintiffs at the hands of Defendants was part of a culture of abuse at Maryland's juvenile detention facilities that has been well-documented and known to Defendants for decades" and that "Defendants fostered, permitted, and perpetuated this culture of sexual abuse and allowed it to thrive, failing to protect the children in their custody." *Id.* ¶ 4. Plaintiffs allege that the Named Defendants knew of the "rampant sexual abuse taking place in Maryland juvenile detention facilities," "create[ed] policies that caused and perpetuated a culture of sexual abuse," and concealed the abuse. *Id.* ¶¶ 117–18, 129–30, 140–41; *see also id.* ¶ 18–22, 25–29, 113.

Plaintiffs filed this action on June 25, 2025, and the amended complaint on November 14, 2025. ECF Nos. 1 & 21. The amended complaint contains two counts under 42 U.S.C. § 1983. Count I alleges a claim for violations of Plaintiffs' right to bodily integrity under the Fourteenth Amendment. In that count, Plaintiffs allege that the Named Defendants and Supervisor John Doe Defendants have supervisor liability for the Officer John Doe Defendants' abuse of Plaintiffs. Count II is a claim for violations of the right to be free from state-created dangers. In that count, Plaintiffs allege that the

Named Defendants created the danger of sexual abuse by the Officer John Doe Defendants.

The Named Defendants filed motions to dismiss. ECF Nos. 32 & 35. Plaintiffs responded, and Defendants replied. ECF Nos. 38 & 39. On July 20, 2026, the Court held oral argument on the motions.

## II. STANDARD OF REVIEW

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When a defendant asserts that, even assuming the truth of the alleged facts, the complaint fails "to state a claim upon which relief can be granted," the defendant may move to dismiss the complaint. Fed. R. Civ. P. 12(b)(6). To withstand a motion to dismiss, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level" and state a facially plausible claim for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). As stated, when considering such a motion, the Court must "accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *King*, 825 F.3d at 212. "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. The Court is "not bound

to accept as true a legal conclusion couched as a factual allegation." *Id.* (quoting *Twombly*, 550 U.S. at 555).

## III. DISCUSSION

Under § 1983, a plaintiff may file suit against any person who, acting under the color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. Plaintiffs allege that the Named Defendants are liable (1) as supervisors for the Officer John Doe Defendants' constitutional violations of Plaintiffs' bodily integrity, and (2) for having created a danger of sexual abuse by the Officer John Doe Defendants. While Plaintiffs' allegations of abuse at the hands of the Officer John Doe Defendants are horrific, the Court concludes that Plaintiffs have not adequately alleged either claim against the Named Defendants, who Plaintiffs do not allege were personally involved in the abuse or had direct knowledge of the abuse.

### A. Supervisory Liability

There is no *respondeat superior* liability under § 1983; instead, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. "[A] a supervisor's mere knowledge of his subordinate's [improper] purpose" does not amount to a constitutional violation. *Id.* at 677. But a supervisor can be held liable in an individual capacity in connection with a subordinate's actions when (1) "the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff," (2) "the supervisor's response to that knowledge was so inadequate as to show deliberate

indifference to or tacit authorization of the alleged offensive practices," and (3) "there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Timpson by & through Timpson v. Anderson Cnty. Disabilities & Special Needs Bd.*, 31 F.4th 238, 257 (4th Cir. 2022) (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).

After stripping away Plaintiffs' allegations that are legal conclusions or statements of the elements of the claims, Plaintiffs have not adequately pled these requirements.

**1. Knowledge & Deliberate Indifference**

To establish sufficient knowledge of, and deliberate indifference to, a pervasive and unreasonable risk of constitutional injury, Plaintiffs must allege "continued inaction [by the Named Defendants] in the face of documented widespread abuses." *Timpson*, 31 F.4th at 257–58 (quoting *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984)). "The plaintiff assumes a heavy burden of proof" in establishing deliberate indifference. *Id.* at 258; *see Mikkelsen v. DeWitt*, 141 F. App'x 88, 91 (4th Cir. 2005) ("Deliberate indifference is a very high standard—a showing of mere negligence will not meet it.") (quoting *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999)).

In *Shaw*, for example, the court found the requisite knowledge where the supervisor knew of at least three incidents where the subordinate at issue used unreasonable excessive force. 13 F.3d at 800. And the court found deliberate indifference where three witness "notified [the supervisor] of assaults by [the subordinate]," and the supervisor "responded callously and with apparent amusement." *Id.*

Likewise, in *Slakan*, the court concluded that three supervisors were liable for prison guards' cruel and unusual punishment of the plaintiff, which included the "heavy-handed use of water hoses, billy clubs, and tear gas." 737 F.2d at 372. There, the warden defendant "knew of and condoned the use of high-pressure water hoses against inmates housed in one-man cells on at least seven occasions in the twelve months preceding the attack upon" Slakan. *Id.* at 373. "[O]n one occasion he had personally approved of the use of a high-pressure hose against an inmate who was handcuffed and confined in a cell by himself," and there was testimony from a guard that the practice of "hosings" "was widespread among the guards and seldom questioned by supervisors." *Id.* at 374. And "while there were alternative intervention techniques training . . . given to guards dealing with mental patients," there was no such training given "to those handling regular inmates," and the warden had specifically "opposed a gubernatorial commission recommendation . . . that would have strictly regulated the use of water hoses against inmates locked in one-man cells." *Id.*

The prison director defendant "admitted specific knowledge about the seven incidents [of the use of hoses and tear gas] that immediately preceded the Slakan attack and indicated that he approved of the use of force in each case," and "opposed implementing the 1975 commission recommendation concerning the need for tighter controls on the use of high-pressure hoses against cell-confined inmates." *Id.*

And the secretary of corrections defendant "indisputably knew that water hosing was used as a routine control measure in North Carolina prisons" because he "became Secretary shortly after a highly-publicized incident in which an inmate was hosed for 25 to 30 minutes while helplessly locked in his cell" and "must have been aware of the commission report recommending tighter controls on the use of water hoses in North

Carolina prisons." *Id.* at 375. The court held that "the prevalence of the practice was itself a circumstantial indication that administrators at all levels knew and approved of water hosings." *Id.* at 375. "The defendants admitted that seven cell-confined inmates were water hosed at Central Prison in the months immediately preceding the Slakan attack," and the warden and director "testified that they had personal knowledge of these incidents and approved of the procedures." *Id.* In addition, "[a] non-defendant guard testified that he was involved in at least six incidents of hosings in the years he spent at Central Prison without ever receiving a reprimand," and there was "evidence of an incident in which an inmate was handcuffed and hosed for 25 to 30 minutes without any action being taken against the guards." *Id.* And the warden testified that the secretary of corrections "knew of the water hosing practices." *Id.*

Plaintiffs do not allege that the Named Defendants here received complaints or warnings about the Officer John Doe Defendants who abused Plaintiffs or that the Named Defendants' response to Plaintiffs' abuse (or any abuse) was so inadequate as to show deliberate indifference or tacit authorization. Instead, Plaintiffs allege that they did not report the abuse. While Plaintiffs allege that they "did not know of any safe way to report the abuse," ECF No. 21 ¶¶ 157, 174, 192, 207, they have not alleged that there was no safe way to report abuse or that any specific policies and customs put into place by the Named Defendants led to Plaintiffs' reluctance or inability to report. Instead, Plaintiffs allege that they did not report their abuse due to threats from their abusers. *Id.* ¶ 206 ("Plaintiffs were threatened by their abusers, preventing them from reporting the instances of sexual abuse or lodging any sort of grievance against them"). Bare assertions that the Named Defendants "knew of, condoned, and willfully and

maliciously agreed to" allow Plaintiffs' abuse are insufficient to state a § 1983 supervisory liability claim. *Iqbal*, 556 U.S. at 680 (citation omitted).

As for the Named Defendants present during 2019 and 2020, Plaintiffs also do not allege that those Defendants had actual or constructive notice of on-going sexual abuse in general, as Plaintiffs do not allege any instances of widespread abuse during that time period—or for approximately a decade prior for that matter—at any facility, let alone specifically at Waxter and Hickey.

Plaintiffs do allege that there was a pattern of self-harm by detainees at Walter and Hickey. But they do not allege that there were any specific incidents of sexual abuse at either facility any time after the early 2000s, let alone incidents that would have put the Named Defendants on notice that sexual abuse by the John Doe Defendants was occurring at those facilities. *See* ECF No. 21 ¶ 86 (alleging a report in 2009 provided that juveniles at Waxter had mental health issues and a high rate of suicide attempts), *id.* ¶¶ 88 & 110 (alleging a pattern of self-harm, suicidal ideation, and suicide attempts between 2010 and 2020 at Maryland juvenile detention facilities including Waxter and Hickey); *id.* ¶ 107 (alleging a 2007 report informed about an escape from Hickey); *id.* ¶ 97 (alleging that in the "early 2000s" male inmates reported that officers at Hickey beat and sexually assaulted them at night); *id.* ¶ 98 (alleging that a report in 2003 documented cases of physical and sexual abuse at Hickey).

Similarly, although Plaintiffs also allege that there were instances of sexual abuse at some *other* juvenile detention facilities in the relatively distant past, given the strict and narrow standard for knowledge for supervisory liability claims under § 1983, those allegations likewise do little work making plausible the inference that the supervisors knew that the John Doe Defendants were sexually abusing children at Waxter and

Hickey in 2019 and 2020. *See, e.g., id.* ¶ 78(a) (alleging abuse at the Montrose School in 1986), *id.* ¶ 78(b)–(f) & (k) (alleging abuse at the Cheltenham Youth Facility between 1991 and 1999 and 2002), *id.* ¶ 78(g) (alleging abuse at "Maple Run" in 1999), *id.* ¶ 78(h) (alleging abuse at the Victor Cullen Center in 2000), *id.* ¶ 78(i) (alleging abuse at "Backbone" in 2000), *id.* ¶ 78(o) (alleging abuse at "Noyes"); *id.* ¶ 109 (alleging that in 2009 a counselor working for a privately-run program operating in Hickey had sex with a minor in her own home following the minor's escape).

Plaintiffs' allegations in this case are a far cry from the evidence present in *Shaw* and *Slakan* where the supervisors had direct knowledge of the unconstitutional actions and condoned them, or the additional evidence in *Slakan* of constructive knowledge based on similar widely-known actions by the guards that occurred many times over a short period of time before the actions at issue in the case, without any reprimands being issued to the offenders. At the hearing, Plaintiffs contended that *Slakan* was the case most analogous to their case, but Plaintiffs have not come close to alleging the kind of direct and constructive knowledge in *Slakan*.

In the end, the allegations Plaintiffs cite to support their contention that the Named Plaintiffs had actual or constructive knowledge of widespread sexual abuse by the John Doe Officer Defendants are either at least ten years removed from Plaintiffs' alleged abuse (and most are far older than that) or occurred after Plaintiffs' abuse. Of those, many concern sexual abuse at other facilities or incidents not involving sexual abuse at Waxter and Hickey. None of Plaintiffs' allegations involve sexual abuse at Waxter or Hickey around the time of Plaintiffs' alleged abuse. The Court concludes that Plaintiffs have not met their "heavy burden of proof," as there are no allegations from

which this Court could infer that the Named Defendants had even constructive notice of Plaintiffs' abuse and were deliberately indifferent to it. *Timpson*, 31 F.4th at 258.

**2. Causation**

To establish sufficient causation for supervisory liability, Plaintiffs must also prove "'an affirmative causal link'—a concept quasi-analogous to proximate cause—between the supervisor's inaction and the harm suffered." *Id.* In other words, Plaintiffs must allege that the sexual abuse "was a natural and foreseeable consequence of [the Named Defendants'] failure to investigate" allegations of abuse. *Shaw*, 13 F.3d at 800. For example, in *Shaw*, the court concluded the causation standard was met where the supervisor knew of the subordinate's "frequent use of excessive force" and thus knew that a natural consequence of failing to act would be the "constant and dangerous threat to the welfare of arrestees." *Id.* Likewise, in *Slakan*, the court found adequate causation where the three supervisors "all had varying degrees of knowledge about the excessive and unregulated use of water hoses against unarmed, securely confined inmates," "were keenly aware of their special statutory and constitutional responsibilities to protect inmates against inhumane treatment," knew "that water blasts from a high-pressure hose would probably inflict injuries of unpredictable severity on inmates," and "were cognizant of the volatile nature of the prison environment and the need to provide clear guidance to frontline personnel on the permissible uses of force against defenseless inmates." *Slakan*, 737 F.2d at 376.

Here, Plaintiffs' allegations fall short of adequately alleging a sufficient causal link between any of the Named Defendants' actions or inaction and Plaintiffs' abuse. Without actual or constructive knowledge, there can be no causal link to the abuse. In addition, as to the Named Defendants who were not present during 2019 and 2020 (and

who had not been present since 2011), their alleged actions are too attenuated to create a causal link to Plaintiffs' specific abuse in 2019 and 2020. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (affirming dismissal of a § 1983 supervisory liability claim because the plaintiff did not allege the supervisor had "personal involvement" in or a "personal connection" to the alleged denial of constitutional rights).

In short, Plaintiffs do not allege what specific conduct the Named Defendant engaged in that supports supervisory liability and instead generally allege that the Named Defendants' actions met the elements of their causes of action, which is insufficient to state a claim for relief. *See Rice v. Adams*, 172 F.4th 428, 432 (4th Cir. 2026) ("In the § 1983 context, [the pleading] standard demands that a plaintiff 'plead that *each* Government-official defendant, through the official's *own individual actions*, has violated the Constitution.'") (quoting *Iqbal*, 556 U.S. at 676); *see also, e.g.*, *Francis v. Maryland*, Case No. 21-cv-1365-ELH, 2023 WL 2456553, at *19–*20 (D. Md. Mar. 10, 2023) (dismissing § 1983 supervisory liability claims that were "replete with conclusory assertions that" simply stated the claim elements and failed to explain the roles played by the defendants).

As a result, the Court will grant the Named Defendants' motion on Count I and will dismiss them from that count.

### B. State-Created Danger

Plaintiffs also allege that the Named Defendants deprived them of their right to be free from a state-created danger of abuse because they protected the abusers and hid reports of sexual abuse.

"[T]o establish § 1983 liability based on a state-created danger theory, a plaintiff must show that the state actor created or increased the risk of private danger, and did so

directly through affirmative acts, not merely through inaction or omission." *Doe v. Rosa*, 795 F.3d 429, 439 (4th Cir. 2015). "'Affirmative acts,' in the state-created danger context, are quite limited in scope" and the concept "should not extend 'beyond the context of immediate interactions between the [state actor] and the plaintiff.'" *Id.* at 441 (quoting *Pinder v. Johnson*, 54 F.3d 1169, 1176 (4th Cir. 1995)). Under the state-created danger theory, "a plaintiff alleges that some conduct by an officer *directly* caused harm to the plaintiff" and while "inaction can often be artfully recharacterized as 'action,' courts should resist the temptation to inject this alternate framework into omission cases by stretching the concept of 'affirmative acts' beyond the context of immediate interactions between the officer and the plaintiff." *Pinder*, 54 F.3d at 1176 n*. The state-created danger theory is a "'narrow' exception to the general rule that state actors are not liable [under the Due Process Clause] for harm caused by third parties," *Callahan v. N. Carolina Dep't of Pub. Safety*, 18 F.4th 142, 146 (4th Cir. 2021) (quoting *Graves v. Lioi*, 930 F.3d 307, 319 (4th Cir. 2019)), "and the bar for what constitutes an 'affirmative act' is high." *Turner v. Thomas*, 930 F.3d 640, 645 (4th Cir. 2019).

Plaintiffs allege the following affirmative acts taken by Abed, Montague, and DeVore created a danger that the Officer John Doe Defendants would abuse Plaintiffs. They allege that Abed voted against a 2016 task force recommendation to curb the overuse of strip searches at Department of Juvenile Services facilities. ECF No. 21 ¶ 78(v)–(w). They allege that in 2005, Montague kept Hickey partially open after the Mayor announced his intention to close the facility due to "intolerable" conditions. *Id.* ¶ 105. They allege that sometime before 2008, "Devore hired Wallis Norman as the superintended of CHS, despite knowing that Norman had previously resigned under threat of dismissal from a superintendent role for ordering a guard to falsify a report

that a guard physically abused an incarcerated youth in his care." *Id.* ¶ 131. Plaintiffs do not allege any affirmative actions taken by Steeple and Gaskins to create the danger of abuse.

As explained in *Callahan*, allegations that defendants "failed to investigate—and even covered up—complaints about . . . sexual misconduct" are insufficient to meet the high bar for the state-created danger theory. 18 F.4th at 147. Here, Plaintiffs have not alleged any "immediate interactions" between the Named Defendants and themselves that caused the danger of abuse. Thus, the claims against the Named Defendants fail because "the downstream, but-for connection[s] alleged here simply stretch[] the 'affirmative acts' concept too far." *Rosa*, 795 F.3d at 442.

Plaintiffs also have not alleged the creation of any danger of injury *by a third party* who was not a state actor themselves. *See Turner,* 930 F.3d at 645 (noting that the state-created danger doctrine applies when state actors increase the risk of *private* danger); *Rosa*, 795 F.3d at 439 (holding that a plaintiff "must show that the state actor created or increased the risk of *private* danger") (emphasis added). Instead, Plaintiffs contend that the Named Defendants created a danger that other state actors—the Officer John Doe Defendants—would abuse Plaintiffs. In that posture, this theory mimics one for supervisory liability.

For these reasons, Plaintiffs' state-create danger theory also fails. As a result, Count II against the Named Defendants will be dismissed.

**C. John Doe Defendants**

With the Named Defendants' dismissal, all that remains are unnamed John Doe defendants. The Named Defendants suggest dismissal of the John Doe Defendants, asserting that a complaint cannot continue against only unnamed and unserved

defendants. *Whitehead v. Viacom*, 233 F. Supp. 2d 715, 725 n.13 (D. Md. 2002); *Roberts v. City of Hagerstown*, Case No. 22-c-2682-LKG, 2024 WL 640029, at *7 (D. Md. Feb. 14, 2024). That is accurate, but often the dismissal of unnamed defendants is not appropriate unless “it does not appear that the true identity of an unnamed party can be discovered through discovery or through intervention by the court.” *Schiff v. Kennedy*, 691 F.2d 196, 198 (4th Cir. 1982). It is within the district court’s discretion to determine “whether the case against Doe should be now permitted to proceed or whether the case at this stage should be terminated.” *Attkisson v. Holder*, 925 F.3d 606, 628 (4th Cir. 2019) (quoting *Schiff*, 691 F.2d at 198).

Here, Plaintiffs have not alleged any identifying characteristics of the John Doe Defendants or any details regarding the dates (other than approximate years) or locations where the abuse occurred. *See* ECF No. 21 ¶¶ 31–68, 150–201. Therefore, the Court will exercise its discretion and dismiss the claims against the John Doe Defendants without prejudice.

## IV. CONCLUSION

Plaintiffs have not adequately pled claims for § 1983 supervisory liability or direct liability for state-created danger against the Named Defendants, or a basis to maintain a claim based on the present allegations against the unnamed John Doe Defendants. Therefore, the motions to dismiss will be granted and the amended complaint will be dismissed without prejudice.

A separate order follows.

Date: August 12, 2026

/s/
Adam B. Abelson
United States District Judge